# In the United States Court of Appeals
## for the Fifth Circuit

---

TEXAS A&M QUEER EMPOWERMENT COUNCIL,

*Plaintiff-Appellee,*

*v.*

WILLIAM MAHOMES, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; ROBERT L. ALBRITTON, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; DAVID C. BAGGETT, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; JAMES R. BROOKS, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; JOHN W. BELLINGER, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; JAY GRAHAM, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; MICHAEL A. HERNANDEZ, III, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; MICHAEL J. PLANK, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; SAM TORN, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; CAGE SAWYERS, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; JOHN SHARP, IN HIS OFFICIAL CAPACITY AS CHANCELLOR OF THE TEXAS A&M UNIVERSITY SYSTEM; MARK A. WELSH, III, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF TEXAS A&M UNIVERSITY,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Southern District of Texas, Houston Division

## JOINT PETITION FOR INITIAL HEARING EN BANC

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

William R. Peterson
Solicitor General

William F. Cole
Principal Deputy Solicitor General
William.Cole@oag.texas.gov

Christopher J. Pavlinec
Assistant Attorney General

*Counsel for Defendants-Appellants*

JT Morris
Foundation for Individual Rights and
Expression
700 Pennsylvania Avenue, SE, Suite
700
Washington, DC 20003
jt.morris@fire.org

Adam Steinbaugh
Foundation for Individual Rights and
Expression
510 Walnut Avenue, Suite 900
Philadelphia, PA 19106
adam@fire.org

*Counsel for Plaintiff-Appellee*

TEXAS A&M QUEER EMPOWERMENT COUNCIL,

*Plaintiff–Appellee,*

v.

WILLIAM MAHOMES, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; ROBERT L. ALBRITTON, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; DAVID C. BAGGETT, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; JAMES R. BROOKS, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; JOHN W. BELLINGER, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; JAY GRAHAM, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; MICHAEL A. HERNANDEZ, III, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; MICHAEL J. PLANK, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; SAM TORN, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; CAGE SAWYERS, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; JOHN SHARP, IN HIS OFFICIAL CAPACITY AS CHANCELLOR OF THE TEXAS A&M UNIVERSITY SYSTEM; MARK A. WELSH, III, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF TEXAS A&M UNIVERSITY,

*Defendants-Appellants.*

———

On Appeal from the United States District Court
for the Southern District of Texas, Houston Division

———

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Plaintiff-Appellee**

- Texas A&M Queer Empowerment Council

**Counsel for Plaintiff-Appellee**

JT Morris (lead counsel)

Adam B Steinbaugh

Jeffrey Daniel Zeman

*Foundation for Individual Rights and Expression*

**Defendants-Appellants (in their official capacities)**

- William Mahomes (member of the Board of Regents of the Texas A&M University System)

- Robert L Albritton (member of the Board of Regents of the Texas A&M University System)

- David C Baggett (member of the Board of Regents of the Texas A&M University System)

- James R Brooks (member of the Board of Regents of the Texas A&M University System)

- John W Bellinger (member of the Board of Regents of the Texas A&M University System)

- Jay Graham (member of the Board of Regents of the Texas A&M University System)

- Michael A Hernandez, III (member of the Board of Regents of the Texas A&M University System)

ii

- Michael J Plank (member of the Board of Regents of the Texas A&M University System)

- Sam Torn (member of the Board of Regents of the Texas A&M University System)

- Cage Sawyers (member of the Board of Regents of the Texas A&M University System)

- John Sharp (Chancellor of the Texas A&M University System)

- Mark A Welsh, III (President of Texas A&M University)

**Counsel for Defendants-Appellees**

Ken Paxton

Brent Webster

William R. Peterson

William C. Cole (lead counsel)

Christopher J. Pavlinec

Ryan Glen Kercher

Zachary William Berg

Jacob C. Beach (no longer employed at the Office of the Attorney General; currently employed by Quinn Emanuel Urquhart & Sullivan, LLP)

Mark A. Csoros (no longer employed at the Office of the Attorney General; currently employed as a law clerk for the Honorable Scott Brister of the Texas Court of Appeals for the Fifteenth Judicial District)

*Office of the Attorney General*

/s/ William F. Cole
WILLIAM F. COLE
*Counsel for Defendants-Appellees*

iii

# Table of Contents

Page

Certificate of Interested Persons ............................................................... i

Table of Contents ................................................................................... iv

Table of Authorities ................................................................................. v

Introduction and Rule 40(b)(2) Statement ............................................... 1

Background ............................................................................................... 3

    I.    The Spectrum Litigation .............................................................. 3

    II.   The Texas A&M Queer Empowerment Council Litigation ....................... 5

Reasons for Granting Initial Hearing En Banc .......................................... 7

    I.    Courts in this Circuit Are Divided Over the Proper Application of *CLS v. Martinez.* ............................................................................. 7

    II.   The District Courts Are Divided Over How to Determine Whether Conduct Is Inherently Expressive. ............................................. 10

    III.  These Issues Are Important and Recurring, Requiring the En Banc Court's Intervention. .......................................................... 13

Conclusion ............................................................................................. 14

Certificate of Compliance ...................................................................... 15

Page(s)

**Cases:**

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026) ........................................................................... 9

*Christian Legal Society v. Martinez*,
561 U.S. 661 (2010) ................................................................. 1, 4, 7, 9

*Fairchild v. Liberty Indep. Sch. Dist.*,
597 F.3d 747 (5th Cir. 2010) ............................................................. 7

*HM Fla.-ORL, LLC v. Governor of Fla.*,
137 F.4th 1207 (11th Cir. 2025) ....................................................... 13

*HM Fla.-ORL, LLC v. Sec'y of Fla. Dep't of Bus. & Pro. Regul.*,
160 F.4th 1282 (11th Cir. 2025) ...................................................... 13

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995) ............................................................................ 11

*Imperial Sovereign Ct. of Mont. v. Knudsen*,
170 F.4th 820 (9th Cir. 2026) .......................................................... 13

*Saxe v. State Coll. Area Sch. Dist.*,
240 F.3d 200 (3d Cir. 2001) ............................................................... 7

*Spectrum WT v. Wendler*,
157 F.4th 673 (5th Cir. 2025) ......................................................... 1, 4

*Spectrum WT v. Wendler*,
151 F.4th 714 (5th Cir. 2025) ................................... 1, 3, 4, 8, 9, 10

*Spectrum WT v. Wendler*,
No. 23-10994, 2026 WL 184215 (5th Cir. Jan. 20, 2026) ................. 1, 5

*Spectrum WT v. Wendler*,
693 F. Supp. 3d 689 (N.D. Tex. 2023) ............................................. 3

*Spectrum WT v. Wendler*,
816 F. Supp. 3d 648 (N.D. Tex. 2026) ................... 2, 4, 5, 8, 9, 10, 12

*Speech First, Inc. v. Cartwright*,
32 F.4th 1110 (11th Cir. 2022) .......................................................... 7

*Spence v. Washington*,
418 U.S. 405 (1974) ............................................................................ 11

*Texas v. Johnson*,
491 U.S. 397 (1989) ............................................................... 10, 11

*Woodlands Pride, Inc v. Paxton*,
168 F.4th 293 (5th Cir. 2026) .................................................. 6, 11

*Woodlands Pride, Inc. v. Paxton*,
694 F. Supp. 3d 820 (S.D. Tex. 2023) ...........................................11

**Rules:**

Fed. R. App. P.
40(b)(2)(A) ...................................................................7, 10, 11
40(b)(2)(D) ................................................................... 7, 11
40(g) ...................................................................... 2, 7, 11

**Other Authorities:**

Jessica Priest, *University of Texas System bans drag shows in campus facilities*, Texas Tribune (Mar. 18, 2025),
https://tinyurl.com/3r9n6e8t...............................................13

Matthew Winter, *GLAD drag show blocked from performing on campus after drag pause was lifted*, North Texas Daily (Mar. 19, 2026),
https://tinyurl.com/y8k4hjt8 ..............................................13

Pls.' Ex. 1, *Spectrum WT v. Wendler*,
No. 2:23-CV-00048 (N.D. Tex. Feb. 26, 2024), Dkt. No. 179-1........................... 3

Pls.' Ex. 2, *Spectrum WT v. Wendler*,
No. 2:23-CV-00048 (N.D. Tex. Feb. 26, 2024), Dkt. No. 179-2 ........................ 3

## Introduction and Rule 40(b)(2) Statement

The parties respectfully jointly petition this Court for initial hearing en banc. This appeal presents questions of exceptional importance that have divided judges of this Circuit and that will impact students, faculty, and administrators at over 100 public colleges and universities across the Circuit. This Court recognized as much just last year when it *sua sponte* ordered rehearing en banc in a related case involving these same issues. *Spectrum WT v. Wendler*, 151 F.4th 714 (5th Cir. 2025), *reh'g en banc granted, op. vacated*, 157 F.4th 673 (5th Cir. 2025) ("*Spectrum I*"). The district court's intervening final judgment mooted the en banc Court's consideration of those vital legal issues just days before oral argument. *Spectrum WT v. Wendler*, No. 23-10994, 2026 WL 184215, at *1 (5th Cir. Jan. 20, 2026).

This appeal centers on the same two legal issues, and those issues continue to warrant the attention of the full Court. *First*, this appeal presents a dispute over the applicability of *Christian Legal Society v. Martinez*, 561 U.S. 661 (2010) (*CLS*), and whether it permits university officials to limit student activities and expression—specifically, drag-show performances—in certain university spaces based on asserted concerns over "respect," "demean[ing] women," "hostile environment for women" and "anti-discrimination." ROA.372. *Second*, this appeal raises a crucial antecedent question about whether drag-show performances constitute inherently expressive conduct protected by the First Amendment.

The first issue divided the members of this Court in *Spectrum I*, and both issues have divided district courts in this Circuit in cases currently on appeal. In this case,

for example, the district court held that drag shows are inherently expressive conduct; that the university space at issue was a designated public forum; that, even if the university forum at issue was a limited public forum, the exclusion of the student drag show was viewpoint discriminatory and did not pass constitutional scrutiny under *CLS*; and that, in any case, strict scrutiny applied, which the government did not satisfy. ROA.373–391.

By contrast, in *Spectrum WT v. Wendler*, 816 F. Supp. 3d 648 (N.D. Tex. 2026) ("*Spectrum*"), the district court held the opposite on each of those same legal issues. After trial, it held that the student drag-show performance at issue was not inherently expressive conduct protected by the First Amendment; that the university space at issue was a limited public forum; and that the university's exclusion of the drag show from that forum was both reasonable and viewpoint neutral—and therefore constitutional under *CLS*. *Id.* at 665–682.

Because these issues are important, recurring, and presented in two cases currently on appeal in this Court, the parties submit that initial, consolidated en banc review of both cases will (1) conserve judicial resources, (2) secure uniformity of its precedent, and (3) guarantee that university officials, students, and other courts receive the benefit of this Court's plenary consideration of these important issues. *See* Fed. R. App. P. 40(g). Accordingly, the parties are simultaneously filing a joint petition for initial hearing en banc in *Spectrum*.

## I.   The Spectrum Litigation

The *Spectrum* litigation concerns Spectrum WT's First Amendment challenge to President Walter Wendler's prohibition on student-organized drag shows at West Texas A&M University. In 2023, Wendler sent a campus-wide email cancelling Spectrum's planned drag performance at Legacy Hall, a University event space. President Wendler explained that "West Texas A&M will not host a drag show," and explained his view that drag performances "disrespect" and "demean" women and constitute impermissible "harassment" and "discriminat[ion] against womanhood." Pls.' Ex. 1, *Spectrum WT v. Wendler*, No. 2:23-CV-00048 (N.D. Tex. Feb. 26, 2024), Dkt. No. 179-1 at 1–3. After Spectrum applied to hold another performance in 2024, Wendler again sent a campus-wide email cancelling the show. Pls.' Ex. 2, *Spectrum*, No. 2:23-CV-00048 (N.D. Tex. Feb. 26, 2024), Dkt. No. 179-2 at 1.

The district court denied the plaintiffs' motion for a preliminary injunction, concluding that the First Amendment does not protect drag shows, that Legacy Hall is a limited public forum, and that the policy was not viewpoint discriminatory. *Spectrum WT v. Wendler*, 693 F. Supp. 3d 689, 700–712 (N.D. Tex. 2023), *aff'd in part, rev'd in part and remanded*, 151 F.4th 714 (5th Cir. 2025).

Plaintiffs appealed, and in August 2025, a divided panel reversed. *Spectrum I*, 151 F.4th at 733. The panel majority held that Spectrum was likely to succeed in showing the First Amendment protects its planned drag performance because Legacy Hall was a designated public forum and President Wendler failed to satisfy

strict scrutiny to justify a content-based restriction on protected expression. *Id.* at 721–29. Judge Ho dissented, reasoning that Legacy Hall is a limited public forum, *id.* at 738–39 (Ho, J., dissenting), and explaining that *CLS* binds this Court to "respect university officials when it comes to regulating student activities to ensure an inclusive educational environment for all," *id.* at 733 (citing *CLS*, 561 U.S. 661).

Thereafter, this Court held the mandate and *sua sponte* ordered rehearing en banc, vacating the panel opinion. *Spectrum WT v. Wendler*, 157 F.4th at 674. After the parties completed briefing, this Court set argument for January 23, 2026. *Spectrum WT v. Wendler*, No. 23-10994 (5th Cir. Oct. 31, 2025), Dkt. No. 217.

Soon after the panel issued its opinion, the trial court held a status conference and set an expedited discovery and trial schedule. Civil Scheduling Order, *Spectrum*, No. 2:23-CV-00048 (N.D. Tex. Oct. 8, 2025), Dkt. No. 120 at 1–17; Second Amended Scheduling Order, No. 2:23-CV-00048 (N.D. Tex. Nov. 10, 2025), Dkt. No. 126 at 1–17. On January 14, 2026, a day after denying Spectrum's motion for summary judgment, Memorandum Opinion & Order, No. 2:23-CV-00048 (N.D. Tex. Jan. 13, 2026), Dkt. No. 165 at 1–9, the district court held a one-day bench trial on Spectrum's request for a permanent injunction and declaratory relief. Three days later, the district court entered final judgment and issued findings of fact and conclusions of law denying Spectrum's requested relief. *Spectrum*, 816 F. Supp. 3d 655–83.

The district court concluded that the First Amendment does not protect Spectrum's drag performances, that Legacy Hall is a limited public forum, that the University's policy is not viewpoint discriminatory or a prior restraint, and that *CLS*

4

permits President Wendler to prohibit Spectrum's performances at Legacy Hall based on his concerns about harassment of women and sex discrimination. *Id.*

Because the district court entered final judgment, Spectrum moved to dismiss its interlocutory appeal as moot. Motion to Dismiss Appeal, *Spectrum*, No. 23-10994 (5th Cir. Jan. 19, 2026), Dkt. No. 323 at 2–3. On January 20, 2026, this Court, sitting en banc, granted that motion. *Spectrum*, 2026 WL 184215, at *1 (5th Cir. Jan. 20, 2026).

The plaintiffs timely noticed their appeal on February 12, 2026, and it remains pending in this Court. Notice of Appeal, *Spectrum WT v. Wendler*, No. 26-10127 (5th Cir. Feb. 16, 2026), Dkt. No. 1.

## II. The Texas A&M Queer Empowerment Council Litigation

While the appeal of the denial of a preliminary injunction in *Spectrum I* was pending before the panel, the Texas A&M University System Board of Regents issued a policy prohibiting student-organized drag shows at any Texas A&M University campus. ROA.241–42. Echoing West Texas A&M President Wendler's reasoning in the *Spectrum* litigation, the System policy lists concerns that drag shows "demean[] women" and create "a hostile environment for women contrary to System anti-discrimination policy and Title IX[.]" ROA.371–72.

Thereafter, the Texas A&M Queer Empowerment Council (QEC)—a student organization at Texas A&M University that hosts a drag show on campus called "Draggieland"—filed a lawsuit in the Southern District of Texas challenging on First Amendment grounds Texas A&M's cancellation of its drag show under the System policy. ROA.368–72.

The district court issued a preliminary injunction against enforcement of the policy. ROA.397–98 (order). The court concluded that QEC was likely to succeed on the merits, holding that drag shows are inherently expressive conduct protected by the First Amendment, ROA.373–78, and that the System policy banning them likely violates the First Amendment as a viewpoint-based prior restraint that fails strict scrutiny, ROA.378–391. The court characterized the university forum at issue (a university theater) as a designated public forum rather than a limited public forum and therefore rejected the argument that the System's anti-discrimination policies and Title IX justified prohibiting campus drag performances. ROA.378–81.

The Texas A&M System defendants noticed the instant appeal. ROA.399–400. On May 27, 2025, this Court granted Appellants' motion to hold this appeal in abeyance pending this Court's decisions in *Spectrum* and *Woodlands Pride, Inc. v. Paxton*, No. 23-20480 (5th Cir.), another case concerning drag shows and the First Amendment. Dkt. No. 20. A panel of this Court issued an opinion in *Woodlands Pride* on November 6, 2025, and later issued a substitute opinion after denying panel rehearing on February 25, 2026. *Woodlands Pride v. Paxton*, 168 F.4th 293 (5th Cir. 2026). The mandate in *Woodlands Pride* issued on March 18, 2026. Mandate, *Woodlands Pride*, No. 23-20480 (5th Cir. Mar. 18, 2026), Dkt. No. 323.

On April 7, 2026, this Court lifted the stay and issued a briefing schedule in this appeal. Dkt. No. 44.

This appeal presents two questions of exceptional importance concerning application of the First Amendment at public universities that have divided members of this Court and district courts in this Circuit. The Court should grant the petition to remedy the confusion and "secure" the "uniformity" of its precedent on these questions of "exceptional importance." Fed. R. App. P. 40(b)(2)(A), (D), 40(g).

## I. Courts in this Circuit Are Divided Over the Proper Application of *CLS v. Martinez.*

In *CLS*, the Supreme Court held that a public-university's "access barrier" to a "limited public forum" must be "reasonable and viewpoint neutral" to survive constitutional scrutiny. 561 U.S. at 679. In at least three ways, application of this principle has divided members of this Court and courts in this Circuit—including the panel in *Spectrum I* and the district courts in *Spectrum* and *QEC*—in the context of university policies restricting campus drag-show performances due to asserted concerns about discrimination and harassment.[1]

To start, courts in this Circuit are confused about how to characterize the university forum at issue. *See Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 758 (5th Cir. 2010) ("The action—in this case and most others—exists at the line between designated and limited public forums."). For example, the majority in *Spectrum I* held that *CLS* was inapplicable because Legacy Hall is a designated public

---

[1] Two of this Court's sister circuits have addressed the constitutionality of campus anti-discrimination and harassment policies, though not through the framework of *CLS*. *See Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1125-27 (11th Cir. 2022); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001).

forum rather than a limited public forum. 151 F.4th at 728–29. That classification decision hinged on the fact that the University had permitted what the majority deemed were similar activities in the past and because the University's reservation policy did not limit expression to certain topics or speakers. *Id.* The district court in this case engaged in a similar forum analysis, holding that "Rudder Theatre is a designated public forum," ROA.381, because, despite the University's reservation system, the record did not reflect prohibitions for any past activities and past uses of the forum were similar to QEC's proposed drag show. ROA.378–81.

Conversely, the dissent in *Spectrum I* reasoned that Legacy Hall is a limited public forum based on the University's reservation system and its right to refuse access for violations of University policy. 151 F.4th at 738 (Ho, J., dissenting). The dissent reasoned that it was irrelevant that the University had not prohibited other student activities, because in the dissent's view the same was true in *CLS*. *Id.* at 739. Similarly, after trial the district court in *Spectrum* held that, based on the University's reservation system, its stated values, the nature of the proposed performance, and the past uses of the space, Legacy Hall is a limited public forum. *Spectrum*, 816 F. Supp. 3d at 673–78.

These diverging forum analyses led to application of different standards of constitutional scrutiny. Because it found that Legacy Hall is a designated public forum, the majority in *Spectrum I* concluded that *CLS*'s lower standard of review was inapplicable and applied strict scrutiny. 151 F.4th at 727–29. Likewise, after holding that Rudder Theater is a designated public forum, ROA. 378–81, the district court in this case subjected Texas A&M's policy to strict scrutiny, ROA.387–90. By

contrast, both the dissent in *Spectrum I* and the district court in *Spectrum* found Legacy Hall to be a limited public forum and applied *CLS*'s lower "reasonableness" standard. *See* 151 F.4th at 733–35 (Ho, J. dissenting); 816 F.Supp.3d at 677–83.

In these cases, the choice of the standard of review was pivotal: under strict scrutiny, the majority in *Spectrum I* and the district court in this case held that the policies were not likely to survive constitutional scrutiny; but under *CLS*'s lower "reasonableness" standard, the dissent in *Spectrum I* and the district court after trial in *Spectrum* concluded they would.

Beyond forum analysis and the standard of review, these courts have splintered on a third issue: whether the university policies prohibiting drag performances are viewpoint discriminatory. *See Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026) (describing the First Amendment's prohibition on viewpoint discrimination); *CLS*, 561 U.S. at 683–85 (requiring restrictions in limited public fora to still be viewpoint neutral).

In *Spectrum I*, the majority did not expressly consider the question of viewpoint discrimination, although it remarked that "[o]n the record so far, President Wendler's objections were not to the message but to the way it would be delivered." 151 F.4th at 728. The dissent reasoned that President Wendler's policy was viewpoint neutral. *Id.* at 738 (Ho., J. dissenting) (stating that "there's no evidence of discriminatory animus or selective enforcement," "Wendler's policy applies to everyone" and "Wendler supports Spectrum WT"). Echoing the dissent's conclusions, after trial the district court in *Spectrum* held that President Wendler had not engaged in viewpoint discrimination because he openly supported Spectrum's message and

9

other activities, but just not "the way they would do" so through a drag show. 816 F. Supp. 3d at 677. But in this case the district court held that Texas A&M's similar policy was viewpoint discriminatory because it was based on the Board of Regents' "subjective" judgment about the offensiveness or propriety of the speech. ROA.381–82.

*   *   *

These disagreements over the proper application of *CLS* pervaded every step of these courts' First Amendment analysis—from forum analysis to selection of the standard of review to application of constitutional principles. Rather than permit these consequential issues to be resolved by separate panels, judicial economy favors the en banc Court resolving these deep divides in the first instance. That will allow the Court to secure the uniformity of its precedent and ensure that it speaks with one voice in resolving these issues that have divided judges in this Circuit for the past three years. *See* Fed. R. App. P. 40(b)(2)(A).

## II. The District Courts Are Divided Over How to Determine Whether Conduct Is Inherently Expressive.

The Court should grant the petition to resolve an additional question dividing courts in this Circuit: the proper test for determining whether conduct is inherently expressive and protected by the First Amendment. The panel in *Spectrum I* did not split on this issue; the court held that Spectrum's planned performances were likely inherently expressive and protected by the First Amendment, 151 F.4th at 721–26. But the district courts in *Spectrum* and *QEC* were sharply divided on the question, looking to Supreme Court precedents like *Texas v. Johnson*, 491 U.S. 397 (1989), and

10

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995), and coming to divergent conclusions as to whether the planned drag shows were inherently expressive. To secure the uniformity of its precedent, the en banc Court should resolve this recurring issue now. Fed. R. App. P. 40(b)(2)(A), (D), 40(g).

In *Johnson*, the Supreme Court explained that, to determine "whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play," courts should consider "whether 'an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it.'" 491 U.S. at 404 (quoting *Spence v. Washington*, 418 U.S. 405, 410–11 (1974)). Six years later, the Supreme Court held in *Hurley* that expressive conduct need not convey "a narrow, succinctly articulable message" to warrant First Amendment protection. 515 U.S. at 569. Application of these precedents has divided judges of this Circuit.

The district court in this case held that QEC's drag show is protected expressive activity. "Applying *Hurley*," the court asked "whether [a] reasonable person would interpret" the drag show as conveying "some sort of message" and concluded that the drag show at issue was "protected expressive conduct." ROA.377. It explained that "[t]he performance is clearly intended to convey 'political, social, and cultural messages.'" ROA.377 (quoting *Woodlands Pride, Inc. v. Paxton*, 694 F. Supp. 3d 820, 844 (S.D. Tex. 2023), *vacated and remanded*, 168 F.4th 293 (5th Cir. 2026)). That is, it "provide[s] a way for students to express messages supporting the LGBTQ+ community and educate the broader university community about LGBTQ+ culture through the performance." ROA.377 (internal citation and quotation marks

omitted). The court likened the performance to a "theatrical performance" and held that "[i]t is long and well established that theatrical performances are protected forms of expressive conduct." ROA.378. Similarly, the court rejected the argument that "only parts" of the drag show may be protected by the First Amendment, reasoning that "[t]he performance must be considered as a whole, like any other artwork." ROA.378.

By contrast, the district court in *Spectrum* came to the opposite conclusion on each of these legal issues. The district court held that Spectrum's planned drag show did not constitute inherently expressive conduct because any messages that Spectrum intended the show to convey were "generalized" and in any event unlikely to be understood by those who view it. *Spectrum*, 816 F. Supp. 3d at 668–70. The court rejected Spectrum's argument that the Supreme Court's decision in *Hurley* affirms that expressive conduct need not convey a "particularized" message to receive First Amendment protection. *Id.* at 670. And unlike the district court in this case, the *Spectrum* district court disagreed with Spectrum's contention that its drag shows were akin to "live entertainment" that has long been protected by the First Amendment. *Id.* at 670–71. Finally, the court held that the First Amendment does not protect Spectrum's performances when (1) minors are present and (2) the performance has sexual content. *Id.* at 666–68.

\* \* \*

These divides over fundamental principles of First Amendment law, too, warrant the en banc Court's attention to secure the uniformity of the Court's precedent on these questions of exceptional importance.

## III. These Issues Are Important and Recurring, Requiring the En Banc Court's Intervention.

This appeal and the *Spectrum* appeal involve just two of several campus drag-performance prohibitions across Texas. The University of Texas System has imposed a prohibition on campus drag performances. Jessica Priest, *University of Texas System bans drag shows in campus facilities*, Texas Tribune (Mar. 18, 2025), https://tinyurl.com/3r9n6e8t. And in February, the University of North Texas revoked its prior approval for a student group to perform its annual drag show on campus. Matthew Winter, *GLAD drag show blocked from performing on campus after drag pause was lifted*, North Texas Daily (Mar. 19, 2026), https://tinyurl.com/y8k4hjt8.

The issues involved in this appeal therefore have statewide importance, and the en banc Court's resolution of them will provide needed clarity for students and universities throughout the Circuit that have operated on uncertain and conflicting legal terrain over the past three academic years.

And it is not just Texas: at least two other circuits have recently considered the extent to which the First Amendment protects drag shows, albeit in slightly different contexts. *See, e.g.*, *Imperial Sovereign Ct. of Mont. v. Knudsen*, 170 F.4th 820, 855–56 (9th Cir. 2026) (holding that "drag queen story hour" is inherently expressive conduct); *cf. HM Fla.-ORL, LLC v. Governor of Fla.*, 137 F.4th 1207 (11th Cir. 2025), *reh'g en banc granted, opinion vacated sub nom. HM Fla.-ORL, LLC v. Sec'y of Fla. Dep't of Bus. & Pro. Regul.*, 160 F.4th 1282 (11th Cir. 2025) (addressing constitutional challenge by business hosting drag shows to a Florida law restricting the admission

of minors to sexually explicit performances). The nationwide consideration of this issue in this Court's sister circuits underscores the importance of this appeal.

Given the importance of the issues, the diverging views of the district courts and members of this Court, and the parties' and this Court's preparation before the preliminary-injunction appeal in *Spectrum I* was mooted, hearing this appeal initially en banc would best serve judicial efficiency and consistency. It would also secure a speedy resolution and aid the parties. And it would benefit university officials, students, and other courts around the Nation. If this Court agrees to initially hear this appeal and the *Spectrum* appeal en banc, the parties ask that the Court coordinate the oral argument for both cases.

## Conclusion

For these reasons, the parties respectfully request this Court grant the petition to hear this appeal initially en banc.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

William R. Peterson
Solicitor General

/s/ William F. Cole
William F. Cole
Principal Deputy Solicitor General
William.Cole@oag.texas.gov

Christopher J. Pavlinec
Assistant Attorney General

*Counsel for Defendants-Appellants*

14

/s/ JT Morris
JT Morris
Foundation for Individual Rights and
Expression
700 Pennsylvania Avenue, SE, Suite
700
Washington, DC 20003
jt.morris@fire.org

Adam Steinbaugh
Foundation for Individual Rights and
Expression
510 Walnut Avenue, Suite 900
Philadelphia, PA 19106
adam@fire.org

*Counsel for Plaintiff-Appellee*

## Certificate of Compliance

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 3,597 words, excluding the parts of the brief exempted by Rule 32(f) and Fifth Circuit Rule 32.2, according to the word count of Microsoft Word. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Equity font.

/s/ William F. Cole
William F. Cole

# In the United States Court of Appeals for the Fifth Circuit

TEXAS A&M QUEER EMPOWERMENT COUNCIL,

*Plaintiff-Appellee*,

*v.*

WILLIAM MAHOMES, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; ROBERT L. ALBRITTON, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; DAVID C. BAGGETT, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; JAMES R. BROOKS, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; JOHN W. BELLINGER, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; JAY GRAHAM, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; MICHAEL A. HERNANDEZ, III, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; MICHAEL J. PLANK, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; SAM TORN, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; CAGE SAWYERS, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; JOHN SHARP, IN HIS OFFICIAL CAPACITY AS CHANCELLOR OF THE TEXAS A&M UNIVERSITY SYSTEM; MARK A. WELSH, III, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF TEXAS A&M UNIVERSITY,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Southern District of Texas, Houston Division

## APPENDIX TO JOINT PETITION FOR INITIAL HEARING EN BANC

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

WILLIAM R. PETERSON
Solicitor General

WILLIAM F. COLE
Principal Deputy Solicitor General
William.Cole@oag.texas.gov

CHRISTOPHER J. PAVLINEC
Assistant Attorney General

*Counsel for Defendants-Appellants*

JT MORRIS
Foundation for Individual Rights and
Expression
700 Pennsylvania Avenue, SE, Suite
700
Washington, DC 20003
jt.morris@fire.org

ADAM STEINBAUGH
Foundation for Individual Rights and
Expression
510 Walnut Avenue, Suite 900
Philadelphia, PA 19106
adam@fire.org

*Counsel for Plaintiff-Appellee*

# Index

Tab

District Court's Memorandum Opinion ...............................................................1

District Court's Order Granting Motion for Preliminary Injunction .......................2

Tab 1: District Court's Memorandum Opinion

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| TEXAS A&M QUEER EMPOWERMENT COUNCIL, | § § § § | |
| Plaintiff, | § § | CIVIL ACTION NO. 25-992 |
| v. | § § | |
| WILLIAM MAHOMES, *et al.*, | § § § | |
| Defendants. | § § § | |

**MEMORANDUM AND OPINION**

> Nowhere is free speech more important than in our leading institutions of higher learning. Colleges and universities serve as the founts of—and the testing grounds for—new ideas. Their chief mission is to equip students to examine arguments critically and, perhaps even more importantly, to prepare young citizens to participate in the civic and political life of our democratic republic.

*Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1128 (11th Cir. 2022).  "[T]he Supreme Court has 'long recognized that, given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition.'"  *Id*. (citing *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003)).  The combination of this important purpose and the freedoms it requires means that public "colleges and universities [must] toe the constitutional line when monitoring, supervising, and regulating student expression."  *Id.* at 1129.

In recent years, the commitment to free speech on campuses has been both challenging and challenged. There have been efforts from all sides of the political spectrum to disrupt or prevent students, faculty, and others from expressing opinions and speech that are deemed, or actually are, offensive or wrong.  But the law requires the recognition and application of speech rights and

25-20108.368

guardrails that preserve and protect all our treasured First Amendment rights.  Today, this court, in its required neutral and impartial fashion, applies this law to the facts the parties have presented.

Texas A&M is a public university system.  It enrolls over 150,000 students each year across its eleven campuses.  A&M has consistently recognized in its policies on speech and conduct on its campuses that exposure to a variety of ideas, including ideas that may offend some or many listeners, is a critical part of the education it promises to provide.  *See* Texas A&M University Policy No. 08.99.99.M1, "Expressive Activity on Campus," Rule Statement (May 14, 2020); *see also* Texas A&M Student Rules on Freedom of Expression, Appendix XI (rev. 2015).

The Texas A&M Queer Empowerment Council ("QEC"), a student organization at A&M's College Station flagship campus has, for each of the last five years, sponsored a drag show cleverly named "Draggieland" on campus.  It is a ticketed event; only those who want to attend do so. Anyone who finds the performance or performers offensive has a simple remedy: don't go. This year, the performance was scheduled for March 27, 2025.  But on February 28, after tickets were sold, the A&M Board of Regents banned the show from its "Special Event Venues."  No one can go to the scheduled March 27 performance at the on-campus venue that was reserved in advance, even those who want to attend.

The QEC sued the A&M Board of Regents, challenging the ban as unconstitutional and seeking an injunction against its enforcement.  The court held argument on the injunction application, the response, and the reply on March 18, 2025.  (Docket Entry No. 23).  Based on the pleadings, the briefs, the record, the arguments of counsel, and the applicable law, the court grants the motion for a preliminary injunction that bars the Board from enforcing its ban and permits the planned performance to go forward on March 27, 2025, at 7:30 pm, in the Rudder Theatre on the A&M College Station campus.  (Docket Entry No. 3).   The reasons for these rulings are below.

2

## I.    Background

The QEC sued William Mahomes, Robert L. Albritton, David C. Baggett, John W. Bellinger, James R. Brooks, Jay Graham, Michael Hernandez III, Michael J. Plank, Sam Torn, Cage Sawyers, John Sharp, and Mark A. Welsh III, members of the A&M Board of Regents, in their official capacities under 42 U.S.C. §§ 1983 and 1988, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.    The QEC describes Draggieland as a "drag performance," in which performers "participate in a pageant to try to win the title of 'Queen/King of Draggieland.'" (Docket Entry No. 1 ¶¶ 40-44).    Draggieland performers are clothed and do not perform nude. (*Id*.).    The performers often make clothing choices that contrast with the expected presentation based on their sex; a male performer may dress in women's clothing, while a female performer may dress in men's clothing.    (*Id*.).

In 2020 and 2021, A&M financially sponsored Draggieland, but in 2021, university administrators decided that A&M would no longer directly support the event.    (*Id*. ¶¶ 55, 58). After the QEC was formed in 2023, that student organization began to host Draggieland.    (*Id*. ¶ 63).    Draggieland is fully funded by the QEC.    (*Id*. ¶ 16).    The QEC received no funds from A&M for the 2025 production of Draggieland.    (*Id*.).

The QEC's mission is "to foster unity among LGBTQ+ organizations on campus, and to serve as a resource for LGBTQ+ students, creating spaces that empower individuals regardless of their gender identity or sexual orientation."    (*Id*. ¶ 13).    Draggieland is the QEC's main annual event.    (*Id*. ¶ 15).

The QEC reserved the Rudder Theatre, as it has in the past, to host Draggieland.    (Docket Entry No. 1 ¶ 39).    The Rudder Theatre provides a list of rules and guidelines for those who wish to reserve the venue for an event.    (*See* Docket Entry No. 21-9).    Both A&M students and "external

3

clients"—members of the public—may reserve the Rudder Theatre for events. (*Id.*). Those wishing to reserve the Rudder Theatre to host an event must submit a request, which is then approved by a member of A&M's staff. (*Id.*). The record contains no evidence that a request to hold an event at the Rudder Theatre has ever been denied.

The Rudder Theatre has the stated purpose of hosting "events such as Broadway productions, concerts, variety shows, movies, lectures, conferences, commencement ceremonies, and recitals." (Docket Entry No. 1 ¶ 36). The list of past events hosted at the Rudder Theatre includes a fraternity-sponsored beauty pageant; comedy shows; performances of *Rent*, *Hadestown*, *The Cher Show* (in which the participants wore "risqué" costumes), and *Swan Lake*; a get-out-the-vote event organized by the Aggie Democrats; and speeches by political commentators and activists. (*Id.*).

On May 28, 2024, the QEC submitted a request to book the Rudder Theatre to present the Draggieland performance on March 27, 2025, as well as two pre-show rehearsals that would also occur in March 2025. (*Id.* ¶ 74). The QEC's request to reserve the Rudder Theatre was approved by the Manager of Special Events for Texas A&M University's Rudder Theatre Complex on October 23, 2024, by email. (*Id.* ¶ 76). Draggieland tickets were made available on the Rudder Theatre's website. (*Id.*).

On February 28, 2025, the Board held a telephone meeting and subsequently issued a "Resolution Regarding Certain Public Events on the Campuses of Universities in the Texas A&M University System." (Docket Entry No. 21-2).

The Board's resolution states that:

> [T]he Board finds that it is inconsistent with the System's mission and core values of its Universities, including the value of respect for others, to allow Special Event Venues of the Universities to be used for drag shows that involve biological males dressing in women's clothing, wearing exaggerated female make up and/or exaggerated prosthetics

4

meant to parody the female body type, and that are: open to the public; involve sexualized, vulgar or lewd conduct; and involve conduct that demeans women (Drag Show Events) … [and] the Board finds that Drag Show Events are likely to create or contribute to a hostile environment for women contrary to System anti-discrimination policy and Title IX of the Education Amendments of 1972 (Title IX), as these events often involve unwelcome and objectively offensive conduct based on sex for many members of the respective communities of the Universities, particularly when they involve the mockery or objectification of women.

(Docket Entry No. 21-2 at 2).

Citing President Trump's January 20, 2025 executive order entitled *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, as well as Governor Abbott's January 30, 2025, letter expressing support for the executive order, the Board's resolution stated that: "given that both the System and the Universities receive significant federal funding, the use of facilities at the Universities for Drag Show Events may be considered promotion of gender ideology in violation of the Executive Order and the Governor's directive." (*Id*. at 2).  The Board's resolution noted that there were "alternative locations for such events at off-campus venues and private facilities" off the A&M campus.  (*Id*.).

On the same day, Chancellor John Sharp issued a notice to the System Presidents of A&M about the resolution, directing university presidents "to take actions to cancel any 'Drag Show Events' (as defined in the resolution) and to make any necessary revisions to your university's procedures relating to the use of your public event venues."  (Docket Entry No. 1-2).  Interim Associate Vice President Thomas W. Reber subsequently sent the QEC an email notifying it that because the Board had adopted the drag ban resolution, "your event, Draggieland 2025, will not be permitted on campus."  (Docket Entry No. 1 ¶ 90).  The box office for the Rudder Theatre refunded the 168 tickets that had already been sold for the March 27th performance of Draggieland. (Docket Entry No. 21-11).

## II.     The Legal Standard

25-20108.372

A court may grant a temporary restraining order or preliminary injunction only if the movant shows: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Jones v. Tex. Dep't of Criminal Justice*, 880 F.3d 756, 759 (5th Cir. 2018) (per curiam) (quoting *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)). The party seeking injunctive relief must meet all four requirements. *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016) (quoting *Bluefield Water Ass'n v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009)). A preliminary injunction is an "extraordinary remedy." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 536 (5th Cir. 2013). "A temporary restraining order may be treated as a preliminary injunction when an adversarial hearing has taken place." *Butts v. Aultman*, 953 F.3d 353, 361 (5th Cir. 2020). Because the issues are fully briefed and the court has heard argument on the motion, the court considers only the request for the preliminary injunction.

## III.   Analysis

### A.   The Likelihood of Success on the Merits

The QEC argues that the Draggieland show, and drag shows in general, are expressive conduct. (Docket Entry No. 3 at 12-13). The Board responds that whether Draggieland or drag shows generally are expressive conduct is unclear. (Docket Entry No. 20 at 12). The threshold issue is whether Draggieland is speech or expressive conduct protected under the First Amendment.

"First Amendment scrutiny" applies in "cases involving governmental regulation of conduct that has an expressive element." *TikTok Inc. v. Garland*, 145 S. Ct. 57, 65 (2025). The Supreme Court has held that conduct is protected by the First Amendment if "[a]n intent to convey

25-20108.373

a particularized message was present, and … the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 405 (1989) (citing *Spence v. Washington*, 418 U.S. 405, 410-11 (1974)).

Another judge in this district recently considered a similar issue in *Woodlands Pride, Inc. v. Paxton*, 694 F. Supp. 3d 820 (2023). That case concerned the constitutionality of a Texas law targeting "sexually oriented performances." *Id*. At 829. The law imposed civil penalties for commercial entities that hosted such performances and criminal penalties for performers. *Id*. at 829. The law also granted counties and municipalities the ability to ban and regulate such performances. *Id*. The court noted that the law was "touted as a 'Drag Ban'" from its inception. *Id*. The plaintiffs, a coalition of LGBTQ+ groups that had organized an upcoming "Woodlands Pride" event, argued that the law violated the First Amendment because it was content-based, viewpoint-based, overbroad, vague, and an impermissible prior restraint on speech. *Id*. at 842.

After reviewing the relevant case law, the court found that among the district courts that had considered similar issues involving drag shows, there was "little divergence from the opinion that drag performances are expressive content that is afforded First Amendment protection." *Id*. at 843. The court noted that "[d]rag shows express a litany of emotions and purposes, from humor and pure entertainment to social commentary on gender roles." *Id*. Considering the artistic value of drag shows, the court concluded that "[t]here is no doubt that at the bare minimum these performances are meant to be a form of art that is meant to entertain," which alone "warrant[ed] some level of First Amendment protection." *Id*. The court emphasized that "drag shows … are performances that express conduct with no need for extra explanation. … [They] express either pure entertainment, or, like most types of expressive art, an underlying deeper message. (Such as music, theater, and poetry)." *Id*.

25-20108.374

The only other district court in this circuit to consider a similar question came to a different conclusion. In *Spectrum WT v. Wendler*, 693 F. Supp. 3d 689 (N.D. Tex. 2023), the plaintiffs, an organization for LGBTQ+ students on West Texas A&M's campus and two of the organization's officers, moved for a preliminary injunction after West Texas A&M University's president refused to permit the organizers to host a drag show held to raise funds for LGBTQ+ suicide prevention on campus. *Id*. at 696-97. The court upheld the president's decision, finding that: (1) it was not clear that all drag shows were expressive conduct under the First Amendment, because they do not clearly seek to convey a "message," and do not, in fact, clearly convey a "message" that would be understood by observers; and (2) even if the drag show was expressive conduct protected by the First Amendment, because it was a sexually oriented event and because children would be in the audience, the University's president had acted in an "objectively reasonable" manner in banning the show.

The Board urges the court to ignore *Woodlands Pride* and follow the approach in *Spectrum* to find that drag shows are not clearly protected expressive conduct. But *Spectrum* is readily distinguishable in its facts. In that case, the audience was expected to include children. *Id*. at 701-02 (the drag show organizers "expressly contemplate[d] and even advertise[d] the involvement of children"). The court in *Spectrum* asserted the existence of an "outer limit 'on expressive conduct' … when children are involved," precluding the court from finding that drag shows were expressive conduct. *Id.* at 698. Here, by contrast, there is no evidence that Draggieland marketed itself as a child-friendly event, or that any of the 168 Draggieland tickets were sold to children. The fact that the event is hosted by a student group and primarily markets itself to A&M students supports finding that that the attendees are intended to, and likely will, be consenting adults.

25-20108.375

The court in *Woodlands Pride* discussed the *Spectrum* case, noting that the West Texas A&M president's decision to prevent the drag show from taking place on campus was motivated by his view that "drag shows stereotype women in cartoon-like extremes for the amusement of others and discriminate[] against womanhood … [d]rag shows are derisive, divisive, and demoralizing misogyny, no matter the stated intent." *Id*. at 844.  The court emphasized that the West Texas A&M president's "sentiment reinforces this Court's opinion that while some people may find a performance offensive or morally objectionable, it does not mean that the performance is not expressive or given First Amendment protection." *Id*.  That is the correct First Amendment analysis under Supreme Court precedent and the case law.  *Cf. Papish v. Board of Curators of the University of Missouri,* 410 U.S. 667, 670 & n.6 (1973) (per curiam).

The Board asserts that under the two-part *Texas v. Johnson* test—whether an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it—drag shows, including Draggieland, fail to meet the threshold for expressive conduct.  491 U.S. 397, 405 (1989) (*See* Docket Entry No. 20 at 12-13).  In that case, the Supreme Court considered whether a protestor's burning an American flag constituted expressive conduct, giving him First Amendment protection.  491 U.S. at 405.  Citing its prior decision in *Spence v. Washington*, the Supreme Court in *Texas v. Johnson* first noted that First Amendment protection "does not end at the spoken or written word" and that "conduct may be 'sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments.'" *Id*. at 404 (citing *Spence*, 418 U.S. at 409).  The Court found that the flag burning was conduct sufficiently communicative to implicate the First Amendment's protections of speech.  *Id*. at 407.

In *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, the Court clarified that expression need not convey "a narrow, succinctly articulable message" to be constitutionally protected. 515 U.S. 557, 569 (1995). The Court in *Hurley* emphasized that if First Amendment protections were confined to expressions conveying a particularized message, they "would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll." *Id.* at 569. Instead, "in determining whether conduct is expressive, we ask whether the reasonable person would interpret it as some sort of message, not whether an observer would necessarily infer a specific message." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004); *see also Food Not Bombs Houston v. City of Houston, Texas*, 2024 WL 623913, at * 3 (S.D. Tex. Feb. 14, 2024) (applying *Holloman* to find that the food-sharing program at issue was expressive conduct).

Applying *Hurley*, the court agrees with the conclusion reached in *Woodlands Pride* that drag shows may be protected expressive conduct and finds that Draggieland is in that category. Draggieland is a performance that "includes conversations between the performer and host about what drag means to the performers." (Docket Entry No. 1 ¶ 46). The theatrical performance and the explicit discussion of the intended message are both protected under the First Amendment. The Draggieland performance and the conversation that follows "provide[] a way for students to express messages supporting the LGBTQ+ community" and "educate the broader university community about LGBTQ+ culture" through the performance. (*Id.* ¶¶ 72-73). The Board's contention that drag shows, and Draggieland, are not expressive conduct directly contradicts the Board's simultaneous assertion that drag performances promote an ideology. (*See* Docket Entry No. 22 at 13). The Board cannot assert both that the performance promotes an ideology and that it is not expressive conduct. The performance is clearly intended to convey "political, social, and

25-20108.377

cultural messages." *See Woodlands Pride*, 694 F. Supp. 3d at 844.  The Board disagrees with the messages expressed and finds them offensive, but they are conveyed through speech and expressive conduct under the First Amendment.

The Board also advances the unpersuasive argument that the only parts of Draggieland that are protected by the First Amendment are the segments in which the performers discuss what drag means to them.  (Docket Entry No. 20 at 12-14).  The Board claims that the QEC cannot combine "unprotected" non-expressive conduct—the performance of choreographed routines set to music and lighting, while performers are dressed in clothing of the opposite sex—with protected expressive conduct—the articulation of what drag means to the performers—to seek First Amendment protections for the entirety of the drag show performance.  (*Id.*).

The court disagrees.  It is long and well established that theatrical performances are protected forms of expressive conduct, not held to a "drastically different standard" than other forms of speech under the First Amendment solely because theater "frequently mixes speech with live action or conduct."  *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 587-88 (1975).  The parties do not cite authority requiring the court to deconstruct the elements of a live drama, theatrical performance, or work of art to separate out components that are "expressive" or "non-expressive."  The performance must be considered as a whole, like any other artwork.  Both the performance and conversations that comprise Draggieland are intended to convey a culturally significant message about LGBTQ+ rights.  The court finds that Draggieland is protected as speech and expressive conduct.

The court turns to whether the Board's resolution is viewpoint-based discrimination and the nature of the Rudder Theatre as a forum.  The QEC argues that the drag ban is "quintessential" viewpoint discrimination, which creates the presumption that the ban is unconstitutional regardless

25-20108.378

of the type of forum.  (Docket Entry No. 3 at 14).   The Board counters by asserting that the Rudder Theatre is only a "limited public forum," and not a "designated public forum," giving the Board greater leeway to restrict speech in that forum. (Docket Entry No. 20 at 3).

The right of a speaker "to access government property is determined by the nature of the property or forum." *Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 116 (5th Cir. 1992).  "The constitutionality of speech restrictions in a limited public forum are judged under the reasonableness standard, while speech restrictions in a traditional or designated public forum are subject to strict scrutiny." *Pro-Life Cougars v. Univ. of Houston*, 259 F. Supp. 2d 575, 581 (S.D. Tex. 2003) (citing *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 346 (5th Cir. 2001)).   To determine whether a forum is a limited non-public forum or a designated public forum, a court considers two factors: (1) the government's intent with respect to the forum; and (2) the nature of the forum and its compatibility with the speech at issue.  *Chiu*, 260 F.3d at 346.  "The necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)

The Board points to the Rudder Theatre's reservation approval system as evidence that it is a limited public forum, arguing that the university has opened the Rudder Theatre to some, but not all, forms of speech.  (Docket Entry No. 20 at 21; Docket Entry No. 21-9).  The Board cites its resolution describing the Rudder Theatre, and other "Special Event Venues," as "limited forums" as additional support for its position.  (Docket Entry No. 20 at 21; Docket Entry No. 21-2).  Finally, the Board points to A&M's University Rule on Expressive Activity on Campus, which describes "limited public forums" as those "limited to particular groups or particular topics."  Tex. A&M Pol'y 08.99.99.M1 (May 14, 2020).

12

But the Board's representations that the Rudder Theatre is a limited public forum are at odds with the ways in which the Rudder Theatre has been used in recent history. As to the first factor, the theatre is open to reservations by student groups and members of the public. There is no evidence in the record that any group wishing to reserve the Rudder Theatre has been precluded from doing so. Nothing in A&M's University Rule on Expressive Activity on Campus identifies the Rudder Theatre as a limited public forum; the fact that the Rule defines a limited public forum does not compel the conclusion that any campus venue not specifically identified as an open or designated forum is by default a limited public forum. The Rule specifically states that the decision to deny a student group's request to make an advance reservation to use a campus space for an event "in no circumstance will … be based on the content or viewpoint of the expressive activity or upon the expected reaction of others." Tex. A&M Pol'y 08.99.99.M1, "Reservation Procedures" (rev. June 25, 2024). Nor do the guidelines for reserving the Rudder Theatre describe the venue as a "limited public forum." This evidence supports finding that the Rudder Theatre functions as a designated public forum.

As to the second factor, the Draggieland event is consistent with the other types of events that have been held at the Rudder Theatre previously—plays, musicals, beauty pageants, and speakers. When, as here, "a university by policy and practice opens up an area for indiscriminate use by the general public, or by some segment of the public, such as student organizations, such area may be deemed to be a designated public forum." *Pro-Life Cougars,* 259 F. Supp. 2d at 582; *Cf. Widmar v. Vincent*, 454 U.S. 263, 267 n.5 ("the denial to particular groups of use of campus facilities for meetings and other appropriate purposes" must be subject to strict scrutiny) (internal quotations omitted) (alterations adopted)). The fact that other theatrical productions, including those with mature themes, have been held at the Rudder Theatre in the past indicates that drag

13

shows are consistent with the types of events that the Rudder Theatre has been used to present. The court finds that the Rudder Theatre is a designated public forum.

Even if the Rudder Theatre is considered a limited public forum, the Board's resolution still fails constitutional muster. As discussed in detail below, the ban on drag shows is a viewpoint-based restriction on speech and expressive conduct. Viewpoint-based restrictions are unconstitutional whether the forum is a designated or limited public forum. *Chiu*, 260 F.3d at 349; *cf. Heaney v. Roberts*, 846 F.3d 795, 801 (5th Cir. 2017) ("It is beyond debate that the law prohibits viewpoint discrimination in a limited public forum.").

"The adoption of a facially neutral policy for the purpose of suppressing the expression of a particular viewpoint is viewpoint discrimination." *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 736 (2010). "Viewpoint discrimination exists 'when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.'" *Heaney,* 846 F.3d at 802 (citing *Rosenberger*, 515 U.S. at 829). The QEC argues that the ban is on its face a "viewpoint-discriminatory regulation of expression because it censors drag performances based on the message, viewpoint, or ideology expressed—real or perceived," (Docket Entry No. 1 ¶ 111), which also violates the First Amendment by banning Draggieland because of the content of the performance and the message it conveys. (*Id*. ¶ 117).

The Board argues that the ban is viewpoint-neutral because "[t]he Resolution finds that the act of a drag performance that falls within specific parameters—namely, one that features biological males dressing in women's clothing with makeup or prosthetics exaggerating stereotypical female physiognomies, is open to the public, involves 'sexualized, vulgar, or lewd conduct,' and involves conduct that demeans women—is 'inconsistent with the System's mission and core values.'" (Docket Entry No. 20 at 27; Docket Entry No. 21-2). Put another way, the

14

Board argues that "[t]he Resolution targets conduct that is demeaning, regardless of whether that conduct is meant to express a viewpoint that is itself demeaning." (Docket Entry No. 20 at 27). The Board appears to argue that the ban is not a viewpoint-based restriction because the QEC and Draggieland performers do not intend to convey a demeaning message.

The Board's argument is both faulty in logic and contrary to longstanding First Amendment jurisprudence. First, "censorship based on a state actor's subjective judgment that the content of protected speech is offensive or inappropriate is viewpoint discrimination." *Robinson v. Hunt County*, 921 F.3d 440, 447 (5th Cir. 2019). Whether drag shows are "demeaning" is precisely the type of subjective judgment that the court in *Robinson* held cannot form the basis for a restriction on expression. *See also Matal v. Tam*, 582 U.S. 218, 250 (2017) (Kennedy, J., concurring in part and concurring in the judgment) ("The danger of viewpoint discrimination is that the government is attempting to remove certain ideas or perspectives from a broader debate. That danger is all the greater if the ideas or perspectives are ones a particular audience might think offensive, at least at first hearing."). The distinction the Board attempts to make could be used to justify restraints on a wide variety of expressive conduct that is intended to convey a message but may be construed as offensive, shocking, or demeaning by state actors, such as burning the American flag. Our Constitution does not allow for such subjective and unrestricted limits on expression based on viewpoint.

Performances by men dressed as women are nothing new. Men have been dressing as women in theater and film for centuries. It is well-established among scholars of Shakespeare's literary works that, when his plays were written and performed, female characters were played by young men dressed in women's attire. *See* Royal Shakespeare Company, *Women on Stage*, https://www.rsc.org.uk/shakespeares-life-and-times/women-on-stage (last visited May 23, 2025).

15

Women may not have been permitted to perform themselves in Shakespeare's time, but that has not been true for many years. Yet many popular contemporary musicals and films have included male characters dressed in what amounts to drag, including *Hairspray* (1988), *Mrs. Doubtfire* (1993), and *White Chicks* (2004). In the college campus context, organizations like Harvard University's Hasty Pudding Club have put on performances with male performers dressed in drag in campus theaters for centuries. Those performances continue to this day. *See* Hasty Pudding Club*, The Hasty Pudding Institute of 1770*, https://www.hastypudding.org/hasty-pudding-club/ (last visited March 23, 2025). When do performances in which men dress as women cross the line from entertaining to demeaning? The impossibility of objectively answering that question demonstrates why such standards are impermissible as the basis for a restriction on expressive conduct.

The Board's argument that a recent federal executive order necessitates banning drag shows from Special Event Venues fares no better. The Board points to the president's executive order stating that "[f]ederal funds shall not be used to promote gender ideology." Exec. Order No. 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025). The executive order defines gender ideology, in part, "as [the] ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa." *Id*. This executive order cannot override First Amendment protections. The Board states that it is banning drag shows on campus because they "promote gender ideology" by advancing the view "that that there is a vast spectrum of genders that are disconnected from one's sex." (*See* Docket Entry No. 21-1). The fact that the Board justifies its ban on drag shows by saying it aligns with the rejection of a certain ideology belies the Board's contrary position that the ban is viewpoint neutral. The Board's stated justification is the kind of viewpoint discrimination proscribed by the Court in *Rosenberger*: a

16

restriction that "targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger*, 515 U.S. at 829.

The Board's position conflates biological sexual identity—which the executive order defines as limited to male and female—with the various ways humans have creatively described sex and sexuality in literature, art, and theater. Nothing in the Draggieland performance offends the executive order the Board cites. No male performer in the drag show is stating an intent to become a woman. Nor does the Board point to evidence in the record establishing that the president's executive order on "biological truth" specifically refers or applies to drag shows. The QEC's complaint makes clear that by donning clothing and makeup traditionally associated with the opposite sex, Draggieland performers intend to convey a message of LGBTQ+ support by engaging in a protected art form. The performers are just that: performers. They are acting. The performance is theater. It is not about individuals seeking to change their biological sex or claim a different biological sex. It is about actors who perform dressed differently than their biological sex. Again, the Board's argument conflates the existence of two sexes with different ways to express sexuality and sexual themes. The record does not show that the Draggieland performance is in the purview of President Trump's executive order or Governor Abbott's statement in support.

The Fourth Circuit's decision in *IOTA XI Chapter of Sigma Chi Fraternity v. George Mason University,* 993 F.2d 386 (4th Cir. 1993), is instructive. In that case, the court found that George Mason University could not punish a fraternity for holding an "ugly woman contest" merely because the contest "ran counter to the views that the University sought to communicate to its students and the community." *Id*. at 393. In doing so, the court found that the University was "silencing speech on the basis of its viewpoint." *Id.* George Mason took the further step of sanctioning the student group that hosted the "ugly woman contest," while A&M banned the QEC

17

from hosting its event at a campus venue, but both actions violate the First Amendment. Sanctioning a student group for sponsoring an event and precluding a student group from holding an event on campus based on the events' content and viewpoint have the same result: stifling expression because it is offensive to some.

Turning back to *Woodlands Pride*, the court held that a law targeting "sexual conduct" was an impermissible viewpoint-based restriction directed at drag shows even though the law did not specifically mention them. 694 F. Supp. 3d at 847. In finding viewpoint discrimination, the court pointed out that the law mentioned "the exhibition of sexual gesticulations using accessories or prosthetics that exaggerate male or female sexual characteristics," as proof that the law was "directed at the specific act of impersonating or exaggerating a sex other than the one a performer is assigned." *Id.* The Board's resolution states that "Drag Show Events" are not permissible at Special Event Venues because the shows "involve biological males dressing in women's clothing, wearing exaggerated female make up and/or exaggerated prosthetics meant to parody the female body type." (Docket Entry No. 21-2 at 2-3). The QEC has shown that the ban is an unconstitutional viewpoint-based restriction.

The QEC also argues that the ban is a prior restraint on speech: it prevents the QEC from "speaking in a campus public forum before the speech ever occurred, based on [the Board's] prediction and perception that Draggieland 'promotes gender ideology,' 'demeans women,' and may lead to a 'hostile environment for women.'" (Docket Entry No. 1 ¶ 138). A restraint on speech or expressive conduct is a "prior restraint" for First Amendment purposes when the restraint "[gives] public officials the power to deny use of a forum in advance of actual expression." *Conrad*, 420 U.S. at 553.

25-20108.385

The QEC has shown that the ban is a prior restraint by establishing that the ban is a viewpoint-based prohibition on expressive conduct imposed before it takes place, in a forum that is designated for a wide range of speech and conduct. *See Hoefer v. Bd. of Educ. of the Enlarged City Sch. Dist. of Middletown*, No. 10 CIV. 3244 (ER), 2017 WL 2462660, at *5 (S.D.N.Y. June 6, 2017) (citing *Conrad*, 420 U.S. at 555). The Board nonetheless asserts that its prior restraint is justified because "colleges may prohibit lewd speech and conduct without violating the First Amendment." (Docket Entry No. 20 at 15). In support, the Board cites *Bethel School District v. Fraser*, 478 U.S. 675 (1986), a case involving restraints on speech targeted at high school audiences. (*Id*.). The Board asserts that past Draggieland performances have been "lewd" and "indecent," involving performers who engage in whipping, lap dances, and crotch grinding. (*Id*. at 16). The Board also points to Texas A&M University, Student Conduct Code § 24.4.17, which prohibits "[p]ublic behavior that is disruptive, rude or indecent." (*Id*.).

The Supreme Court's decision in *Papish v. Board of Curators of the University of Missouri* is on point. In *Papish*, the Court held that the University of Missouri could not expel a student for disseminating a political cartoon depicting a policeman raping the Statue of Liberty, which university administrators considered to be "indecent." 410 U.S. at 670. The Court noted that "the mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Id*.

"What is 'inappropriate' or 'offensive' is a subjective determination, which would vary based on a college administrator's personal beliefs." *Flores v. Bennett*, No. 22-16762, 2023 WL 4946605, at *2 (9th Cir. Aug. 3, 2023). Neither the Board's resolution banning drag shows, nor the student speech rules, define "lewd" or "indecent." To some, Draggieland, which features fully clothed performers, would be considered no more "lewd" or "indecent" than the scantily clad

19

25-20108.386

performers in *The Cher Show* that was performed in the Rudder Theatre, and no more demeaning to women than a beauty pageant. And *Bethel* is distinguishable because it involved minors, while this case involves an audience of adults who are capable of forming their own opinions as to whether the Draggieland performance is "lewd" or "indecent" and of making their own choice to buy a ticket or stay away. *See Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 267 (3d. Cir. 2002) ("The public-school setting is fundamentally different from other contexts, including the university setting.").

The argument that the ban is a permissible restraint on speech because it aligns with A&M's Student Conduct Code is similarly unpersuasive. The court notes that when "Codes of Conduct" adopted by universities and the First Amendment conflict, the First Amendment takes precedence. *See, e.g.*, *DeJohn v. Temple Univ.*, 537 F.3d 301, 318-19 (3d Cir. 2008); *Keefe v. Adams*, 840 F.3d 523, 544 (8th Cir. 2016) ("[A student's] statements may indeed violate the administrators' interpretation of certain provisions of the College's professionalism Code, but that does not answer the question of whether that interpretation is consistent with the First Amendment.") (Kelly, J., concurring in part and dissenting in part). The court finds that there is a high likelihood that the ban is an unconstitutional prior restraint on speech.

Even assuming that the ban is not a viewpoint-based restriction, it does not pass muster under strict scrutiny. "When strict scrutiny is applicable, the Government 'must specifically identify an actual problem in need of solving,' and the 'curtailment of [the constitutional right] must be actually necessary to the solution.'" *Mance v. Sessions*, 896 F.3d 699, 705 (5th Cir. 2018) (quoting *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011)). The court finds that on the present record, the Board has failed to meet this standard.

20

The QEC asserts that drag shows present no harm to women and that disagreement with the perceived message conveyed by drag shows is not a compelling governmental interest. (Docket Entry No. 3 at 20). The QEC also asserts that even if drag shows are viewed by some as demeaning to women, Draggieland, a once-a-year event, is not "severe" and "pervasive" harassment of women—the standard for unlawful harassment for which an academic institution can be held liable under Title IX. (*Id.* at 21). There is no evidence in the record that past performances of Draggieland have caused female members of the A&M community to be harassed. Finally, the QEC asserts that the ban is not narrowly tailored because those who find drag shows "demeaning" or "lewd" can simply choose not to attend. (*Id*. at 23).

The Board describes the compelling governmental interest that the ban is intended to serve as "providing an effective learning environment to its students and … complying with federal antidiscrimination law." (Docket Entry No. 20 at 23). Clearly, providing an effective learning environment and complying with federal antidiscrimination laws are compelling governmental interests. The question is whether the ban is narrowly tailored to achieve those ends.

The court finds that the ban is not narrowly tailored to either interest. As to the first interest, the Board has not shown that permitting a once-a-year drag show in a campus theater, for which attendance is entirely optional, would "infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education." *See Gay Student Servs. v. Texas A&M Univ.*, 737 F.2d 1317, 1330 (5th Cir. 1984); *cf. Diei v. Boyd*, 116 F.4th 637, 649 (6th Cir. 2024) ("'[I]n the absence of any disruption of campus order or interference with the rights of others,' the Supreme Court [has] explained, a university cannot 'proscribe' speech based on its content—'no matter how offensive to good taste' the speech may be." (citing *Papish,* 410 U.S. at 670 & n.6.)). Draggieland is set to occur at 7:30 in the evening, when most

21

classes are likely not in session, and in a venue where academic classes are not typically held. There is no evidence that Draggieland causes any interference with students' ability to obtain an education.

The Board's five-factor test for determining the permissibility of a campus drag show also demonstrates that its approach is not narrowly tailored to serve the interests of providing an effective learning environment to students and of remaining in compliance with Title IX. The Board's resolution bans drag events that: (1) are held at Special Event Venues; (2) involve biological males dressing in women's clothing, wearing exaggerated female make up or exaggerated prosthetics meant to parody the female body type; (3) are open to the public; (4) involve sexualized, vulgar or lewd conduct; and (5) involve conduct that demeans women. (Docket Entry No. 21-2 at 2).

Turning to the first requirement, the Board does not identify why A&M's stated interests are better served by banning drag shows from Special Event Venues as opposed to other venues on campus. Indeed, at oral argument, counsel for the Board conceded that under the five-factor test, if the drag show was held outdoors on the campus, it would pass muster under the Board's test. But a drag show held outdoors would expose those who are simply passing by—including children—to the performance, rather than limiting the exposure to those who choose to attend by holding it in a theater and requiring a ticket for admission. Counsel also conceded that if the event was limited to A&M students, it would pass the Board's test because it would not be "open to the public," which is inconsistent with the Board's stated concerns about the effect of the performance on students.

The Board asserts that the Draggieland performance would demean women and could lead to their harassment. For the purposes of Title IX, "harassment" is defined as "'pervasive' and

22

'widespread' conduct with the 'systemic effect of denying the victim equal access to an educational program or activity.'"   *Carmichael v. Galbraith*, 574 F. App'x 286, 290 (5th Cir. 2014) (per curiam) (quoting *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.,* 526 U.S. 629, 652-54 (1999)).   The court agrees with the QEC's assertion that permitting a once-a-year drag show to occur at the Rudder Theatre—as it has for the past five years—cannot constitute severe or pervasive harassment.   The record contains no evidence of a correlation between drag shows and the harassment of female students at any university.   The record does not show that any female student at A&M complained about harassment in the performance, or resulting from the performance, of Draggieland on campus.   The court finds that the drag ban is not narrowly tailored to further either of the Board's compelling interests of preventing harassment of female students at A&M or ensuring that A&M students have a productive and safe learning environment.

The court also finds that the ban is unconstitutionally vague.   "A law can be unconstitutionally vague if it 'fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited.'"   *Doe v. Landry*, 909 F.3d 99, 116 (5th Cir. 2018) (citing *Kucinich v. Tex. Democratic Party*, 563 F.3d 161, 166 n.4 (5th Cir. 2009)).   Put another way, a statute is unconstitutionally vague if "men of common intelligence must necessarily guess at its meaning and differ as to its application...." *Connally v. General Constr. Co*., 269 U.S. 385, 391 (1926).   The ban lacks "many key definitions," which allows "the law to be wide sweeping in many ways." *See Woodlands Pride*, 694 F. Supp. 3d at 848.   The ban contains no definition of "vulgar," "sexualized," or "lewd." *See* (Docket Entry No. 21-2 at 2).   Other district courts considering bans to drag shows or other drag-themed events have found that bans prohibiting "lewd" or "sexually oriented" conduct "r[a]n a significant risk of vagueness and overbreadth." *Imperial Sovereign Ct. v. Knudsen*, 699 F. Supp. 3d 1018, 1046 (D. Mont. 2023); *see also HM*

23

*Fla.-ORL, LLC v. Griffin*, 679 F. Supp. 3d 1332, 1343 (M.D. Fla. 2023). Outside the drag-ban context, the result is the same. *See, e.g., Carico Invs., Inc. v. Tex. Alcoholic Bev. Comm'n*, 439 F. Supp. 2d 733, 749 (S.D. Tex. 2006) (citing *Reno v. ACLU*, 521 U.S. 844, 871 (1997)).

Draggieland is speech and expressive conduct protected by the First Amendment. Because the Board's resolution banning drag shows discriminates on the basis of viewpoint, it is unconstitutional regardless of whether the Rudder Theatre is a limited public forum or a designated public forum. The resolution is also unconstitutionally vague because it fails to define "vulgar," "sexualized," or "lewd." The Draggieland performance does not satisfy the five criteria that the Board's resolution requires in order to ban the production. The QEC has established a substantial likelihood of success on the merits of both its facial and as-applied challenges under the First Amendment to the Board's drag show ban.

## B. Substantial Threat of Irreparable Injury

The QEC asserts that it will suffer irreparable injury to its mission of advocating for the LGBTQ+ community at A&M if Draggieland is prohibited on campus. (Docket Entry No. 3 at 23). Citing Fifth Circuit precedent, the QEC argues that the loss of First Amendment freedoms almost always constitutes irreparable injury. (*Id.*). Draggieland attendees may be less likely to attend an off-campus event, which is more difficult to get to and less convenient. (*Id.*). The QEC may have to expend considerable funds securing an outside venue. (*Id.*). As the QEC states, "[t]he only alternative is … self-censorship." (*Id.*).

The Board asserts that the QEC will suffer no irreparable harm in the absence of injunctive relief, because "it has already abandoned the once-planned event that is the object of its still-live request for injunction." (Docket Entry No. 20 at 7). The Board states that because refunds have already been issued for the tickets sold for the event, QEC suffers no imminent injury. (*Id.* at 24).

24

The Board also asserts that while the QEC "may intend to hold a show in the future, [] because injunctive relief 'is an extraordinary and drastic remedy' it is not properly issued to protect an as-yet unscheduled show." (*Id*.). It claims that the QEC can hold "non-drag show events" advocating for LGBTQ+ rights and expression at other campus facilities as an alternative. (*Id*.).

The case law is clear that "a plaintiff satisfies the 'substantial threat of irreparable injury' prong by showing that the challenged state action 'represents a substantial threat to his First Amendment rights.'" *Palo Pinto Cnty. Conservatives v. Long*, 2024 WL 3833292, at *7 (5th Cir. Aug. 15, 2024) (quoting *Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch. Dist*., 88 F.3d 274, 280 (5th Cir. 1996)). Because the QEC has established that the ban poses a substantial threat to students' ability to engage in protected conduct, the irreparable injury prong is satisfied. Even if the QEC has the ability to hold Draggieland on an off-campus, less accessible, more distant venue, the ban impairs the exercise of First Amendment rights. The QEC's ability to perform Draggieland on campus is forbidden this year and made uncertain (at best) in subsequent years as a result of the ban. *See Elrod v. Burns*, 427 U.S 347, 373 (1976)) (the irreparable injury prong is met by showing that "First Amendment interests [are] either threatened or in fact being impaired at the time relief [is] sought"). This element of the preliminary injunction test is satisfied.

### C. Balancing of Equities and Public Interest

Finally, the court considers whether the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and whether the grant of an injunction will disserve the public interest. These factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "When a preliminary injunction is sought against the Government, the interests of the Government and the public merge." *Tex. Trib. v. Caldwell County*, 121 F.4th 520, 525 (5th Cir. 2024).

25-20108.392

Citing the State of Texas's 2019 campus free speech law, the QEC asserts that an injunction protecting First Amendment rights by enjoining censorship at a public university is in the public interest.  (Docket Entry No. 3 at 24); TEX. EDUC. CODE § 51.9315(g).  The court finds that the infringement of the QEC's First Amendment rights, and the chilling effect that the ban will have on A&M students' ability to engage in protected speech and expressive conduct, outweighs the hardships that the Board claims A&M will face if the ban cannot be enforced.

It is well established that "[c]olleges and universities are not immune from the requirements of the First Amendment." *Shamloo v. Miss. State Bd. of Trs. of Insts. of Higher Learning*, 620 F.2d 516, 521 (5th Cir. 1980) (citing *Healy v. James*, 408 U.S. 169 (1972)).  The First Amendment at a university such as A&M allows speech across the political and ideological spectrum.  The First Amendment protection covers politically conservative speakers, politically progressive, and politically radical speakers, and those in between, even—or especially—when their views may be unpopular with vocal members of the A&M community.  A&M has long represented itself as a university system that values and prioritizes freedom of expression, claiming that "[a]ny person is allowed, subject to reasonable time, place, and manner restrictions, to engage in expressive activities on campus, including by responding to the expressive activities of others."  Tex. A&M Pol'y 08.99.99.M1 (May 14, 2020).  In fact, the organization that now represents the QEC has previously ranked Texas A&M at College Station among the top ten colleges for free speech in the country.  *See* FIRE, *2024 College Free Speech Rankings*, https://www.thefire.org/research-learn/2024-college-free-speech-rankings (last visited March 23, 2025).  And the exhibits the Board submitted at the hearing held on the application for injunctive relief show that a number of A&M students protested the ban, making clear that at least some A&M students view the ban as an encroachment on their right to be exposed to a variety of views and to freely express themselves

25-20108.393

on campus.  (*See* Docket Entry No. 21-10).  As the Supreme Court stated in *Healy*, "the college classroom with its surrounding environs is peculiarly the marketplace of ideas…." 408 U.S. at 180 (quotation marks and quoting reference omitted).  As in *Healy*, the court finds that A&M, "acting here as the instrumentality of the State, may not restrict speech or association simply because it finds the views expressed by any group to be abhorrent." *See id.* at 188-89.  Granting preliminary injunctive relief to allow the Draggieland performance to occur as scheduled furthers the University's longstanding interest in fostering free expression on campus and the students' interest in continuing to engage in, and be exposed to, a range of freely expressed ideas and opinions.  The injunction, not the ban, serves the public interest.

The Board asserts that if the court grants the injunction, A&M's female students may have their rights abridged under Title IX.  (Docket Entry No. 20 at 24).  The Board also claims that "if A&M is found responsible for that abridgment or to be in violation of President Trump's and Governor Abbott's directives, A&M risks losing federal and state funding." (*Id.*).  As support for this proposition, the Board cites the fact that President Trump recently cancelled $400 million in federal loans to Columbia for its alleged failure to comply with federal antidiscrimination laws. (*Id.*; *see also* Docket Entry No. 21-12).

The Board's concerns do not support the ban.  The Board argues that if the Draggieland performance is held at the Rudder Theatre, the show's perceived message of promoting gender ideology will be attributed to the A&M administration and the Board.  But Draggieland is fully funded, and hosted by, the QEC.  And it is well-established that "the very nature of a public forum is such that state approval does not attach to the various forms of speech (religious or otherwise) communicated therein." *Chabad-Lubavitch of Georgia v. Miller*, 5 F.3d 1383, (11th Cir. 1993); *cf. Widmar v. Vincent*, 454 U.S. at 274 ("an open forum in a public university does not confer any

27

imprimatur of state approval on religious sects or practices"). By permitting Draggieland to be held on campus, in the theatre used for a wide variety of events and performances, for those who want to attend and have bought tickets to do so, the Board does not imply that it endorses Draggieland's message. Instead, the Board is complying with the constitutional obligation to allow different messages and viewpoints, including those viewed as offensive to some, to be expressed at a university that is committed to critical thought about a wide range of conflicting and divergent viewpoints and ideologies.

As discussed previously, the Board has failed to show that permitting drag shows to occur at Special Event Venues would cause the harassment of female students, much less the type of severe and pervasive harassment that violates Title IX. Nor does the Board point to evidence in the record showing that President Trump's executive order regarding "biological truth" specifically refers or applies to drag shows, or that the Draggieland message denies the existence of the male and female sexes. The Board, and some members of the A&M community, are offended by the Draggieland performance. To ban the performance from taking place on campus because it offends some members of the campus community is precisely what the First Amendment prohibits.

The court finds that the balance of the equities and public interest factors weighs in favor of granting the injunction.

## IV.   The Bond Requirement

The QEC asks this court to waive the Federal Rule of Civil Procedure 65(c) security requirement. (Docket Entry No. 3 at 24). The Board did not oppose the QEC's request. *See Glycobiosciences, Inc. v. Woodfield Pharm., LLC*, 2016 WL 1702674, at *10 (S.D. Tex. Apr. 27, 2016). The court also notes that the QEC, a student organization, likely has limited resources to

post a significant bond. *See Tex. Trib. v. Caldwell County*, 2024 WL 420160, at *8 (W.D. Tex.

Feb. 5, 2024), *aff'd* 121 F.4th 520 (5th Cir. 2024).   In light of these considerations, the court

exercises its discretion not to require the QEC to post a bond. *See Kaepa, Inc. v. Achilles Corp.*,

76 F.3d 624, 628 (5th Cir. 1996) (a district court "may elect to require no security at all")

## V.   Conclusion

The court grants the motion for a preliminary injunction.   The Board is enjoined from

enforcing the ban.   The Draggieland performance scheduled for March 27, 2025, in the Rudder

Theatre, may proceed as originally scheduled.   The court separately enters an order of injunction

under Rule 65(c).   No bond is required.

SIGNED on March 24, 2025, at Houston, Texas.

_____
Lee H. Rosenthal
Senior United States District Judge

25-20108.396

**Tab 2: District Court's Order Granting Motion for Preliminary Injunction**

United States District Court
Southern District of Texas

**ENTERED**

March 24, 2025

Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| TEXAS A&M QUEER EMPOWERMENT COUNCIL, | § § § § | |
| Plaintiff, | § | CIVIL ACTION NO. 25-992 |
| v. | § § | |
| WILLIAM MAHOMES, *et al.*, | § § § | |
| Defendants. | § § § | |

**ORDER OF INJUNCTION**

The court has fully reviewed the application by the Texas A&M Queer Empowerment Council ("QEC") for a Preliminary Injunction, the Texas A&M Board of Regents' response, the record, the arguments of counsel, and the applicable law.  Based on this review, the court finds that plaintiff QEC has demonstrated good cause for the court to grant plaintiff's motion.  The court finds that plaintiff QEC has demonstrated: (a) a substantial likelihood of success on the merits of its First Amendment claims; (b) that it will suffer irreparable harm absent a preliminary injunction; and (c) that the public interest favors this injunction.

The court GRANTS the Motion for a Preliminary Injunction and ORDERS as follows:

1. Defendants and their agents, officials, servants, employees, and persons acting in concert with them, are enjoined from enforcing the Texas A&M Board of Regents "Adoption of a Resolution Regarding Certain Public Events on the Campuses of Universities in the Texas A&M University System," dated February 28, 2025, and must permit the Draggieland performance to take place as scheduled on March 27, 2025, at 7:30 p.m., at the Rudder Theatre;

2.  Under Federal Rule of Civil Procedure 65(c), plaintiff QEC is not required to post a bond for this preliminary injunction; and

3.  This preliminary injunction is effective immediately and remains in effect until further order of this court.

SIGNED on March 24, 2025, at Houston, Texas.

_____
Lee H. Rosenthal
Senior United States District Judge

2