No. 25-20108

# In the United States Court of Appeals for the Fifth Circuit

---

Texas A&M Queer Empowerment Council,

*Plaintiff-Appellee*,

*v.*

William Mahomes, in his official capacity as a member of the Board of Regents of the Texas A&M University System; Robert L. Albritton, in his official capacity as a member of the Board of Regents of the Texas A&M University System; David C. Baggett, in his official capacity as a member of the Board of Regents of the Texas A&M University System; James R. Brooks, in his official capacity as a member of the Board of Regents of the Texas A&M University System; John W. Bellinger, in his official capacity as a member of the Board of Regents of the Texas A&M University System; Jay Graham, in his official capacity as a member of the Board of Regents of the Texas A&M University System; Michael A. Hernandez, III, in his official capacity as a member of the Board of Regents of the Texas A&M University System; Kelley Sullivan Georgiades, in her official capacity as a member of the Board of Regents of the Texas A&M University System; Sam Torn, in his official capacity as a member of the Board of Regents of the Texas A&M University System; Lisa D. Cantu, in her official capacity as a member of the Board of Regents of the Texas A&M University System; Glenn Hegar, in his official capacity as Chancellor of the Texas A&M University System; Dr. Susan Ballabina, in her official capacity as President of Texas A&M University,

*Defendants-Appellants*.

———

On Appeal from the United States District Court
for the Southern District of Texas, Houston Division

———

# BRIEF FOR APPELLANTS

———

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

WILLIAM R. PETERSON
Solicitor General

WILLIAM F. COLE
Principal Deputy Solicitor General
William.Cole@oag.texas.gov

CHRISTOPHER J. PAVLINEC
Assistant Attorney General

*Counsel for Defendants-Appellants*

## CERTIFICATE OF INTERESTED PERSONS

No. 25-20108

## TEXAS A&M QUEER EMPOWERMENT COUNCIL,

*Plaintiff-Appellee,*

*v.*

WILLIAM MAHOMES, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; ROBERT L. ALBRITTON, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; DAVID C. BAGGETT, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; JAMES R. BROOKS, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; JOHN W. BELLINGER, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; JAY GRAHAM, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; MICHAEL A. HERNANDEZ, III, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; KELLEY SULLIVAN GEORGIADES, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; SAM TORN, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; LISA D. CANTU, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF REGENTS OF THE TEXAS A&M UNIVERSITY SYSTEM; GLENN HEGAR, IN HIS OFFICIAL CAPACITY AS CHANCELLOR OF THE TEXAS A&M UNIVERSITY SYSTEM; DR. SUSAN BALLABINA, IN HER OFFICIAL CAPACITY AS PRESIDENT OF TEXAS A&M UNIVERSITY,

*Defendants-Appellants.*

———

On Appeal from the United States District Court
for the Southern District of Texas, Houston Division

———

i

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellants, as governmental parties, need not furnish a certificate of interested persons.

/s/ William F. Cole
WILLIAM F. COLE
*Counsel for Defendants-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

The Court has calendared this case for oral argument during its September 2026 en banc sitting. Appellants agree that oral argument will be helpful to the Court in addressing the complex First Amendment issues presented.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons ..................................................................i

Statement Regarding Oral Argument ........................................................iii

Table of Contents ......................................................................................iv

Table of Authorities ...................................................................................v

Introduction................................................................................................1

Statement of Jurisdiction ...........................................................................3

Issues Presented .........................................................................................3

Background..................................................................................................4

    I.   Factual Background .............................................................................4

        A.  The parties.................................................................................4

        B.  QEC applies to reserve Rudder Theatre for *Draggieland* in 2025........5

        C.  After the Board adopts a resolution forbidding hosting certain drag shows in particular university venues, *Draggieland* is cancelled..........8

    II.  Procedural Background.....................................................................12

Summary of the Argument.........................................................................14

Standard of Review ...................................................................................17

Argument...................................................................................................17

    I.   QEC Is Unlikely to Succeed on Its First Amendment Claims. .................17

        A.  QEC did not meet its burden to demonstrate it wished to engage in inherently expressive conduct. .......................................................18

        B.  If First Amendment conduct is implicated, Appellants applied reasonable, viewpoint-neutral restrictions in a limited public forum..27

            1.   Rudder Theatre is a limited public forum. ...................................28

            2.   Appellants' actions survive constitutional scrutiny.....................37

        C.  Appellants' forum-based restriction is not a prior restraint. ..............46

        D.  Unconstitutional vagueness cannot be a ground for relief.................48

    II.  The Remaining Preliminary Injunction Factors Support Reversal. ..........49

Conclusion.................................................................................................51

Certificate of Compliance .........................................................................52

## Table of Authorities

Page(s)

**Cases:**

*Alexander v. United States*,
509 U.S. 544 (1993)......................................................................46

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998).........................................................31, 36, 49

*Barrett v. Walker Cnty. Sch. Dist.*,
872 F.3d 1209 (11th Cir. 2017) ......................................................29

*Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*,
458 U.S. 176 (1982)........................................................................39

*Bloedorn v. Grube*,
631 F.3d 1218 (11th Cir. 2011) ................................................ 32, 41

*Brown v. Louisiana*,
383 U.S. 131 (1966) .......................................................................20

*Cabrol v. Town of Youngsville*,
106 F.3d 101 (5th Cir. 1997) ..................................................... 19, 25

*Cath. Leadership Coal. of Tex. v. Reisman*,
764 F.3d 409 (5th Cir. 2014) ..................................................... 46, 47

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026)..........................................................16, 42, 43

*Chiu v. Plano Indep. Sch. Dist.*,
260 F.3d 330 (5th Cir. 2001) ............................... 30, 31, 34, 36, 37, 49

*Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*,
561 U.S. 661 (2010).... 1, 2, 15, 16, 30, 32, 35, 37, 38, 39, 40, 41, 42, 43, 44, 46, 48

*City Council of L.A. v. Taxpayers for Vincent*,
466 U.S. 789 (1984) .......................................................................42

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985).......................................................................27

*City of Dallas v. Stanglin*,
490 U.S. 19 (1989) .....................................................................19, 21

*Clark v. Cmty. for Creative Non-Violence*,
468 U.S. 288 (1984) .......................................................................20

*Clark v. Sweeney*,
607 U.S. 7 (2025)...........................................................................48

v

Case: 25-20108   Document: 74-1   Page: 8   Date Filed: 07/17/2026

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
   473 U.S. 788 (1985)..................................................28, 31, 32

*Currier v. Potter*,
   379 F.3d 716 (9th Cir. 2004)................................................ 37

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ..............................................................26

*Doe v. Santa Fe Indep. Sch. Dist.*,
   168 F.3d 806 (5th Cir. 1999).........................................31, 32

*Elrod v. Burns*,
   427 U.S. 347 (1976)..............................................................49

*Estiverne v. La. State Bar Ass'n*,
   863 F.2d 371 (5th Cir. 1989) ............................................... 31

*Evans v. Garza*,
   161 F.4th 315 (5th Cir. 2025) .............................................. 17

*FCC v. Beach Commc'ns, Inc.*,
   508 U.S. 307 (1993)..............................................................27

*Fairchild v. Liberty Indep. Sch. Dist.*,
   597 F.3d 747 (5th Cir. 2010) ......................................... 30, 31

*Freedom from Religion Found., Inc. v. Abbott*,
   58 F.4th 824 (5th Cir. 2023) ................................................ 37

*Freedom from Religion Found. v. Abbott*,
   955 F.3d 417 (5th Cir. 2020).........................................28, 47

*Good News Club v. Milford Cent. Sch.*,
   533 U.S. 98 (2001) ......................................................... 30, 37

*Green v. Miss U.S. of Am., LLC*,
   52 F.4th 773 (9th Cir. 2022)................................................23

*Greer v. Spock*,
   424 U.S. 828 (1976) ..............................................................28

*Harrison v. Young*,
   48 F.4th 331 (5th Cir. 2022) ................................................ 17

*Hays Cnty. Guardian v. Supple*,
   969 F.2d 111 (5th Cir. 1992) ....................................32, 34, 35

*Hazelwood Sch. Dist. v. Kuhlmeier*,
   484 U.S. 260 (1988)..............................................................38

*Healy v. James*,
   408 U.S. 169 (1972)......................................................... 38, 39

vi

*Heaney v. Roberts*,
846 F.3d 795 (5th Cir. 2017) ................................................................. 42

*Hunt v. Bd. of Regents of Univ. of N.M.*,
792 F. App'x 595 (10th Cir. 2019) ........................................................ 45

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995) ........................................................................ 18, 25

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*,
505 U.S. 672 (1992) .............................................................. 28, 29, 30

*IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*,
993 F.2d 386 (4th Cir. 1993) ................................................................. 22

*Just. For All v. Faulkner*,
410 F.3d 760 (5th Cir. 2005) .......................................................... 32, 34

*Keister v. Bell*,
29 F.4th 1239 (11th Cir. 2022) ................................................ 32, 34, 35

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
508 U.S. 384 (1993) ............................................................ 15, 29, 31, 42

*Lichtenstein v. Hargett*,
83 F.4th 575 (6th Cir. 2023) ...................................................20, 21, 24, 25

*Littlefield v. Forney Indep. Sch. Dist.*,
268 F.3d 275 (5th Cir. 2001) .......................................................... 19, 25

*Margolin v. Nat'l Ass'n of Immigr. Judges*,
146 S. Ct. 1285 (2026) ........................................................................ 48

*Matal v. Tam*,
582 U.S. 218 (2017) ............................................................................ 44

*Minn. Voters All. v. Mansky*,
585 U.S. 1 (2018) ...................................................................... 28, 30, 31

*Mock v. Garland*,
75 F.4th 563 (5th Cir. 2023) ............................................................... 49

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ............................................................................ 36

*Nat'l Socialist Party of Am. v. Vill. of Skokie*,
432 U.S. 43 (1997) .............................................................................. 18

*Papish v. Bd. of Curators of the Univ.of Mo.*,
410 U.S. 667 (1973) ................................................................ 44, 45, 48

*PCI Transp., Inc. v. Fort Worth & W. R.R. Co.*,
418 F.3d 535 (5th Cir. 2005) ............................................................... 17

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
  460 U.S. 37 (1983)..........................................28, 29, 30, 31, 32, 37, 40

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*,
  748 F.3d 583 (5th Cir. 2014)......................................................27

*Pleasant Grove City v. Summum*,
  555 U.S. 460 (2009) ...............................................................29

*Police Dep't. of Chi. v. Mosley*,
  408 U.S. 92 (1972) ................................................................18

*R.A.V. v. St. Paul*,
  505 U.S. 377 (1992) ...............................................................42

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ...............................................................18

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) ...........................................................30, 42

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
  547 U.S. 47 (2006) ...............................................18, 20, 23, 24, 25

*Southeastern Promotions, Ltd. v. Conrad*,
  420 U.S. 546 (1975)...........................................................24, 25

*Spectrum WT v. Wendler*,
  151 F.4th 714 (5th Cir. 2025)...............................................16, 40, 42, 43

*Spence v. Washington*,
  418 U.S. 405 (1974)...........................................................19, 25, 26

*Stromberg v. California*,
  283 U.S. 359 (1931) ...............................................................18

*Texas v. Johnson*,
  491 U.S. 397 (1989) ...............................2, 14, 18, 19, 20, 21, 25, 26, 43

*Tinker v. De Moines Indep. Cmty. Sch. Dist.*,
  393 U.S. 503 (1969)...........................................................18, 19, 20

*United States v. Abbott*,
  110 F.4th 700 (5th Cir. 2024) (en banc) ........................................49

*United States v. Bjerke*,
  796 F.2d 643 (3d Cir. 1986)......................................................37

*United States v. O'Brien*,
  391 U.S. 367 (1968) ...............................................................19

*United States v. Sineneng-Smith*,
  590 U.S. 371 (2020) ...............................................................48

*Voting for Am., Inc. v. Steen*,
   732 F.3d 382 (5th Cir. 2013)................................................. 20, 25, 26

*W. Va. State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) ................................................................. 18

*Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*,
   576 U.S. 200 (2015) ................................................................. 29

*Wandering Dago, Inc. v. Destito*,
   879 F.3d 20 (2d Cir. 2018) ........................................................ 44

*Widmar v. Vincent*,
   454 U.S. 263 (1981)....................................................... 32, 35, 38

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ............................................................... 17, 49

*Wisconsin v. Mitchell*,
   508 U.S. 476 (1993)................................................................. 44

*Yeasin v. Durham*,
   719 F. App'x 844 (10th Cir. 2018)............................................... 45

*Ysleta Fed'n of Tchrs. v. Ysleta Indep. Sch. Dist.*,
   720 F.2d 1429 (5th Cir. 1983) .................................................... 37

**Statutes and Rules:**

20 U.S.C. § 1681 ......................................................................... 10

28 U.S.C.
   § 1292 ...................................................................................3
   § 1331....................................................................................3
   § 1343 ...................................................................................3

42 U.S.C. § 1983 ...........................................................................3

Tex. Educ. Code
   § 51.355 .................................................................................4
   § 85.11...................................................................................4
   § 85.21 ..................................................................................4

Fed. R. Evid. 201..........................................................................6

**Other Authorities:**

Brief of ACLU & Equality Texas, *Spectrum WT v. Wendler*,
   No. 23-10994, 2025 WL 3540028 (5th Cir. Dec. 3, 2025) ............... 23

System Policy 08.02.01, Texas A&M University System
   (Nov. 13, 2025) ............................................................. 6, 7, 34

*The University Center & Special Events: Rudder Theatre Complex*, Texas
    A&M University: University Center & Special Events .............................. 33, 34
*This is the Army* (Warner Bros. Pictures 1943) ......................................................22
University Rule 08.02.99.M1, Texas A&M University
    (March 16, 2026) ..........................................................................6, 7, 12, 34, 35

## Introduction

In early 2025, exercising "its discretion" to govern the University System and maintain its "mission and core values," the Texas A&M University Board of Regents adopted a policy barring the performance of "drag show events" in university-controlled meeting rooms, theaters, and auditoriums. ROA.37. Citing concerns that these shows are inconsistent with both antidiscrimination law and "the System's mission and core values," the Board restricted the staging of such shows to the extent that they involve "unwelcome and objectively offensive conduct based on sex" that "mock[s] or objectifi[es] women" through "parody [of] the female body type." ROA.37.

The district court erred by enjoining enforcement of this policy against the Texas A&M Queer Empowerment Council ("QEC"), which sought to host a drag show in Texas A&M University's Rudder Theatre. Universities are entitled to adopt reasonable policies, "due decent respect" by federal courts, that help advance their educational mission and enforce "[n]ondiscrimination" policies and "state-law proscriptions on discrimination." *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 687, 689-90 (2010) ("*CLS*").

That principle controls this appeal, and this Court should reverse. At the outset, QEC has not demonstrated that its planned show involved inherently expressive conduct protected by the First Amendment. On this record, QEC has not demonstrated that a performance involving individuals donning a "costume" (sometimes, but not always, associated with the opposite sex) and performing

"dance routines" or showcasing "other talents," ROA.17, would convey a message "overwhelmingly" likely to be understood by viewers, *Texas v. Johnson*, 491 U.S. 397, 404, 406 (1989), including QEC's alleged "message[s] supporting the LGBTQ+ community" and "challenges to societal norms," ROA.20.

But even if QEC offered sufficient evidence that its conduct was inherently expressive and protected by the First Amendment, Appellants' exclusion of its drag show from Rudder Theatre comports with the Constitution. Rudder Theatre—an indoor event venue that student groups may reserve for use with University approval—is a limited public forum because it is not generally accessible to students or the public for indiscriminate use. And because Rudder Theatre is a limited public forum, Appellants need only show that their adoption and application of a policy prohibiting "drag show events" was "reasonable" in the light of the forum's purpose and was viewpoint neutral. *CLS*, 561 U.S. at 679. It was.

Appellants' adoption and application of the Board's policy was grounded in its judgment about the show's effect on the educational environment and out of concern for compliance with antidiscrimination law—decisions the Supreme Court has held federal courts are bound to respect. *Id.* at 686-87. And no evidence in the record supports the notion that Appellants discriminated against QEC's message of support for the LGBTQ+ community; instead, they sought to curb "the perceived harms" associated with QEC's "conduct—not its . . . perspective." *Id.* at 696.

2

## STATEMENT OF JURISDICTION

QEC invoked the district court's subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1343, for its federal constitutional claims brought under 42 U.S.C. § 1983. ROA.11, 23-34. Appellants timely noticed their appeal of the district court's March 24, 2025, order granting QEC's preliminary injunction motion on March 28, 2025. ROA.397-98 (order), 399-400 (notice of appeal). This Court has appellate jurisdiction over Appellants' appeal of the district court's grant of a preliminary injunction motion under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

1.   Whether QEC demonstrated that the conduct in which it sought to engage—staging a performance with individuals donning a "costume" and performing "dance routines" to "songs" or showcasing "other talents," ROA.17—transmits messages overwhelmingly likely to be understood by viewers such that it constitutes inherently expressive conduct protected by the First Amendment.

2.   Whether Rudder Theatre—a university-owned, on-campus indoor event space that may be reserved for use through a multi-step event-approval process—constitutes a limited public forum, and whether Appellants adoption and application of rules prohibiting drag shows in that forum, grounded in concerns about the educational environment, antiharassment, and antidiscrimination, was a reasonable, viewpoint-neutral restriction on the forum.

## BACKGROUND

### I.  Factual Background

#### A.  The parties

Texas A&M University, a public university located in College Station, Texas, is one of eleven universities that is part of the broader Texas A&M University System. ROA.245. State law vests overall governance of "the university system and its institutions, agencies, and services," Tex. Educ. Code § 85.21, in a nine-member[1] Board of Regents appointed by the Governor, *id.* § 85.11; *see* ROA.12-13; Dkt. 68. To carry out its functions, the Board appoints a Chancellor to serve as the "chief executive officer" of the University System and a President to helm each university. ROA.13. At present, Glenn Hegar serves as Chancellor of the Texas A&M University System, and Dr. Susan Ballabina serves as President of Texas A&M University. Dkt. 68; ROA.13.

QEC is a student organization on Texas A&M University's campus that "was formally established in March 2023." ROA.12, 19. Its mission is "to foster unity among LGBTQ+ organizations on campus, and to serve as a resource for LGBTQ+ students, creating spaces that empower individuals regardless of their gender identity or sexual orientation." ROA.12. "To further its mission," QEC "hosts regular events" on campus, including: (1) "The Coming Out Monologues, an annual event where students share and listen to queer stories and experiences in front of an accepting audience," (2) "the Rainbow Resource Fair, [which] connect[s] students

---

[1] The Board also seats a tenth, non-voting "student regent" appointed by the Governor to serve on the Board for a one-year term. Tex. Educ. Code § 51.355.

with on- and off-campus LGBTQ+ friendly organizations and groups," and (3) the "Lavender Graduation, an annual celebration that recognizes and affirms LGBTQ+ graduates and their loved ones." ROA.12; *see also* ROA.245-46 (listing additional events, including a "Town Hall," a "Winter Wonderland," and "Pride Mentors socials").

But QEC's "main annual event is *Draggieland*, a pageant-style performance," ROA.12, that takes the form of a "student-funded drag show," ROA.9. The premise of this event is that "competitors—frequently including community members and students—participate in a pageant to try to win the title of 'Queen/King of *Draggieland*.'" ROA.17. Each competitor dons a "costume"—"frequently, but not always, mak[ing] clothing choices to deliberately contrast with their expected gender presentation"—and performs a "dance routine[]" to "songs" or "other talents" that "advance" unspecified "themes." ROA.17. QEC "hire[s] a host (or multiple hosts)" and appoints judges to crown a champion. ROA.18. Following the performance, the competitors "discuss what drag means to them in conversation with the host." ROA.17.

*Draggieland* has been hosted at the University since 2020 and was sponsored by the University in 2020 and 2021. ROA.18. Following the University's decision to cease its sponsorship of *Draggieland*, QEC was "formally established" to organize and fund the event. ROA.18-19.

## B.  QEC applies to reserve Rudder Theatre for *Draggieland* in 2025

On May 28, 2024, QEC submitted a request to University staff to book Rudder Theatre as the venue to host *Draggieland* on the evening of March 27, 2025, along

with two rehearsals that month. ROA.21. Rudder Theatre is a 750-seat event space housed within the Rudder Theatre Complex on the University's campus. ROA.14, 18.

**1.** University and System policy makes "all common outdoors areas" of a campus "traditional public forums," University Rule 08.02.99.M1.2, Texas A&M University (March 16, 2026), https://perma.cc/JTZ7-GQ9R ("University Rule"), where "[a]ny person is permitted to engage in expressive activities ... freely," System Policy 08.02.01, Texas A&M University System (Nov. 13, 2025), https://perma.cc/NYF8-JWQT ("System Policy").[2] Such areas include "streets, sidewalks, plazas, lawns, and parks, unless closed by the [university] for a special event." System Policy 08.02.01. The University has also designated certain "common outdoor spaces"—as well as certain "indoor spaces" like classrooms, residence halls, faculty and staff offices, and libraries—"not to be considered public forums." University Rule 08.02.99.M1.2.2, 2.3.

The University has also expressly designated three outdoor areas of its campus—Rudder Fountain Area, West Academic Plaza, and West Campus Mall Area—as public forums that may be formally reserved for expressive activity, University Rule 08.02.99.M1.3, and are thus "treated similar to public streets,

---

[2] The Court can take judicial notice of the System Policies and University Rules, referenced in QEC's verified complaint, ROA.13-14, because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b)(2). Although Appellants updated those policies in the sixteen months since the district court's decision, those updates do not materially change the legal analysis.

sidewalks, and parks in terms of access and availability," System Policy 08.02.01. Reservations are required for use of these three designated public forums "for activities near intersections, and/or in close proximity to academic buildings anytime classes, and/or study activities, and/or research are taking place." University Rule 08.02.99.M1.4. The purpose of requiring advance reservations in these circumstances is "to ensure safety and to promote an environment conducive to study." *Id.*

Other spaces on campus are "limited public forums" where "[t]he university reserves the right to set reasonable restrictions to preserve university hosted, sponsored, or approved events and activities." University Rule 08.02.99.M1.6.1.1. The University expressly states that "[r]estrictions will be established as necessary to enable events and activities to proceed for their intended purpose and to maintain . . . substantial university interests." *Id.* And "[t]he university reserves the right to establish other limited forums on campus through individualized written-use policies." *Id.* University Rule 08.02.99.M1.6.2.3.

**2.** Rudder Theatre, an indoor 750-seat event space on the University's campus, is neither a "common outdoor area" of the University nor one of the three "designated public forums" listed in the University Rules. Instead, like other limited public forums, it may be reserved for use with University approval. ROA.297-301 (describing step-by-step process); *see also* University Rule 08.02.99.M1.6. Student groups that wish to use Rudder Theatre must submit an "initial request" supplying basic information about the desired event. ROA.279. Once University staff can confirm details, including "staffing, event time, needs and costs," ROA.284, they

will send the requester several documents to execute, including one "containing rules [and] standards that requires their signature." ROA.290; *see* ROA.293. Once the event details are "confirmed "and all necessary documents are" completed, the University will treat the reservation as "final [and] confirmed." ROA.284.

3.   Following its May 2024 submission of a request to book Rudder Theatre, in October 2024, the University provided QEC a bill for estimated costs, which includes Rudder Theatre staff, rental of drapes and stage equipment, a fire alarm technician, and campus police officers. ROA.21. The University then confirmed reservations both for the event and for two rehearsals that same month. ROA.21. By February 28, 2025, *Draggieland* was listed as "Approved" by the University and tickets were available on the Rudder Theatre website. ROA.21.

### C.   After the Board adopts a resolution forbidding hosting certain drag shows in particular university venues, *Draggieland* is cancelled

Ultimately, QEC's plans to host *Draggieland* were put on hold following the Board of Regents' issuance of a Resolution in February 2025 barring the hosting of "drag show events" in specific campus venues. Pursuant to the policy in that Resolution, the University cancelled *Draggieland*.

1.   On February 28, 2025, the Board issued a Resolution prohibiting "drag show events" from being held in certain venues on any Texas A&M University System campus. ROA.37-38. The Board "recognize[d] and support[ed] the efforts of the Universities' student, staff and faculty organizations, to foster a sense of community and belonging for the many students, staff and faculty of the Universities from varied backgrounds." ROA.37. But it found "that it is inconsistent with the

System's mission and core values of its Universities, including the value of respect for others, to allow" certain venues—specifically, "meeting rooms, theaters, auditoriums, and other venues available to student, staff, and faculty organizations in which the organizations periodically host events that are open to members of the public"—"to be used for drag shows." ROA.37. It thus barred such drag shows from being held at these campus venues "from and after the date of this Resolution," though it explained that it had been "advised that there are alternative locations for such events at off-campus venues and private facilities near the Universities." ROA.38.

The Board defined the prohibited drag shows in a specific way: performances that involve (1) "biological males dressing in women's clothing;" (2) "wearing exaggerated female make up and/or exaggerated prosthetics meant to parody the female body type;" and that (3) are "open to the public;" (4) "involve sexualized, vulgar or lewd conduct;" and (5) "involve conduct that demeans women." ROA.37.

The Board came to this determination by "necessarily us[ing] its discretion" attendant to "carrying out its responsibility for the proper governance of the System and the proper management of the Universities." ROA.37. It offered three grounds for its decision.

*First*, the Board identified mission-consistent use of campus property. Specifically, "the Board recognize[d] a special interest in maintaining the Universities' Special Event Venues as limited forums for the purpose of promoting the mission of the System to provide education, conduct research, commercialize technology, offer training and deliver services for the people of Texas and beyond."

9

ROA.37. In pursuit of this "special interest," the Board found that "it is inconsistent with the System's mission and core values of its Universities, including the value of respect for others, to allow Special Event Venues of the Universities to be used for drag shows." ROA.37.

*Second*, the Board cited universities' obligations under federal and state anti-discrimination law. In particular, it "f[ound] that Drag Show Events are likely to create or contribute to a hostile environment for women contrary to System anti-discrimination policy and Title IX of the Education Amendments of 1972 (Title IX)." ROA.37; 20 U.S.C. § 1681(a). The Board concluded that Title IX was implicated after determining that "these events often involve unwelcome and objectively offensive conduct based on sex for many members of the respective communities of the Universities, particularly when they involve the mockery or objectification of women." ROA.37.

*Third*, the Board cited the risk that hosting such drag shows might run afoul of a recent Presidential executive order, endorsed by the Governor, and thereby cost universities federal funds. Specifically, the Board "acknowledge[d] President Trump's Executive Order issued January 20, 2025, entitled *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*," which: "recognizes two sexes, male and female," "specifies that the federal government shall not promote gender ideology," and that "federal funds shall not be used to promote gender ideology." ROA.38; *see* ROA.235-36. Similarly, the "Board acknowledge[d] Governor Abbott's letter dated January 30, 2025, expressing support for the Executive Order and directing state agencies to 'comply

10

with the law and the biological reality that there are only two sexes—male and female.'" ROA.38; *see* ROA.238.

"[G]iven that both the System and the Universities receive significant federal funding," the Board explained, "the use of facilities at the Universities for Drag Show Events may be considered promotion of gender ideology in violation of the Executive Order and the Governor's directive," and thus result in the loss of federal funds. ROA.38.

**2.**   Heeding the Board's directive that "the Chancellor and President of each of the Universities" "take the actions necessary to implement the policy set forth" in its Resolution, "including action to cancel any upcoming Drag Show Events," ROA.38, the then-current Chancellor and then-current President of Texas A&M University took action.

On the same day the Board issued its Resolution, then-Chancellor John Sharp emailed the "System Presidents" alerting them that "our Board of Regents adopted the attached Resolution regarding certain public events on the campuses of the universities in the A&M System," and asking them to "[p]lease take prompt action to implement the directives set forth in the Resolution." ROA.40. In turn, then-President Mark A. Welsh, III, instructed then-Interim Vice President for Student Affairs, Thomas W. Reber, "to cancel the 2025 'Draggieland' drag performance . . . in compliance with the Board's Resolution." ROA.245.

Reber thereafter alerted QEC that its show would be canceled. ROA.362. Accordingly, all "ticket sales" were "suspended" and "[a]ll previously purchased tickets, consisting of 168 tickets totaling $6,645.50, were refunded in full on March 3,

11

2025." ROA.245. Though *Draggieland* had been cancelled, Reber attested that "QEC has been allowed to reserve and use Texas A&M facilities for non-drag performance activities since its founding in 2023" and that he "anticipate[d]" that the activities "w[ould] continue" in the future. ROA.245. Reber also identified four "event facilities in the near vicinity" of the University that "also seat 750 or more people and are available for rent by the public." ROA.246.

**3.**   On March 6, 2025, students protested the Board's Resolution and the University's cancellation of *Draggieland*. It was dubbed the "Day of Drag Protest" and was held in Academy Plaza on the University's campus—a designated public forum under University Rules, *see* University Rule 08.02.99.M1.3.1.2—with protestors dressed in costume, speaking in support of drag shows, and sharing their opposition to Appellants' actions. ROA.251-54, ROA.320-26. Appellants took no action to prevent or interfere with this protest.

## II.  Procedural Background

On March 5, 2025, QEC filed a lawsuit in the Southern District of Texas challenging on First Amendment grounds the cancellation of its drag show. ROA.9-35. QEC sued all ten members of the Board, the then-current Chancellor, and the then-current President of Texas A&M University. ROA.12. QEC then sought a TRO and preliminary injunction against enforcement of the Board's Resolution and cancellation of *Draggieland*. ROA.67-91, 95-98. QEC's claims do not dispute that *Draggieland* is subject to the Board's Resolution and its definition of "drag show events" or contend that University officials misapplied the Resolution; rather their

theory is that enforcement of the Board's Resolution as written violates the First Amendment. ROA.25-31.

The district court granted QEC's motion and issued a preliminary injunction against enforcement of the Resolution and cancellation of the show. ROA.397-98. The court concluded that QEC was likely to succeed on the merits of its First Amendment claims, holding that drag shows are inherently expressive conduct protected by the First Amendment, ROA.373-78, and that the Board Resolution banning them likely violates the First Amendment as a viewpoint-based prior restraint that fails strict scrutiny, ROA.378-91. The court characterized Rudder Theatre as a designated public forum rather than a limited public forum and rejected the argument that the System's anti-discrimination policies and Title IX justified prohibiting the specified campus drag performances. ROA.378-81.

Appellants timely noticed the instant appeal. ROA.399-400. On May 27, 2025, this Court granted Appellants' motion to hold this appeal in abeyance pending this Court's decisions in *Spectrum WT v. Wendler*, No. 23-10994 (5th Cir.), and *Woodlands Pride, Inc. v. Paxton*, No. 23-20480 (5th Cir.). Dkt. No. 20. On April 7, 2026, this Court lifted the abatement and issued a briefing schedule in this appeal. Dkt. 44. On May 15, the parties filed a joint petition for initial hearing en banc in this case, Dkt. 53, and in *Spectrum WT v. Wendler*, No. 26-10127 (5th Cir. May 15, 2026), Dkt. 41. On June 22, this Court granted the petitions, set briefing schedules, and consolidated the cases for oral argument purposes only. Dkt. 65.

## SUMMARY OF THE ARGUMENT

This Court should reverse the district court's grant of QEC's motion for a preliminary injunction because QEC did not meet its burden to establish any of the preliminary injunction factors.

**I.** QEC is unlikely to succeed on the merits of its First Amendment claims. On this record, QEC has failed to demonstrate that it intended to engage in any First Amendment-protected activity. The Free Speech Clause protects only conduct that is "inherently expressive"—that is, conduct "sufficiently imbued with elements of communication." *Johnson*, 491 U.S. at 404. Conduct qualifies as such only if "[1] an intent to convey a particularized message was present, and . . . [2] the likelihood was great that the message would be understood by those who viewed it." *Id.*

QEC did not satisfy the latter prong: It supplied no evidence to carry its burden to show that it would be "overwhelmingly apparent," *id.* at 406, to viewers that performances involving individuals donning a "costume" (sometimes, but not always, associated with the opposite sex) and performing "dance routines" or showcasing other talents, ROA.17, convey "message[s] supporting the LGBTQ+ community" and "challenges to societal norms," ROA.20. The district court erred by concluding that QEC met its evidentiary burden because the performers speak about what drag means to them after the performance or because the drag show was analogous to live theater and musicals.

Even if QEC were engaged in inherently expressive conduct protected by the First Amendment, Appellants' exclusion of its drag show from Rudder Theatre was not unconstitutional because it was a reasonable, viewpoint-neutral restriction in a

14

limited public forum. To begin, Rudder Theatre—an indoor, 750-seat event space on the University campus that may be reserved for student use with University approval—is a limited public forum. Unlike a designated public forum, Rudder Theatre is not "open for indiscriminate public use for communicative purposes." *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 392 (1993). Instead, students who would like to use the forum must obtain approval from the University that is secured through a multi-layered approval process. ROA.297-301.

Because Rudder Theatre is a limited public forum, Appellants need only show that their adoption and application of rules prohibiting drag shows in that forum was reasonable and viewpoint neutral. *CLS*, 561 U.S. at 679. It was both. By excluding drag shows from Rudder Theatre, Appellants sought to prevent events that would involve "unwelcome and objectively offensive conduct based on sex" that "mock[s] or objectifi[es] women" through "parody [of] the female body type," ROA.37, in violation of the A&M System's "mission and core values" and antidiscrimination law. ROA.37. Efforts to enforce "[n]ondiscrimination" policies and "state-law proscriptions on discrimination" are the precise concerns the Supreme Court has deemed "reasonable" in the university context, *CLS*, 561 U.S. at 689-90, particularly where, as here, "substantial alternative channels . . . remain open"— including numerous on-campus events and other venues—for QEC to convey its message, *id.* at 690 (citation omitted).

Appellants' adoption and application of rules prohibiting drag shows in university theaters and other limited public forums was also viewpoint neutral. QEC "was told to abandon *the way in which* it wished to deliver its message, *i.e.*, the

15

message of support of the LGBT+ community through the *delivery mechanism* of a drag show." *Spectrum WT v. Wendler*, 151 F.4th 714, 728 (5th Cir. 2025) (emphases added). And "[o]n the record so far," Appellants' "objections were *not to the message but to the way* [in which] it would be delivered." *Id.* (emphasis added). Appellants' objection was not that the show conveyed pro-LGBTQ+ *speech* or *ideas* disfavored by the Board or University but because the drag show involved "*act*[s]" that might rise to the level of "unwelcome and objectively offensive conduct based on sex" that violates "System anti-discrimination policy and Title IX." ROA.37; *CLS*, 561 U.S. at 696. Appellants' exclusion of *Draggieland* from Rudder Theatre does not preclude QEC from "voic[ing] certain 'perspective[s]'" about LGBTQ+ issues that the Board or University allegedly "disfavors." *Chiles v. Salazar*, 146 S. Ct. 1010, 1024 (2026). Indeed, QEC routinely expresses those messages in university forums through other types of programming.

**II.** Nor has QEC demonstrated that it will suffer irreparable harm in the absence of an injunction or that the balance of equities and public interest support injunctive relief. Because QEC has not identified a First Amendment violation, it cannot bootstrap that deficient claim into irreparable injury. And both the public interest and balance of harms tip in favor of Appellants, as a ruling endorsing an overly expansive forum analysis that would force universities to host conduct antithetical to their mission, harmful to the educational environment, and at odds with antidiscrimination law might encourage universities to close forums for speech.

16

## STANDARD OF REVIEW

This Court "review[s] the grant or denial of a preliminary injunction for abuse of discretion, with any underlying legal determinations reviewed de novo and factual findings for clear error." *Evans v. Garza*, 161 F.4th 315, 320 (5th Cir. 2025) (citations omitted). A "preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion.'" *Harrison v. Young*, 48 F.4th 331, 342 (5th Cir. 2022) (quoting *PCI Transp., Inc. v. Fort Worth & W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005)). Any "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

### I. QEC Is Unlikely to Succeed on Its First Amendment Claims.

This Court should reverse the district court's order granting QEC's motion for a preliminary injunction because QEC is unlikely to succeed on its First Amendment claims. On this thin preliminary injunction record, QEC did not carry its evidentiary burden to show that the drag show it wished to hold in Rudder Theatre—involving performers donning a "costume" and performing "dance routines" to "songs" or showcasing "other talents," ROA.17—constituted inherently expressive conduct entitled to First Amendment protection. But even if QEC had supplied the requisite evidence to identify such inherently expressive conduct, Rudder Theatre is a limited

17

public forum, and Appellants applied reasonable, viewpoint-neutral standards when they excluded QEC's drag show.

### A. QEC did not meet its burden to demonstrate it wished to engage in inherently expressive conduct.

**1.** The First Amendment's Free Speech Clause forbids the government to "restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Police Dep't. of Chi. v. Mosley*, 408 U.S. 92, 95 (1972)). Although "[t]he First Amendment literally forbids the abridgment only of 'speech,'" the Supreme Court has "long recognized that its protection does not end at the spoken or written word." *Johnson*, 491 U.S. at 404. The prohibition also extends to certain "conduct that is inherently expressive." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006) ("*FAIR*").

The Supreme Court has recognized such inherently expressive conduct as including "saluting a flag (and refusing to do so)," *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 632 (1943), "wearing an armband to protest a war," *Tinker v. De Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505-06 (1969), "displaying a red flag," *Stromberg v. California*, 283 U.S. 359, 369 (1931), "and even '[m]arching, walking, or parading' in uniforms displaying the swastika," *Nat'l Socialist Party of Am. v. Vill. of Skokie*, 432 U.S. 43, 43 (1997) (per curiam). *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995) (collecting these authorities). This line of cases recognizes "that conduct may be 'sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments.'"

18

*Johnson*, 491 U.S. at 404 (quoting *Spence v. Washington*, 418 U.S. 405, 409 (1974) (per curiam)).

At the same time, the Supreme Court has cautioned that it "cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). After all, "[i]t is possible to find some kernel of expression in almost every activity a person undertakes." *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989). So, to determine "whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play," the Supreme Court has long instructed courts to consider "whether 'an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it.'" *Johnson*, 491 U.S. at 404 (alterations omitted) (quoting *Spence*, 418 U.S. at 410-11). Ultimately, "[i]n order for a message to be delivered by conduct, it must, in context, be reasonably apprehended by viewers." *Cabrol v. Town of Youngsville*, 106 F.3d 101, 109 (5th Cir. 1997).

In applying this test, identifying "the context in which" the conduct "occurred" is key. *Johnson*, 491 U.S. at 405. Indeed, "[t]he protection of the First Amendment depends not only on whether the conduct is expressive, but also on the context in which that expression takes place." *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 283 (5th Cir. 2001). Thus, it was critical in *Spence* that the defendant's "taping of a peace sign to his flag was 'roughly simultaneous with and concededly triggered by the Cambodian incursion and the Kent State tragedy.'" *Johnson*, 491 U.S. at 405 (quoting *Spence*, 481 U.S. at 410). And in *Tinker* that the students

19

wore "black armbands to protest American military involvement in Vietnam." *Id.* at 404 (citing *Tinker*, 393 U.S. at 505). Or in *Brown v. Louisiana*, that African Americans engaged in a "sit-in . . . in a 'whites only' area to protest segregation." *Id.* (citing 383 U.S. 131, 141-42 (1966)). Likewise, in *Johnson*, the defendant "burned an American flag as part—indeed, as the culmination—of a political demonstration that coincided with the convening of the Republican Party and its renomination of Ronald Reagan for President." *Id.* at 406.

As the Supreme Court has elaborated, the message, or "the point," of the conduct should be "overwhelmingly apparent" for it to be deemed inherently expressive. *FAIR*, 547 U.S. at 66 (quoting *Johnson*, 491 U.S. at 406). That is, "a viewer must be able to understand the message from the conduct *alone*." *Lichtenstein v. Hargett*, 83 F.4th 575, 594 (6th Cir. 2023). But if conduct is "expressive only because" it is "accompanied . . . with speech explaining it," it is unlikely to qualify as inherently expressive. *FAIR*, 547 U.S. at 66. "The fact that such explanatory speech is necessary is strong evidence that the conduct at issue . . . is not so inherently expressive that it warrants protection." *Id.* Otherwise, "[i]f combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it." *Id.*

**2.** "As the party invoking the First Amendment's protection, [QEC] ha[d] the burden to prove that it applies." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013) (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984)). But on this scarce preliminary injunction record, QEC has not demonstrated

that *Draggieland* was intended to convey a message that in "context" had a great likelihood of being understood by viewers. *Johnson*, 491 U.S. at 405.

QEC's verified complaint alleges that *Draggieland* is a "pageant-style performance" in which students and "community members" wear a costume—"[f]requently, but not always, . . . deliberately [in] contrast with their expected gender presentation"—and perform "dance routines" to "songs" or showcase "other talents" that "advance" unspecified "themes." ROA.12, 17. QEC alleges that "[t]he context of drag shows—a stage, lighting, sound, choreography, makeup, and costume—provides cues that alert viewers to the performance's expressive nature." ROA.20. And it asserts that *Draggieland* "provides a way for students to express messages supporting the LGBTQ+ community" and "to embrace their identities, express challenges to societal norms (including norms relating to gender and sexuality), and educate the broader university community about LGBTQ+ culture." ROA.20.

But QEC offers no evidence or explanation for why the likelihood is "great," *Johnson*, 491 U.S. at 404, or "high" that, standing "alone," *Lichtenstein*, 83 F.4th at 594, viewers of *Draggieland* would necessarily equate students dancing to music on stage while clad in costume with a message of support for the LGBTQ+ community or a challenge to gender norms. *Cf. Stanglin*, 490 U.S. at 25 (holding that "dance-hall patrons [] coming together to engage in recreational dancing [] is not protected by the First Amendment"). Nothing about the existence of "a stage, lighting, sound, choreography, makeup, and costume[s]," by itself, transmits a message of support

21

for the LGBTQ+ community. ROA.20. Those elements are part of any stage performance.

Nor does the fact that some—but not all—performers wear attire that "contrast[s] with their expected gender presentation," automatically convey a message of support for the LGBTQ+ community. ROA.17. Cross-dressing was present in the "ugly woman" skit involving members of a fraternity donning the attire of, and caricaturing, the opposite sex, *IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 387-88, 391 (4th Cir. 1993), and a U.S. Army recruitment video involving men dressed in women's clothing that compares being drafted in the Army to being drafted into a women's chorus, *see* "Ladies of the Chorus" in Ronald Reagan's movie *This is the Army* (Warner Bros. Pictures 1943), https://perma.cc/2LJA-UR3X (last accessed on July 16, 2026). And, as the district court noted, cross-dressing is present in certain Shakespearian plays, movies, and college theater. ROA.382-83. But none of these performances necessarily conveys pro-LGBTQ+ messages even though they involve cross-dressing.

QEC might respond that the relevant "context" cluing viewers into the pro-LGBTQ+ message of *Draggieland* is the fact that (a) an LGBTQ+ student group is organizing it; and (b) drag shows are associated with LGBTQ+ culture. But the identity of the organization cannot, without more, convert non-expressive conduct into expressive conduct. Such an argument would prove too much—not *everything* an LGBTQ+ organization does is expressive. A juggling competition would not qualify as expressive conduct merely because an LGBTQ+ club sponsors it. And QEC failed to marshal evidence of the link between drag shows and LGBTQ+ culture

22

and evidence that viewers of *Draggieland* would be aware of that link. The preliminary injunction record only contains vague and generalized allegations in a verified complaint. *Cf. Green v. Miss U.S. of Am., LLC*, 52 F.4th 773, 780 (9th Cir. 2022) (holding that "beauty pageants" constitute inherently expressive conduct in part because "it is *commonly understood* that beauty pageants are generally designed to express the 'ideal vision of American womanhood'" (emphasis added)).

That evidentiary gap is especially stark because QEC acknowledges that drag shows, in general, could communicate a multiplicity of messages. *See* ROA.20. Moreover, the catchall term "drag show" is imprecise and ambiguous because it has been used to describe all manner of conduct, including everything from Shakespeare's plays, "cross-dressing," 19th century "parties where the guests were reportedly men dressed in gowns [that] danced together," "Vaudeville theater," "Madonna's 'Vogue,'" and "female impersonators . . . at the Texas State Fair." Brief of ACLU & Equality Texas, *Spectrum WT v. Wendler*, No. 23-10994, 2025 WL 3540028, at *7-*11 (5th Cir. Dec. 3, 2025). Even the district court appeared to endorse this broad definition. *See* ROA.382-83.

**3.**   The district court held that QEC's staging of *Draggieland* constitutes inherently expressive conduct, but the four reasons it offered miss the mark.

*First*, the court held that, because *Draggieland* "includes conversations between the performers and host about what drag means to the performers," it constitutes "expressive conduct." ROA.377. This rationale runs headlong into *FAIR*: if conduct is "expressive only because" it is "accompanied . . . with speech explaining it," it is unlikely to qualify as inherently expressive. 547 U.S. at 66. That is precisely the

23

circumstances here. As QEC explained below, these conversations take place "after the performance" itself. ROA.75; *see* ROA.17 ("*Draggieland* performers *then* discuss what drag means to them in conversation with the host." (second italics added)). But under *FAIR*, QEC cannot convert its drag show into inherently expressive conduct by including "explanatory speech" on the back end. 547 U.S. at 66.

The district court characterized Appellants as asking the court to improperly "deconstruct" the performance to separate non-expressive elements from expressive ones. ROA.378. But this reasoning conflicts with *FAIR*'s rule that "[w]hen a party must include 'explanatory speech' for the audience to get the message, the conduct does not warrant protection." *Lichtenstein*, 83 F.4th at 594 (quoting *FAIR*, 547 U.S. at 66). And it does not give effect to QEC's admission that this explanatory speech—which Appellants do not dispute would receive First Amendment protection—is not part of the performance but occurs afterwards. ROA.17, 75.

*Second*, the district court held that *Draggieland* constitutes inherently expressive conduct because "theatrical performances are protected forms of expressive conduct." ROA.378 (citing *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557-58 (1975)). The district court overread *Conrad*. The Supreme Court held that a municipality's decision to deny a production company use of a municipal theater to screen a controversial musical was a prior restraint in violation of the First Amendment. *Conrad*, 420 U.S. at 552-57. The Court explained that "[o]nly if we were to conclude that live drama is unprotected by the First Amendment—or subject to a totally different standard from that applied to other forms of expression—could

24

we possibly find no prior restraint here." *Id.* at 557. But the Court elaborated that "[e]ach medium of expression . . . must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems." *Id.* And "[b]y its nature, theater usually is the acting out—or singing out—of the written word." *Id.* at 557-58. Here, nothing in the record indicates that *Draggieland* would involve "the acting out—or singing out—of the written word," so there is no reason to equate it to musical theater or "live drama."

*Third*, the district court held that *Draggieland* was expressive conduct because, "[a]pplying *Hurley*," it is "intended to convey a culturally significant message." ROA.377, 378. But this reasoning only addresses step one of the two-part test for identifying inherently expressive conduct under *Johnson*. *Hurley* did not overrule *Johnson* or *Spence*, which requires *both* "[a]n intent to convey a particularized message" *and* a "great" "likelihood . . . that the message would be understood by those who viewed it." 491 U.S. at 404 (quoting *Spence*, 418 U.S. at 410-11). This Court continues to apply that two-part test. *See, e.g.*, *Voting for Am.*, 732 F.3d at 388; *Littlefield*, 268 F.3d at 282-83; *Cabrol*, 106 F.3d at 109. True, the "first element" may "not pose a high bar" following *Hurley*, but "[t]he second element—that the audience will likely understand the message—has more bite." *Lichtenstein*, 83 F.4th at 594. The district court erred by failing to apply the other half of the *Johnson* test and thereby overlooking QEC's failure to show that the messages it wished to convey would be "overwhelmingly apparent" to viewers. *FAIR*, 547 U.S. at 66.

*Fourth*, the district court reasoned that the Board's references to gender "ideology" in its Resolution amount to "an assertion that drag performances

25

promote an ideology" and a recognition that these performances constitute expressive conduct. ROA.377. Not so. The Board offered three independent reasons for adopting its Resolution, one of which was the risk of losing federal funding by failing to heed President Trump's Executive Order. *Supra* at 9-11. Though, in addressing the possible loss of funding, the Board acknowledged that *some* drag shows "may be considered promotion of gender ideology in violation of the Executive Order and the Governor's directive," ROA.38, no evidence supports the notion that *Draggieland*, in particular, was cancelled due to any Appellant's view that it would "promote gender ideology" as defined in President Trump's Executive Order, rather than because it could run afoul of University and System policies or Title IX or cost federal funds.

Regardless, the Board's views about the promotion of gender ideology would be legally relevant only to the extent they are a proxy for determining the "likelihood . . . that [QEC's] message would be understood by those who viewed it." *Johnson*, 491 U.S. at 404 (quoting *Spence*, 418 U.S. at 410-11). The Board's general statements about some drag shows in general cannot alone carry QEC's burden under the second step of the *Johnson* test.

4.    When a government entity's decisions or policies "regulate conduct only and do not implicate the First Amendment, rational basis scrutiny is appropriate." *Voting for Am.*, 732 F.3d at 392 (citing *District of Columbia v. Heller*, 554 U.S. 570, 628 n.27 (2008)).

Under rational-basis review, this Court must assume the University's exclusion of *Draggieland* from Rudder Theatre was valid, and it must be sustained so long as

26

the policy "is rationally related to a legitimate state interest." *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583, 594 (5th Cir. 2014) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)). Rational-basis review "seeks only to determine whether any conceivable rationale exists." *Id.* (citing *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). And "the state is not required to 'prove' that the objective of the law would be fulfilled." *Id.* (citing *Beach Commc'ns*, 508 U.S. at 315). Even if the Board's policy has no evidentiary or empirical basis, it "satisfies rational basis review." *Id.* (citing *Beach Commc'ns*, 508 U.S. at 315).

Appellants' exclusion of *Draggieland* from Rudder Theatre satisfies rational-basis review. The Board determined that "it is inconsistent with the System's mission and core values of its Universities, including the value of respect for others, to allow Special Event Venues of the Universities to be used for drag shows" because "these events often involve unwelcome and objectively offensive conduct based on sex for many members of the respective communities of the Universities, particularly when they involve the mockery or objectification of women." ROA.37. It further cited its obligations owed under federal and state antidiscrimination law as well. ROA.37. These are entirely rational reasons that survive rational-basis review.

## B. If First Amendment conduct is implicated, Appellants applied reasonable, viewpoint-neutral restrictions in a limited public forum.

Even if QEC planned to engage in inherently expressive conduct protected by the First Amendment, Appellants' exclusion of *Draggieland* from Rudder Theatre

comported with the Constitution, because Rudder Theatre is a limited public forum, and Appellants' policy was reasonable and viewpoint neutral.

### 1. Rudder Theatre is a limited public forum.

**a.** "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799-800 (1985). "[T]he Government, 'no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.'" *Id.* at 800 (quoting *Greer v. Spock*, 424 U.S. 828, 836 (1976)). "The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 44 (1983). Such questions are answered using the Supreme Court's "'forum-based' approach for assessing restrictions that the government seeks to place on the use of its property." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018) (quoting *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) ("*ISKCON*")).

The Supreme Court has recognized "two broad categories of forums: (1) traditional and designated public forums and (2) limited public forums and nonpublic forums," *Freedom from Religion Found. v. Abbott*, 955 F.3d 417, 426 (5th Cir. 2020), differentiated by the level of scrutiny applicable to speech restrictions in each. Traditional public forums "such as a street or a park" have

"'immemorially been held in trust for the use of the public and, time out of mind, ha[ve] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015) (quoting *Perry*, 460 U.S. at 45). Any "content-based restriction" on speech in a traditional public forum is subject to strict scrutiny, though "[t]he state may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry*, 460 U.S. at 45.

Similarly, designated public forums are "'government property that has not traditionally been regarded as a public forum [but] is intentionally opened up for that purpose.'" *Walker*, 576 U.S. at 215 (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009)). Such forums are sometimes referred to as designated public forums of "unlimited character," *ISKCON*, 505 U.S. at 678, owing to the fact that they are "open for indiscriminate public use for communicative purposes," *Lamb's Chapel*, 508 U.S. at 392. Thus, "a designated public forum consists of government property that has been opened for the purpose of functioning, more or less, as a traditional public forum, even though it does not possess the historical pedigree of a traditional public forum." *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1224 (11th Cir. 2017). "Government restrictions on speech in a designated public forum are subject to the same strict scrutiny as restrictions in a traditional public forum." *Pleasant Grove*, 555 U.S. at 469-70.

Limited public forums, on the other hand, are "forums opened for public expression of particular kinds or by particular groups." *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 346 (5th Cir. 2001) (per curiam) (citing *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001), and *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)); *cf. ISKCON*, 505 U.S. at 678 (designated public forums of a "limited . . . character"). "The necessities of confining a forum to the limited and legitimate purpose for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics." *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 758 (5th Cir. 2010) (quoting *Rosenberger*, 515 U.S. at 829). The Supreme Court has therefore "appl[ied] a less restrictive level of scrutiny to speech in limited public forums as compared to other environments." *CLS*, 561 U.S. at 680. As a result, "[w]hen a public body establishes a limited public forum . . . that body may restrict the expression that takes place within the forum so long as the restriction (1) does 'not discriminate against speech on the basis of viewpoint' and (2) is 'reasonable in light of the purpose served by the forum.'" *Chiu*, 260 F.3d at 346 (quoting *Good News Club*, 533 U.S. at 106-07).

The last type of forum is a nonpublic forum—"a space that 'is not by tradition or designation a forum for public communication.'" *Mansky*, 585 U.S. at 11 (quoting *Perry*, 460 U.S. at 46). Like in limited public forums, in nonpublic forums "the government has much more flexibility to craft rules limiting speech." *Id.* at 11-12 (quoting *Perry*, 460 U.S. at 46). "The government may reserve such a forum 'for its intended purposes, communicative or otherwise, as long as the regulation on speech

30

is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Id.* at 12.

**b.** "The action—in this case and most others—exists at the line between designated and limited public forums." *Fairchild*, 597 F.3d at 758. "In distinguishing between the two types of forums," this Court's "precedent directs [the] focus on two factors: (1) the government's intent with respect to the forum, and (2) 'the nature of the [forum] and its compatibility with the speech at issue.'" *Chiu*, 260 F.3d at 346 (quoting *Estiverne v. La. State Bar Ass'n*, 863 F.2d 371, 378 (5th Cir. 1989)).

"The Supreme Court has consistently emphasized that public entities have broad discretion to control access to and use of property or events that are not traditional public forums." *Id.* at 346-47 (citing *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998)). Critically, "[t]he government does not automatically designate a public forum 'by permitting limited discourse' or 'selective access.'" *Id.* at 347 (quoting *Ark. Educ. Television*, 523 U.S. at 677, 679). Instead, "[t]he government creates a designated public forum 'only by intentionally opening a nontraditional forum for public discourse.'" *Id.* (quoting *Cornelius*, 473 U.S. at 802). "To create such a forum, the government must allow 'general access' to, or 'indiscriminate use' of, the forum in question." *Doe v. Santa Fe Indep. Sch. Dist.*, 168 F.3d 806, 819-20 (5th Cir. 1999) (internal citations omitted) (first quoting *Cornelius*, 473 U.S. at 801, then *Perry*, 460 U.S. at 47); *see Lamb's Chapel*, 508 U.S. at 392 (describing a designated public forum as "open for indiscriminate public use for communicative purposes").

Furthermore, "[t]he Supreme Court has recognized that universities differ from other public fora in important ways." *Keister v. Bell*, 29 F.4th 1239, 1252 (11th Cir. 2022) (citing *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981)); *see also CLS*, 561 U.S. at 685-87. "Among other distinctions, universities have a particular mission to educate." *Keister*, 29 F.4th at 1252. "So when it comes to their campus and facilities, universities generally may issue reasonable regulations that are consistent with that mission." *Id.* Thus, even in a designated public forum, a university may impose "limits necessary to preserve the academic mission and to maintain order." *Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 117 (5th Cir. 1992). Although "university public-speaking venues often qualify as limited public fora," a "college campus 'will surely contain a wide variety of fora on its grounds.'" *Kiester*, 29 F.4th at 1252 (quoting *Bloedorn v. Grube*, 631 F.3d 1218, 1232 (11th Cir. 2011)); *see also Just. For All v. Faulkner*, 410 F.3d 760, 766-67 (5th Cir. 2005) (same). Therefore, the Court "must first identify the precise piece of campus the speaker wishes to access." *Kiester*, 29 F.4th at 1252.

Here, that portion of the University is Rudder Theatre—an indoor 750-seat event space on the University's campus. ROA.10, 14, 18. The evidence in the preliminary injunction record indicates that the University intended Rudder Theatre to be a limited, rather than a designated, public forum. Critically, this space is not "general[ly] access[ible]" to the public—or even the student body—for "indiscriminate use." *Doe*, 168 F.3d at 819-20 (quoting *Cornelius*, 473 U.S. at 801, then *Perry*, 460 U.S. at 47). Instead, groups wishing to use Rudder Theatre must

submit a request to use the space that is approved by the University through several layers of review. *See* ROA.297-301 (describing step-by-step process).

Student groups who wish to use Rudder Theatre must submit an "initial request" by completing a reservation request form listing certain information about the desired event. ROA.279; *see* ROA.21. Their reservation will be treated as "tentative," until University staff can confirm certain details with the requester, including "staffing, event time, needs and costs." ROA.284. Once University staff can "confirm a majority of the details" with the requester, they must "email" the requester "a document containing rules [and] standards that requires their signature." ROA.290. That document lists: prohibited items, prohibited actions from performers and guests, limitations on decorations, required coordination with the Stage Manager, cleanup, lighting requirements, and University preferences for audio/video requests. ROA.15; *see The University Center & Special Events: Rudder Theatre Complex*, Texas A&M University: University Center & Special Events, https://perma.cc/MMZ8-LU7N (last accessed July 16, 2026). This is one of at least three forms the requester must execute. ROA.293. Once the event details are "confirmed" "*and* all necessary documents are" completed, the University will treat the reservation as "Final [and] Confirmed." ROA.284.[3] QEC followed this iterative process, which lasted at least five months. ROA.21.

---

[3] Use by the public is even more restricted: they must have "a university sponsor" who agrees to "be responsible for any unpaid expenses," be approved by "the UCEN External Client Review Committee" and pay "[l]icensing fees." ROA.295. And "[m]ost of the time, [the University can] only support on-campus entities with on-campus events." ROA.280.

This reservation-based system that vests final approval in the University regarding use of the property does not bear the hallmarks of a designated public forum, which are "treated similar to public streets, sidewalks, and parks in terms of access and availability." System Policy 08.02.01. When the University intends to create a designated public forum, it does so explicitly. For example, it has listed Rudder Fountain Area, West Academic Plaza, and West Campus Mall Area—all outdoor areas—as public forums. University Rule 08.02.99.M1.3. But the University has not designated other indoor facilities like Rudder Theatre as public forums. Instead, University Rules treat them as "limited [public] forums" subject to "individualized written-use policies." University Rule 08.02.99.M1.6.2.3; *see also* ROA.37 (defining certain indoor facilities as limited public forums).

Rudder Theatre is treated differently from designated public forums because the "nature" of a university-owned *indoor* event space, *Chiu*, 260 F.3d at 347, is different from an *outdoor* one. An indoor space is more physically constrained and may require the provision of university resources, facilities management, and supervision. *See* ROA.15; *The University Center & Special Events: Rudder Theatre Complex*, *supra* at 33. Outdoor areas of universities that this Court has deemed to be designated public forums—such as streets, sidewalks, and common areas—are not subject to similar constraints or resource investments. *See Just. for All*, 410 F.3d at 769 ("the outdoor open areas of [a university's] campus"); *Hays Cnty. Guardian*, 969 F.2d at 116 ("the outdoor grounds of the campus such as the sidewalks and plazas"); *cf. Keister*, 29 F.4th at 1252-56 (concluding that some university sidewalks are limited public forums).

34

Moreover, in the light of "the special characteristics of the school environment,'" *CLS*, 561 U.S. at 685 (quoting *Widmar*, 454 U.S. at 286 n.5), Appellants' adoption of a restriction on conduct that "involve[s] the mockery or objectification of women" and that might violate antidiscrimination law, ROA.37, is a "reasonable regulation . . . consistent with [its] mission." *Keister*, 29 F.4th at 1252. As this Court has held, a university may impose "limits necessary to preserve the academic mission and to maintain order." *Hays Cnty. Guardian*, 969 F.2d at 117. Appellants have done so here in furtherance of "substantial university interests," University Rule, 08.02.99.M1.6.2.3, such as "respect for others" and compliance with antidiscrimination law, ROA.37.

c.    The district court offered three reasons for classifying Rudder Theatre as a designated public forum rather than a limited one, but each is in error.

*First*, the district court noted that there is no evidence that the University had precluded a group from reserving Rudder Theatre, so it concluded that "Rudder Theatre functions as a designated public forum." ROA.380. But the fact that a university is infrequently called upon to enforce the limits on its forum hardly shows that there are no limits at all. In *CLS*, for example, the University "ha[d] more than 60 registered [student] groups and, in all its history, ha[d] denied registration to exactly one: the Christian Legal Society." 561 U.S. at 707 (Alito, J., dissenting). Yet this fact did not change the Supreme Court's conclusion that it was confronting a limited public forum. *See id.* at 679 & n.12.

So too here. That the University infrequently excludes events from Rudder Theatre is more indicative of the fact that the University is rarely faced with requests

35

to host events that might violate its policies or rules. *Cf. Moody v. NetChoice, LLC*, 603 U.S. 707, 732 (2024) (explaining that a decision to "include most items and exclude[] just a few" is a "focused editorial choice [that] packs a peculiarly powerful expressive punch"). No one contends that the University would be required to host minstrel shows, Nazi plays, or KKK demonstrations in Rudder Theatre merely because it has not had occasion to exclude them before. Were such a rule adopted, the University "might elect not to open such property for any public discourse," which "would conflict with the broad First Amendment policy of encouraging public discourse on issues of community interest." *Chiu*, 260 F.3d at 347 (citing *Ark. Educ. Television*, 523 U.S. at 681).

*Second*, the district court likened QEC's drag show to past events that Rudder Theatre has hosted, like "other theatrical productions, including those with mature themes." ROA.380; *see* ROA.16-17. But in Appellants' judgment, past events at Rudder Theatre—a beauty pageant; comedy shows; performances of *Rent*, *Hadestown*, the *Cher Show* and *Swan Lake*; get-out-the-vote events; and political speeches—do not pose the same risks to the educational environment that drag shows do. Nothing about comedy shows or beauty pageants poses the risk of "demean[ing] women," or "sexualized, vulgar, or lewd conduct." ROA.37. And nothing about Broadway shows, get-out-the-vote events, or political speeches "involve the mockery or objectification of women" that is "likely to create or contribute[] to a hostile environment for women" because they "involve unwelcome and objectively offensive conduct based on sex." ROA.37. Because "[s]chools . . . enjoy a significant measure of authority over the types of officially recognized

activities in which their students participate," these "decisions" by Appellants are "due decent respect." *CLS*, 561 U.S. at 686, 687 (citations omitted).

But even if any of these past events implicated these concerns, it is well established that "a state is not required to indefinitely retain the open character of" a designated or limited public forum. *Perry*, 460 U.S. at 46; *see also Freedom from Religion Found., Inc. v. Abbott*, 58 F.4th 824, 835 (5th Cir. 2023) (same); *Currier v. Potter*, 379 F.3d 716, 728 (9th Cir. 2004); *United States v. Bjerke*, 796 F.2d 643, 647 (3d Cir. 1986); *Ysleta Fed'n of Tchrs. v. Ysleta Indep. Sch. Dist.*, 720 F.2d 1429, 1432 (5th Cir. 1983). So even if this past practice suggested that the University once considered drag shows (broadly defined) to be consistent with the limits on the forum, the evidence in the record shows that any such designation had changed, at a minimum, by the date of the Board's Resolution and the University's cancellation of the most recent iteration of *Draggieland*.

### 2. Appellants' actions survive constitutional scrutiny.

Because Rudder Theatre is a limited public forum, Appellants need only show that its "access barrier" is "reasonable and viewpoint neutral" to survive constitutional scrutiny. *CLS*, 561 U.S. at 679. It is both.

### a. Appellants' drag-show restriction is reasonable in the light of the forum's purpose.

**i.** In determining whether the University's restriction "is 'reasonable in light of the purpose served by the forum,'" *Chiu*, 260 F.3d at 345 (quoting *Good News Club*, 533 U.S. at 107), the Supreme Court has instructed that the "inquiry [be] shaped by the educational context in which it arises," *CLS*, 561 U.S. at 685. That is,

"'First Amendment rights . . . must be analyzed in light of the special characteristics of the school environment.'" *CLS*, 561 U.S. at 685-86 (quoting *Widmar*,454 U.S. at 286 n.5)). While "the campus of a public university . . . possesses many of the characteristics of a public forum," it "differs in significant respects from public forums such as streets or parks or even municipal theaters." *Widmar*, 454 U.S. at 286 n.5.

"A university's mission is education, and decisions of [the Supreme] Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities." *Id.* Universities thus "may expect that its students adhere to generally accepted standards of conduct." *Healy v. James*, 408 U.S. 169, 192 (1972). And schools may restrict "student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns" and "members of the public might reasonably perceive [those actions] to bear the imprimatur of the school." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271, 273 (1988). Moreover, "[a] college's commission—and its concomitant license to choose among pedagogical approaches—is not confined to the classroom, for extracurricular programs are, today, essential parts of the educational process." *CLS*, 561 U.S. at 686. So schools "enjoy 'a significant measure of authority over the type of officially recognized activities in which their students participate.'" *Id.* at 686-87. Thus, courts must be "mindful that" the University's decisions regarding "student group[s]" are "due decent respect." *Id.* at 687.

38

No doubt, courts are "the final arbiter of the question whether a public university has exceeded constitutional constraints." *Id.* at 686. But when assessing the reasonableness of a university's restriction, the Supreme Court has cautioned courts to "resist 'substitut[ing] their own notions of sound educational policy for those of the school authorities which they review.'" *Id.* (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982)). That is because "judges lack the on-the-ground expertise and experience of school administrators." *Id.* So courts must afford due "regard for school administrators' judgment" and "'approach [the] task with special caution.'" *Id.* at 687 (quoting *Healy*, 408 U.S. at 171).

**ii.**   Under these standards, Appellants' adoption and application of the Board's Resolution banning drag show events was reasonable in the light of the educational environment. In Appellants' judgment, *Draggieland* would involve conduct that would "parody the female body type," "demean women" and "involve, sexualized, vulgar, or lewd conduct." ROA.37. As the Board explained, permitting such conduct would be "inconsistent with the System's mission and core values of its Universities, including the value of respect for others." ROA.37. Moreover, Appellants found that such conduct—"involv[ing] the mockery or objectification of women"—is "likely to create or contribute to a hostile environment for women contrary to System anti-discrimination policy and Title IX of the Education Amendments of 1972" because it "involve[s] unwelcome and objectively offensive conduct based on sex." ROA.37.

These are exactly the types of judgments that the Supreme Court has held are reserved for administrators and which the federal courts are ill-equipped to second

guess. In *CLS*, the Supreme Court deemed "reasonable" the law school's "all-comers policy" because it "helps Hastings police the written terms of its Nondiscrimination Policy" and "encourages tolerance, cooperation, and learning among students." 561 U.S. at 688, 689. Moreover, that policy "incorporates—in fact, subsumes—state-law proscriptions on discrimination" and "conveys the Law School's decision to decline to subsidize with public monies and benefits conduct of which the people of [the State] disapprove." *Id.* at 689-90 (quotation marks omitted). These are the exact concerns undergirding Appellants' decision to cancel *Draggieland*, and they are no less reasonable when made by Texas A&M University rather than Hastings Law School.

The reasonableness of the University's actions is "all the more creditworthy in view of the 'substantial alternative channels that remain open for . . . communication to take place." *Id.* at 690 (quoting *Perry*, 460 U.S. at 53). The University did not take the drastic step of denying QEC status as an official student organization—and the concomitant benefits that flow from such recognition—like Hastings Law School did in *CLS*; it merely cancelled a single event in a particular university-controlled forum over concerns that "the way in which [QEC] wished to deliver its message," *Spectrum WT*, 151 F.4th at 728, might border on harassment or discrimination.

But Appellants have imposed no barrier to QEC "express[ing] messages supporting the LGBTQ+ community" or "challeng[ing] . . . societal norms" in campus forums. ROA.20. To the contrary, the University has hosted many QEC events, including "The Coming out Monologues," "the Rainbow Resource Fair," "Lavender Graduation," a "Town Hall," "Winter Wonderland," and "Pride

Mentors socials." ROA.12, 245-46. And the University fully expects that those events "will continue" even under the Board's Resolution. ROA.245. Further, Appellants took no action to impede a large protest of the cancellation of *Draggieland*—occurring in a campus designated public forum—even though protesters were dressed in costume, speaking in support of drag shows, and sharing their opposition to Appellants' actions. ROA.251-54, ROA.320-26. Moreover, at least four off-campus venues in the "near vicinity" of campus were suitable for hosting *Draggieland*. ROA.245; *see Bloedorn*, 631 F.3d at 1241-42 (observing that "off-campus locations" and the "public streets and sidewalks" surrounding the campus constituted "ample alternative channels for communication").

**iii.** The district court did not directly address the reasonableness of Appellants' exclusion of *Draggieland* from Rudder Theatre. But in the context of discussing QEC's argument that Appellants have imposed a prior restraint, it rejected Appellants' arguments that the exclusion could be justified in part to enforce Student Codes of Conduct barring "disruptive, rude, or indecent behavior" in the light of evidence that *Draggieland* performances had previously involved performers "engage[d] in whipping, lap dances, and crotch grinding." ROA.386; ROA.271-74.

To the extent the court meant to reject wholesale the relevance of enforcing university policy to the First Amendment analysis, it is inconsistent with *CLS*, which deemed "reasonable" efforts to enforce university policies by excluding the Christian Legal Society from a university forum and held that "the decisions" of "school administrators and educators" on these matters are "due decent respect." 561 U.S. at 687 & n.16, 688, 689.

41

### b.   Appellants' restriction was viewpoint neutral.

**i.**   Appellants' adoption and application of the Board's policy was also viewpoint neutral. "'[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.'" *Lamb's Chapel*, 508 U.S. at 394 (quoting *City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984)). Indeed, "[w]hen the government seeks not just to restrict speech based on its subject matter, but also seeks to dictate what particular 'opinion or perspective' individuals may express on that subject, 'the violation of the First Amendment is all the more blatant.'" *Chiles*, 146 S. Ct. at 1021 (quoting *Rosenberger*, 515 U.S. at 829). "Viewpoint discrimination exists 'when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.'" *Heaney v. Roberts*, 846 F.3d 795, 802 (5th Cir. 2017) (quoting *Rosenberger*, 515 U.S. at 829). It is "thus an egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829. But "[w]here the [State] does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy." *CLS*, 561 U.S. at 696 (quoting *R.A.V. v. St. Paul*, 505 U.S. 377, 390 (1992)).

Appellants' adoption and application of the Board's policy does not run afoul of these principles. As this Court found in a related case, QEC "was told to abandon *the way in which* it wished to deliver its message, *i.e.*, the message of support of the LGBT+ community through the *delivery mechanism* of a drag show." *Spectrum WT*, 151 F.4th at 728 (emphases added). Yet here, as there, "[o]n the record so far," Appellants' "objections were *not to the message* but to the way it would be delivered."

42

*Id.* (emphasis added). Appellants excluded *Draggieland* from Rudder Theatre not because the show conveyed pro-LGBTQ+ *speech* or *ideas* disfavored by the Board or University but because the drag show involved "conduct" that might rise to the level of "unwelcome and objectively offensive conduct based on sex" that violates "System anti-discrimination policy and Title IX." ROA.37. When a university's "policy aims at the *act*[*s*]" of a student group, *i.e.*, its "conduct—not its . . . perspective"—it does not violate the Constitution's mandate of viewpoint neutrality. *CLS*, 561 U.S. at 696; *cf. Johnson*, 491 U.S. at 406 ("The government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word.").

Appellants' exclusion of *Draggieland* from Rudder Theatre does not preclude QEC from "voic[ing] certain 'perspective[s]'" about LGBTQ+ issues that the Board or University allegedly "disfavors." *Chiles*, 146 S. Ct. at 1024. Because the Board's Resolution prohibits "unwelcome and objectively offensive conduct based on sex" that "mock[s] or objectifi[es] women" through "parody [of] the female body type," ROA.37, any drag show meeting the Resolution's definition would have been excluded from Rudder Theatre regardless of whether it sought to oppose LGBTQ+ issues or support them.

**ii.** The district court concluded that Appellants' exclusion of *Draggieland* from Rudder Theatre was viewpoint discriminatory for two reasons, but neither has merit.

*First*, the district court held that Appellants' "subjective judgment that the content of protected speech is offensive or inappropriate is viewpoint discrimination." ROA.382. The district court's authority for this principle can be

43

traced back to *Matal v. Tam*, 582 U.S. 218 (2017), and *Papish v. Board of Curators of the University of Missouri*, 410 U.S. 667 (1973) (per curiam), but neither case is applicable here.

Start with *Matal*. There, the Supreme Court held unconstitutional a provision of the Lanham Act forbidding the registration of a trademark that would "disparage" persons, institutions, beliefs, or national symbols. 582 U.S. at 227. A plurality of the Court held that the Lanham Act's disparagement clause "discriminates on the bas[i]s of 'viewpoint," because "[g]iving offense is a viewpoint." *Id.* at 243 (plurality op.). That is, because "an applicant may register a positive or benign mark but not a derogatory one," the disparagement clause "reflects the Government's disapproval of a subset of messages it finds offensive." *Id.* at 249 (Kennedy, J., concurring).

Unlike in *Matal*, the University is not attempting to shield students' sensibilities from *speech* it finds offensive but instead seeks to "redress th[e] perceived harms" of QEC's "conduct," which might rise to the level of harassment or discrimination. *CLS*, 561 U.S. at 696 (quoting *Wisconsin v. Mitchell*, 508 U.S. 476, 488 (1993)). That is particularly true here: "Most antidiscrimination laws 'regulate[]'" discriminatory practices "as conduct, not as expression," and "not because of the viewpoints such" practices express, but "because of the immediate harms such discrimination causes." *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 32 (2d Cir. 2018) (citation modified).

*Papish* is similarly off point. There, the Supreme Court held that a university violated the First Amendment by expelling a graduate student for distributing a newspaper on campus containing "forms of indecent speech" that violated

44

university policy. 410 U.S. at 667. The Court held "that the mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Id.* at 670.

Crucially, the university's actions in *Papish* could not "be justified as a nondiscriminatory application of reasonable rules governing conduct," *id.* at 671, and the case did not involve "any disruption of campus order or interference with the rights of others," *id.* at 670 n.6. As discussed, the same is not true here, where Appellants excluded *Draggieland* from Rudder Theatre due to the specter of harassment and discrimination. *Cf. Yeasin v. Durham*, 719 F. App'x 844, 851-52 (10th Cir. 2018) (distinguishing *Papish* because it did not "concern university-student conduct that interferes with the rights of other students or risks disrupting campus order"); *Hunt v. Bd. of Regents of Univ. of N.M.*, 792 F. App'x 595, 604-05 (10th Cir. 2019) (similar).

*Second*, the district court held that Appellants' adoption and application of the Board's policy was viewpoint discriminatory because it discriminates against "the view 'that there is a vast spectrum of genders that are disconnected from one's sex.'" ROA.383. But as the district court itself noted, that is not even a message QEC alleges it intends to convey through *Draggieland*: "No male performer in the drag show is stating an intent to become a woman" or "change their biological sex or claim a different biological sex." ROA.384.

Regardless, the court's assertion that "[t]he Board states that it is banning drag shows on campus because they 'promote gender ideology,'" ROA.383, is incorrect. The Board's Resolution "acknowledge[s]" that the President has directed that

45

"federal funds shall not be used to promote gender ideology." ROA.38. And after observing that "the System and the Universities receive significant federal funding," it explained that using its limited public forums to host drag shows "may be considered promotion of gender ideology in violation of the Executive Order and the Governor's directive." ROA.38. Thus, the Board's concern was not squelching a particular viewpoint about gender but the possible loss of federal funding associated with permitting certain "conduct" to be hosted in campus limited public forums. *CLS*, 561 U.S. at 696. This is confirmed by the fact that the Board's definition of "drag show events" does not focus on the messages or ideas expressed through the shows but on the "conduct" and its effect on members of the University community. ROA.37. And it is underscored by the fact that the University permits QEC to host other events that might convey messages regarding "gender ideology." *See* ROA.245.

## C. Appellants' forum-based restriction is not a prior restraint.

**1.** The Court should reject the district court's additional holding that Appellants' exclusion of *Draggieland* from Rudder Theatre operates as a prior restraint on QEC's speech. ROA.385-87. The classic description of a prior restraint is an "administrative [or] judicial order[ ] forbidding certain communications when issued in advance of the time that such communications are to occur." *Cath. Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014) (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993)). And prior restraints may also include "speech licensing schemes that give the licensor too much discretion in how

to exercise his authority," as well as "regulations that require registration before certain types of speech." *Id.*

Appellants' policies regarding the use of limited public forums like Rudder Theatre look nothing like an administrative or judicial order prohibiting certain communications without prior approval from the government. Neither the Board nor the University has forbidden QEC to communicate about drag shows or required its approval before doing so; they have merely denied QEC the use of a particular university-owned facility to host a particular show because of concerns that the conduct involved would run counter to University and System policies and antidiscrimination law. ROA.37-38. The University did not block a student protest of the Board's decision on campus where protesters explicitly discussed drag shows. ROA.251-54, ROA.320-26. And the University attested that "QEC has been allowed to reserve and use Texas A&M facilities for non-drag performance activities since its founding in 2023" and "anticipate[d]" that the activities "w[ould] continue." ROA.245.

To the extent that QEC meant to invoke the related "unbridled discretion" doctrine applicable to certain speech-licensing schemes, this Court has held that "prior restraints on speech in limited public forums must contain neutral criteria sufficient to prevent (1) censorship that is unreasonable in light of the purpose served by the forum *and* (2) viewpoint based censorship." *Freedom From Religion Found.*, 955 F.3d at 429. As demonstrated above, Appellants' actions are reasonable, *supra* at 37-41, and viewpoint neutral, *supra* at 42-46, under the limited-public-forum framework.

47

2.    The district court concluded that Appellants' adoption and application of the Board's policy operated as prior restraint for several reasons: (a) it is a "viewpoint-based prohibition on expressive conduct;" (b) university policies cannot "take precedence over the First Amendment;" and (c) it is inconsistent with *Papish*. ROA.386-87. As explained, each of these arguments is erroneous. QEC is not engaged in inherently expressive conduct, and Appellants' adoption and application of the Board's policy was viewpoint neutral. *Supra* at 18-27, 42-46. The court's dismissal of the relevance of compliance with university policies to the First Amendment analysis is inconsistent with *CLS*. *Supra* at 41. And *Papish* is readily distinguishable. *Supra* at 44-45.

## D.  Unconstitutional vagueness cannot be a ground for relief.

Finally, the district court erred by holding that the Board's Resolution is unconstitutionally vague. ROA.390-91. QEC did not bring a void-for-vagueness claim below, *see* ROA.25-33, so it could not have established a likelihood of success on a claim it did not assert. Moreover, the district court's vagueness holding violates the "principle of party presentation." *Clark v. Sweeney*, 607 U.S. 7, 9-10 (2025) (per curiam). "Because courts are 'essentially passive instruments of government,' [they] rely on the parties to 'frame the issues for decision' and decide 'only the questions presented.'" *Margolin v. Nat'l Ass'n of Immigr. Judges*, 146 S. Ct. 1285, 1288 (2026) (per curiam) (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020)). Because QEC did not raise a vagueness argument below, it was reversible error for the district court to enter a preliminary injunction on those grounds.

48

## II. The Remaining Preliminary Injunction Factors Support Reversal.

QEC also did not show that it is "likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20.

Because Appellants' exclusion of *Draggieland* from Rudder Theatre did not violate the First Amendment, *supra* at 18-46, QEC has not "los[t] First Amendment freedoms for even [a] minimal period[] of time," *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.). The district court's finding of irreparable harm on that basis is therefore erroneous. ROA.391-92.

Nor do the balance of equities and public interest favor issuance of a preliminary injunction. "When the government is a party, 'the government's and the public's interest merge.'" *United States v. Abbott*, 110 F.4th 700, 719 (5th Cir. 2024) (en banc) (quoting *Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023)). The district court's conclusion that Appellants violated QEC's First Amendment rights again infected its analysis here. ROA.392-95.

Indeed, both the balance of equities and public interest tip in Appellants' favor. The issuance of an injunction premised on an overly capacious forum analysis that would require universities to permit conduct at odds with the educational environment and antidiscrimination law—merely because the university opened a forum for broad, but not unlimited, speech—may disincline universities "to open such property for any public discourse." *Chiu*, 260 F.3d at 347 (citing *Ark. Educ. Television*, 523 U.S. at 681). "That result would conflict with the broad First Amendment policy of encouraging public discourse on issues of community

49

interest." *Id.* Moreover, any harm to QEC is minimal where substantial alternative channels of communication are available to QEC to communicate its message of support for the LGBTQ+ community. *Supra* at 40-41.

Similarly, finding that Appellants engaged in viewpoint discrimination by prohibiting "unwelcome and objectively offensive conduct based on sex" that "mock[s] or objectifi[es] women" through "parody [of] the female body type," ROA.37, undermines educators' ability to ensure a safe learning environment for women and adhere to its obligations under Title IX. These factors thus support Appellants.

## Conclusion

The Court should reverse the grant of the preliminary injunction.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

William R. Peterson
Solicitor General

/s/ William F. Cole
William F. Cole
Principal Deputy Solicitor General
William.Cole@oag.texas.gov

Christopher J. Pavlinec
Assistant Attorney General

*Counsel for Defendants-Appellants*

51

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,997 words, excluding the parts of the brief exempted by Rule 32(f) and Fifth Circuit Rule 32.2, according to the word count of Microsoft Word. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Equity font.

/s/ William F. Cole
WILLIAM F. COLE