**No. 25-20108**

**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

TEXAS A&M QUEER EMPOWERMENT COUNCIL,

*Plaintiff-Appellee,*

v.

WILLIAM MAHOMES, in his official capacity as a member of the Board of Regents of the Texas A&M University System; ROBERT L. ALBRITTON, in his official capacity as a member of the Board of Regents of the Texas A&M University System; DAVID C. BAGGETT, in his official capacity as a member of the Board of Regents of the Texas A&M University System; JAMES R. BROOKS, in his official capacity as a member of the Board of Regents of the Texas A&M University System; JOHN W. BELLINGER, in his official capacity as a member of the Board of Regents of the Texas A&M University System; JAY GRAHAM, in his official capacity as a member of the Board of Regents of the Texas A&M University System; MICHAEL A. HERNANDEZ, III, in his official capacity as a member of the Board of Regents of the Texas A&M University System; KELLEY SULLIVAN GEORGIADES, in her official capacity as a member of the Board of Regents of the Texas A&M University System; SAM TORN, in his official capacity as a member of the Board of Regents of the Texas A&M University System; LISA D. CANTU, in her official capacity as a member of the Board of Regents of the Texas A&M University System; GLENN HEGAR, in his official capacity as Chancellor of the Texas A&M University System; DR. SUSAN BALLABINA, in her official capacity as President of Texas A&M University,

*Defendants-Appellants.*

On Appeal from the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. 4:25-CV-992
Hon. Lee H. Rosenthal Presiding

---

**BRIEF FOR APPELLEE**

---

JT Morris
*Counsel of Record*
Samuel Rudovsky
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
Tel: (215) 717-3473
jt.morris@fire.org
sam.rudovsky@fire.org

Adam Steinbaugh
Jeffrey Daniel Zeman
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Ste. 900
Philadelphia, PA 19106
Tel: (215) 717-3473
adam@fire.org
jeff.zeman@fire.org

*Attorneys for Plaintiff-Appellee*

## CERTIFICATE OF INTERESTED PERSONS

The cause number and style of the case is *Texas A&M Queer Empowerment Council v. Mahomes, et al.* (USDC Civil No. 4:25-cv-00992, Southern District of Texas, Houston Division).

Counsel of record certifies that the following listed persons or entities described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiff-Appellee**

Texas A&M Queer Empowerment Council

**Attorneys for Plaintiff-Appellee**

JT Morris
Samuel Rudovsky
Foundation for Individual Rights and Expression
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003

Adam Steinbaugh
Jeffrey Zeman
Foundation for Individual Rights and Expression
510 Walnut Street, Ste. 900
Philadelphia, PA 19106

**Defendants-Appellants**

1. William Mahomes, in his official capacity as a member of the Board of Regents of the Texas A&M University System;
2. Robert L. Albritton, in his official capacity as a member of the Board of Regents of the Texas A&M University System;
3. David C. Baggett, in his official capacity as a member of the Board of Regents of the Texas A&M University System;
4. James R. Brooks, in his official capacity as a member of the Board of Regents of the Texas A&M University System;
5. John W. Bellinger, in his official capacity as a member of the Board of Regents of the Texas A&M University System;
6. Jay Graham, in his official capacity as a member of the Board of Regents of the Texas A&M University System;
7. Michael A. Hernandez, III, in his official capacity as a member of the Board of Regents of the Texas A&M University System;
8. Kelley Sullivan Georgiades, in her official capacity as a member of the Board of Regents of the Texas A&M University System;
9. Sam Torn, in his official capacity as a member of the Board of Regents of the Texas A&M University System;
10. Lisa D. Cantu, in her official capacity as a member of the Board of Regents of the Texas A&M University System;
11. Glenn Hegar, in his official capacity as Chancellor of the Texas A&M University System;
12. Dr. Susan Ballabina, in her official capacity as President of Texas A&M University.

**Attorneys for Defendants-Appellants**

Ken Paxton
Brent Webster
William R. Peterson
William F. Cole
Christopher J. Pavlinec
Office of the Attorney General of Texas
P.O. Box 12548 (MC 059)
Austin, TX 78711-2548

**Former Defendants-Appellants**

1. Michael J. Plank, former member of the Board of Regents of the Texas A&M University System;
2. Cage Sawyers, former member of the Board of Regents of the Texas A&M University System;
3. John Sharp, former Chancellor of the Texas A&M University System;
4. Mark A. Welsh, former President of Texas A&M University.

Respectfully,

/s/ JT Morris
*Counsel of Record for Plaintiff-Appellee*

## STATEMENT REGARDING ORAL ARGUMENT

The Court has calendared this case for oral argument during its September 2026 en banc sitting.

# TABLE OF CONTENTS


CERTIFICATE OF INTERESTED PERSONS .......................................... i

STATEMENT REGARDING ORAL ARGUMENT .................................. iv

TABLE OF AUTHORITIES .......................................................... viii

INTRODUCTION ........................................................................ 1

ISSUES PRESENTED ................................................................... 3

STATEMENT OF THE CASE ......................................................... 3

SUMMARY OF THE ARGUMENT ................................................ 10

ARGUMENT ............................................................................... 14

I. Rigorous First Amendment Scrutiny, Not Broad Deference to Defendants, Is What the Constitution Demands Here. ................ 14

A. The First Amendment vigorously protects against public universities targeting the expressive content of a student group's speech. ...................................................... 14

B. Defendants' reliance on *CLS* and *Hazelwood* is wrong........ 20

II. The District Court Correctly Held QEC is Likely to Succeed on the Merits. ................................................................... 24

A. The First Amendment protects QEC's *Draggieland* performance. ....................................................................... 24

1. Live stage performances are inherently expressive and need not convey a single, particularized message. ............................................... 25

2. *Draggieland*'s expressive character is unmistakable to its ticketed audience. ........................ 29

3. The spoken words of *Draggieland* underscore why the First Amendment protects it. ................................ 33

B. Banning *Draggieland* because of the "ideology" it "promotes" and the perception that it is "demeaning" is unconstitutional viewpoint discrimination. .......... 35

1. Defendants are engaging in viewpoint discrimination by suppressing an "ideology." .......... 35

2. The Drag Ban Resolution expressly targets perspectives the Board considers offensive. .......... 37

3. Labeling the Drag Ban Resolution a regulation of an expressive means or "conduct" does not make it viewpoint neutral. .......... 40

C. Defendants' ban imposes an unconstitutional prior restraint. .......... 43

1. Defendants' ban mirrors the unconstitutional prior restraint in *Southeastern Promotions*. .......... 43

2. Defendants fail to meet their heavy burden to justify a prior restraint. .......... 46

D. Defendants are imposing a content-based speech restriction in a designated public forum. .......... 49

1. TAMU's policy and practice establish Rudder Theatre is a designated public forum. .......... 50

2. By excluding expression from Rudder Theatre based on its content, Defendants' ban triggers strict scrutiny. .......... 55

E. Defendants cannot satisfy strict scrutiny. .......... 55

1. The drag show ban's purported interest in preventing discriminatory harassment does not satisfy strict scrutiny. .......... 56

2. Defendants cannot satisfy strict scrutiny by relying on Executive Order 14168. .......... 59

3. TAMU's apprehensions about the "educational environment" and "lewdness" do not satisfy strict scrutiny. 61

III. Without an Injunction, the Drag Ban Resolution Will Irreparably Harm QEC. 64

IV. The Public Interest Favors Enjoining a Public University System From Imposing Viewpoint-Driven Bans on Student Expression. 65

CONCLUSION 68

CERTIFICATE OF COMPLIANCE 69

CERTIFICATE OF SERVICE 70

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) ........ 25, 34

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) ........ 52, 55

*Bd. of Educ. of the Westside Cmty. Schs. v. Mergens*,
496 U.S. 226 (1990) ........ 23

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ........ 26, 55, 58

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026) ........ 36, 37, 41, 42

*Chiu v. Plano Indep. Sch. Dist.*,
260 F.3d 330 (5th Cir. 2001) ........ 35

*Christian Legal Soc'y v. Walker*,
453 F.3d 853 (7th Cir. 2006) ........ 65

*Christian Legal Soc'y v. Martinez*,
561 U.S. 661 (2010) ........ passim

*City of Dallas v. Stanglin*,
490 U.S. 19 (1989) ........ 31

*City of Ladue v. Gilleo*,
512 U.S. 43 (1994) ........ 42

*Clark v. Cmty. for Creative Non-Violence*,
468 U.S. 288 (1984) ........ 30

*Cohen v. California*,
403 U.S. 15 (1971) ........ 40, 45, 63

*Concerned Women for Am., Inc. v. Lafayette Cnty.*,
883 F.2d 32 (5th Cir. 1989) ........ 12, 53

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985) .......... 50

*Davis v. Monroe Cnty. Bd. of Educ.*,
526 U.S. 629 (1999) .......... passim

*DeJohn v. Temple Univ.*,
537 F.3d 301 (3d Cir. 2008) .......... passim

*Ford v. Mckesson*,
No. 24-30494, 2026 WL 2206584 (5th Cir. July 30, 2026) .......... 67

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
901 F.3d 1235 (11th Cir. 2018) .......... 28, 31, 34

*Gay Student Servs. v. Tex. A&M Univ.*,
737 F.2d 1317 (5th Cir. 1984) .......... 16, 20, 43

*Hays Cnty. Guardian v. Supple*,
969 F.2d 111 (5th Cir. 1992) .......... 54

*Hazelwood School District v. Kuhlmeier*,
484 U.S. 260 (1988) .......... 20, 22, 23, 24

*Healy v. James*,
408 U.S. 169 (1972) .......... passim

*Holloman v. Harland*,
370 F.3d 1252 (11th Cir. 2004) .......... 28, 29

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995) .......... 12, 27, 28, 29

*Iancu v. Brunetti*,
588 U.S. 388 (2019) .......... 67

*Imperial Sovereign Ct. of Mont. v. Knudsen*,
170 F.4th 820 (9th Cir. 2026) .......... 26

*Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch. Dist.*,
88 F.3d 274 (5th Cir. 1996) .......... 64

*IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*,
993 F.2d 386 (4th Cir. 1993) ........ passim

*Joseph Burstyn, Inc. v. Wilson*,
343 U.S. 495 (1952) ........ 25

*Justice for All v. Faulkner*,
410 F.3d 760 (5th Cir. 2005) ........ 51, 55

*Knights of Ku Klux Klan, Realm of La. v. E. Baton Rouge Par. Sch. Bd.*,
578 F.2d 1122 (5th Cir. 1978) ........ 65

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) ........ 64

*Matal v. Tam*,
582 U.S. 218 (2017) ........ passim

*McCauley v. Univ. of the V.I.*,
618 F.3d 232 (3d Cir. 2010) ........ 15, 23, 62

*Miller v. California*,
413 U.S. 15 (1973) ........ 44

*NAACP v. Button*,
371 U.S. 415 (1963) ........ 42

*Neb. Press Ass'n v. Stuart*,
427 U.S. 539 (1976) ........ 10, 43

*Norma Kristie, Inc. v. City of Oklahoma City*,
572 F. Supp. 88 (W.D. Okla. 1983) ........ 26

*Papish v. Bd. of Curators of Univ. of Mo.*,
410 U.S. 667 (1973) ........ passim

*Pernell v. Fla. Bd. of Governors of State Univ. Sys.*,
181 F.4th 1135 (11th Cir. 2026) ........ 2

*Pro-Life Cougars v. Univ. of Hou.*,
259 F. Supp. 2d 575 (S.D. Tex. 2003) ........ 47, 52

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) .......... 13, 55

*Reeves v. McConn*,
631 F.2d 377 (5th Cir. 1980) .......... 42

*Rhode Island Latino Arts v. Nat'l Endowment for the Arts*,
800 F. Supp. 3d 351 (D.R.I. 2025) .......... 36

*Robinson v. Hunt Cnty.*,
921 F.3d 440 (5th Cir. 2019) .......... 37, 39, 41

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) .......... passim

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*,
547 U.S. 47 (2006) .......... 25, 28, 34

*S. Utah Drag Stars v. City of St. George*,
677 F. Supp. 3d 1252 (D. Utah 2023) .......... 26

*Sable Commc'ns v. FCC*,
492 U.S. 115 (1989) .......... 63

*San Francisco A.I.D.S. Found. v. Trump*,
786 F. Supp. 3d 1184 (N.D. Cal. 2025) .......... 36, 59

*Saxe v. State Coll. Area Sch. Dist.*,
240 F.3d 200 (3d Cir. 2001) .......... 17, 23, 24

*Schacht v. United States*,
398 U.S. 58 (1970) .......... 26, 31

*Schad v. Borough of Mount Ephraim*,
452 U.S. 61 (1981) .......... 26

*Schiff v. U.S. Off. of Pers. Mgmt.*,
784 F. Supp. 3d 380 (D. Mass. 2025) .......... 36

*Schneider v. State*,
308 U.S. 147 (1939) .......... 49

*Se. Promotions, Ltd. v. Conrad*,
420 U.S. 546 (1975) .............................................................. passim

*Shuttlesworth v. City of Birmingham*,
394 U.S. 147 (1969) .............................................................. 44

*Spectrum WT v. Wendler*,
151 F.4th 714 (5th Cir. 2025) .............................................. 15

*Spectrum WT v. Wendler*,
157 F.4th 673 (5th Cir. 2025) .............................................. 15

*Spectrum WT v. Wendler*,
816 F. Supp. 3d 648 (N.D. Tex. 2026) ................................... 26

*Speech First, Inc. v. Cartwright*,
32 F.4th 1110 (11th Cir. 2022) ....................................... 17, 58

*Speech First, Inc. v. Fenves*,
979 F.3d 319 (5th Cir. 2020) ................................................ 66

*Spence v. Washington*,
418 U.S. 405 (1974) ......................................................... 27, 28

*Tex. Trib. v. Caldwell County*,
121 F.4th 520 (5th Cir. 2024) .............................................. 65

*Texans for Free Enter. v. Tex. Ethics Comm'n*,
732 F.3d 535 (5th Cir. 2013) ........................................... 64, 65

*Texas v. Johnson*,
491 U.S. 397 (1989) ............................................ 25, 27, 28, 43

*Tinker v. Des Moines Indep. Comm. Sch. Dist.*,
393 U.S. 503 (1969) .............................................................. 47

*United States v. Playboy Ent. Grp. Inc.*,
529 U.S. 803 (2000) .............................................................. 55

*Utah Pol. Watch, Inc. v. Musselman*,
179 F.4th 1241 (10th Cir. 2026) ........................................... 41

*Widmar v. Vincent*,
454 U.S. 263 (1981) ........................................................ passim

**Statutes**

Tex. Educ. Code
§ 51.9315(b)(1) ........................................................ 67
§ 51.9315(g) ........................................................ 67

**Rules**

Texas A&M Sys. Policy 08.01.01,
*Civil Rights Compliance* (Aug. 15, 2022) ........................................ 57

Texas A&M Sys. Policy 08.02.01,
*Expressive Activity on Campus* (Nov. 13, 2025) ................................ 51

Texas A&M Univ. Student Rules,
*Appendix XI*: *Texas A&M Rules on Freedom of Expression* (rev. 2015) ........................................................ 15, 50, 53

Texas A&M Univ. Student Rules,
*Rule 25*, *Student Conduct Code Procedures* (rev. 2013)...................... 62

Texas A&M Univ. Rule 08.02.99.M1,
*Expressive Activity on Campus* (rev. 2026).................................. 50, 51

**Regulations**

Exec. Order No. 14,168,
90 Fed. Reg. 8615 (Jan. 20, 2025) ...................................... 8, 36, 59, 60

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance,
85 Fed. Reg. 30026 (May 19, 2020) ................................................ 61

**Constitutional Provisions**

U.S. Const. amend. I ........................................................ passim

## Other Authorities

"Dear Colleague" Letter from Craig Trainor, Acting Assistant Sec'y for C.R., U.S. Dep't of Educ. (Feb. 4, 2025) ................................ 61

"Dear Colleague" Letter from Gerald A. Reynolds, Assistant Sec'y for C.R., U.S. Dep't of Educ. (July 28, 2003)........................................ 60

*Comm. on Freedom of Expression*, Univ. of Chicago, Report of the Comm. on Freedom of Expression (2015) ............................................ 15

Lewis Carroll, *Jabberwocky*, *in* Jabberwocky and Other Poems (Courier Dover Publ'ns 2001) (1871).................................................... 27

U.S. Dep't of Educ., *Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act* (Feb. 28, 2025)........................................................................... 60

# INTRODUCTION

Defendants invite this Court to rewrite decades of controlling First Amendment precedent and defer to the "judgment" of public university officials who imposed a prior restraint to suppress a disfavored "ideology." The Court should decline that invitation—forcefully—and affirm the district court's preliminary injunction against Defendants' viewpoint-based censorship.

For five years, Texas A&M University (TAMU) allowed the Texas A&M Queer Empowerment Council (QEC) to hold its annual *Draggieland* drag show in a campus performance theatre. But in 2025, its Board of Regents reversed course, passing a resolution banning drag performances in event venues across the TAMU System. Why? Because the Board disagrees with the expressive content of drag shows.

The resolution's words are all the proof the Court needs. It targets drag performances based on the "ideology" they "promote," and which, in the Board's view, is to "parody" and "demean" women. Of course, the Board can hold and express that opinion. But the Constitution prevents it from blocking a campus performance because it disagrees with the viewpoint, even in the name of avoiding offense to others.

Defendants insist they can ban drag shows from campus venues because they "*might* border on harassment" or "*might* violate" TAMU "policies or rules." Defs. Br. 36, 40 (emphasis added). But the First Amendment demands more than guessing games. In fact, the Supreme Court has twice affirmed that speculation cannot justify restricting student expression at public universities, where First Amendment protections are "nowhere more vital." *Healy v. James*, 408 U.S. 169, 180 (1972); *Widmar v. Vincent*, 454 U.S. 263, 268–69 (1981).

Still, Defendants contend this Court is "ill-equipped to second guess" their "judgments." Defs. Br. 39–40. Wrong. Federal courts must "police the First Amendment" at public universities, including when they stifle speech under the banner of preventing discrimination or offense. *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 181 F.4th 1135, 1165 (11th Cir. 2026). That is why, time and again, the Supreme Court has upheld First Amendment rights against administrators exercising their judgment to suppress viewpoints and impose prior restraints. *Healy*, 408 U.S. at 187–88; *Widmar*, 454 U.S. at 268–69; *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 835–36 (1995).

This case is no different. The Court should affirm.

## ISSUES PRESENTED

1. From stage performances to video games, the Supreme Court has long held the First Amendment protects art and entertainment as inherently expressive. QEC wishes to stage a drag performance at TAMU, which, according to the Board of Regents, "promotes" an "ideology" and is a "parody." Did the district court correctly hold the First Amendment protects QEC's stage performance?

2. Public university officials violate the First Amendment when they stifle protected expression based on its viewpoint. The TAMU Board of Regents banned drag shows from campus event venues because it subjectively determined the shows express an unwelcome "ideology" and "demean" others. Did the district court correctly hold this viewpoint-based prior restraint violates the First Amendment?

## STATEMENT OF THE CASE

Texas A&M University makes performance and event venues in its Rudder Theatre Complex, including Rudder Theatre, available to recognized student organizations. ROA.14–15 ¶¶ 25–30. These venues provide spaces for students to present their own artistic, cultural, religious, and political events, and to "gain exposure to diverse political thoughts and viewpoints different from their own." ROA.14 ¶¶ 28–29.

Consistent with TAMU's "Expressive Activity on Campus" policy, ROA.14 ¶¶ 26–27, content- and viewpoint-neutral regulations govern the use of Rudder Theatre, without limits on the content or subject matter of events held there. ROA.15 ¶¶ 33–35. TAMU expressly holds out Rudder Theatre as suitable for "events such as Broadway productions, concerts, variety shows, movies, lectures, conferences, commencement ceremonies, and recitals." ROA.15 ¶ 36.

The events held in the Rudder Theatre Complex reflect that broad purpose. They have included the Broadway musicals *Chicago* and *Hadestown*, each featuring "mature themes," and *The Cher Show*, featuring women in risqué costumes. ROA.16 ¶ 38(a), (g), (h). Students also use Rudder Theatre for an annual "Miss Black & Gold" women's pageant and for productions of *Swan Lake* and *Oklahoma!* ROA.16 ¶ 38(b), (l), (m). Students and community members seeking entertainment can attend concerts, from jazz to South Korean pop, and comedy shows. ROA.16–17 ¶ 38. Student organizations also use Rudder Theatre to host religious and political events, including get-out-the-vote programming and talks from commentators like Ben Shapiro, who

denounced "transgressivism" by the LGBTQ+ community during his speech. ROA.16 ¶ 38(c)–(f).

Both TAMU students and members of the public may reserve Rudder Theatre, ROA.15 ¶¶ 30–31, for which TAMU publishes content-neutral regulations for those seeking to reserve the venue for events. *See* ROA.15 ¶ 33. The record contains no evidence that TAMU has ever denied a request to hold an event there.

***Draggieland* is QEC's principal annual event and repeatedly sells out the 750-seat Rudder Theatre.**

QEC is a recognized student organization whose mission is "to foster unity among LGBTQ+ organizations on campus, and to serve as a resource for LGBTQ+ students, creating spaces that empower individuals regardless of their gender identity or sexual orientation." ROA.12 ¶¶ 12–13. TAMU students established QEC in March 2023 after the University withdrew its financial sponsorship of *Draggieland*. ROA.18–19 ¶¶ 58, 63.

*Draggieland*—a fusion of "drag" and "Aggieland"—is QEC's principal annual event.[1] ROA.12 ¶ 15; ROA.17 ¶ 39. It is a ticketed,

[1] "Aggieland" is a common reference for TAMU, owing to the university's "Aggies" nickname.

pageant-style theatrical performance in which participants compete for the title of "Queen" or "King" of *Draggieland*. ROA.17 ¶¶ 40–45; ROA.21 ¶ 77. Performers assume stage personas and coordinate with each other about costumes, makeup, hairstyles, music, lighting, and choreography. ROA.17–18 ¶¶ 41–45, 50. Their clothing and makeup often, though not always, run counter to their expected gender presentation. ROA.17 ¶¶ 42–44. After each routine, the host speaks with the performer about what drag and LGBTQ+ culture mean to them. ROA.17 ¶ 47.

Staging *Draggieland* requires significant preparation. Student organizers appoint judges, audition prospective performers, and collaborate on costume, performance, set, and lighting design. ROA.17–18 ¶¶ 41–45, 48–53. They also hold two rehearsals so that participants can familiarize themselves with the theatre's layout and address potential obstacles they might encounter during the performance. ROA.18 ¶¶ 51–53.

Through *Draggieland*, QEC celebrates self-expression and LGBTQ+ culture, challenges conventional gender norms, and educates the broader community about LGBTQ+ culture. ROA.20 ¶¶ 71–73.

*Draggieland* began in February 2020 and has repeatedly sold out the 750-seat Rudder Theatre. ROA.18 ¶¶ 54, 56.

QEC privately funds *Draggieland* and uses proceeds from the show to support other events TAMU does not fund. ROA.18–20 ¶¶ 59–60, 63–68. *Draggieland* 2025 received no government funding. ROA.20 ¶ 66. QEC paid for the venue, theatre staff, rental of stage equipment, and campus police. ROA.20 ¶ 67.

In May 2024, QEC submitted a request to book Rudder Theatre for *Draggieland* 2025, scheduled for March 27, 2025, and for two rehearsals earlier that month. ROA.21 ¶ 74. On October 23, 2024, the Manager of Special Events for the Rudder Theatre Complex approved the reservation. ROA.21 ¶ 76. By February 2025, TAMU had listed *Draggieland* as "Approved," and the Rudder Theatre box office had begun selling tickets. ROA.21 ¶ 77.

**The Texas A&M System's Board of Regents abruptly bans drag shows, despite *Draggieland* 2025 having long been approved.**

After five years of approving reservations to stage *Draggieland* in Rudder Theatre, *see* ROA.18–19, TAMU reversed course. On February 28, 2025, the Board of Regents held a special telephonic meeting and then issued a "Resolution Regarding Certain Public Events on the Campuses

of Universities in The Texas A&M University System" (the "Drag Ban Resolution"). ROA.21–22 ¶¶ 80, 82; ROA.37–38. The Resolution declares the Board's new policy that "Drag Show Events are not to be held" at any campus event venues. ROA.38.

The Resolution states "Drag Show Events" are contrary to the TAMU System's "values" because they are "meant to parody" and "demean[] women," and "likely to create or contribute to a hostile environment for women contrary to System anti-discrimination policy and Title IX" because they "involve the mockery or objectification of women." ROA.37–38. The Resolution contains no specific findings (and there is no evidence in the record) that any member of the campus community has ever filed a Title IX complaint related to drag shows. ROA.37–38.

The Drag Ban Resolution also invokes President Trump's Executive Order titled "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." ROA.38; ROA.234–37 (Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025)). It asserts the Executive Order prohibits the use of federal funds to "promote gender ideology" and that "use of facilities at the Universities

for Drag Show Events may be considered promotion of gender ideology in violation of the Executive Order." ROA.22 ¶¶ 82, 85–86; ROA.38. The Resolution identifies no federal funding connected to *Draggieland*. ROA.37–38.

The Resolution directed then-Chancellor John Sharp and then-TAMU President Mark Welsh to "cancel any upcoming Drag Show Events." ROA.38. That afternoon, Chancellor Sharp instructed the presidents of TAMU System institutions, including President Welsh, "to take actions to cancel any 'Drag Show Events'" and to "take prompt action to implement the directives" in the Drag Ban Resolution. ROA.23 ¶¶ 88–89; ROA.40. Later that day, TAMU informed QEC that "your event, Draggieland 2025, will not be permitted on campus." ROA.23 ¶ 90.

**The district court enjoins the Drag Ban Resolution.**

On March 5, 2025, QEC filed this First Amendment action against the ten members of the Board, the Chancellor, and TAMU's President. ROA.9–40. The same day, it moved for a temporary restraining order and preliminary injunction so that QEC could stage *Draggieland* as scheduled at Rudder Theatre. ROA.67–94. The district court heard argument on March 18. ROA.421–488.

On March 24, 2025, the district court preliminarily enjoined Defendants from enforcing the Drag Ban Resolution, permitting *Draggieland* to proceed as scheduled at Rudder Theatre. ROA.368–98. The court concluded that QEC was likely to succeed on the merits of its First Amendment claims, holding that drag shows constitute inherently expressive conduct protected by the First Amendment, ROA.373–78, that Rudder Theatre is a designated public forum, ROA.378–81, that the Resolution is a viewpoint-based prior restraint, ROA.381–87, and that the Resolution fails strict scrutiny, ROA.387–91. This appeal followed.

## SUMMARY OF THE ARGUMENT

This Court should affirm the preliminary injunction because a public university system has imposed a prior restraint on protected expression, "the most serious and the least tolerable" of First Amendment violations. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). This act of censorship is based on the university's view that drag performances in campus venues "promote" an unwelcome "ideology" and "demean," "mock," and "parody" women. ROA.37–38. The district court correctly enjoined this viewpoint-based ban on protected expression, relying on longstanding Supreme Court precedents upholding First Amendment

protections against campus administrators who suppress student speech because of its expressive content.

Those precedents control this case, not the narrow, irrelevant decisions Defendants draw upon. As the district court properly held, at public universities, "the First Amendment takes precedence" over any code of conduct or university policy. ROA.387. Whatever campus rule or discriminatory harassment policy Defendants invoke, they must "accomplish[] [their] goals in some fashion other than silencing speech on the basis of its viewpoint." *IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 392 (4th Cir. 1993).

Yet silencing protected expression because of its viewpoint is precisely what the Drag Ban Resolution does. On its face, the Drag Ban Resolution disproves Defendants' claim that drag shows are not inherently expressive—after all, how does one "promote" an "ideology" or "parody" something absent expression? In any case, whether offering sharp political views, "mocking" humor, or anything in between, the First Amendment protects stage performances like *Draggieland* because they are inherently expressive. Adopting Defendants' cramped view of the First Amendment—a view the Supreme Court has rejected—would

deprive constitutional protection for any expression open to interpretation. But that is not the law. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995).

By banning drag shows because of their "ideology" and the Board's view that they offend women, Defendants discriminate based on viewpoint, which violates the First Amendment in any forum. *Rosenberger*, 515 U.S. at 829–30; *Matal v. Tam*, 582 U.S. 218, 243 (2017) (plurality opinion). But their attack on the First Amendment goes even further. They are imposing an unconstitutional prior restraint, blocking expression in advance based on Defendants' subjective judgments and bare speculation about harassment. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555–58 (1975). And they are discriminating based on content in a designated public forum. *See Concerned Women for Am., Inc. v. Lafayette Cnty.*, 883 F.2d 32, 33–35 (5th Cir. 1989).

While Defendants repeatedly invoke *Christian Legal Society v. Martinez*, 561 U.S. 661 (2010) (*CLS*), that decision does not save the Drag Ban Resolution from rigorous First Amendment scrutiny. At most, *CLS* applies only to narrow, viewpoint-neutral restrictions in limited public forums at public universities, unlike the ban here. And in no event does

it require that courts broadly defer to university administrators' decisions to restrict expression, as Defendants suggest.

Instead, federal courts must hold administrators to their heavy burden to justify targeting protected expression. Defendants fail to meet that burden here. Just consider their scant effort to satisfy the strict scrutiny required for content-based restrictions in designated public forums. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). For all their fearmongering about "harassment" and the "educational environment," Defendants offer not a shred of evidence that anyone complained about past or future iterations of *Draggieland* harming them or that the performance would disrupt the academic environment. Nor can they explain why a ticketed, indoors, after-hours drag show meets the "severe" and "pervasive" criteria required for a public university to establish discriminatory harassment. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999).

Only the injunctive relief the district court granted can prevent QEC from enduring irreparable First Amendment harm and protect the public's interest in ensuring university campuses remain strongholds for

free expression, not serfdoms for onerous speech codes like the Drag Ban Resolution. This Court should affirm.

## ARGUMENT

### I. Rigorous First Amendment Scrutiny, Not Broad Deference to Defendants, Is What the Constitution Demands Here.

When public university officials restrict the expressive content of a student group's speech, as Defendants have, courts owe that decision no deference. Rather, precedent commands a court to rigorously scrutinize the restriction, and hold it to the demanding burden the First Amendment requires. That is the standard the Court should apply here.

#### A. The First Amendment vigorously protects against public universities targeting the expressive content of a student group's speech.

Start with a constitutional cornerstone: Public universities "are not enclaves immune from the sweep of the First Amendment." *Healy*, 408 U.S. at 180. Quite the opposite. The "vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Id.* (citation omitted).

That principle tracks the essence of public universities, which serve as "one of the vital centers for the Nation's intellectual life." *Rosenberger*, 515 U.S. at 836. Against that "background and tradition of thought and

experiment," *id.*, public universities "are intended to function as marketplaces of ideas." *McCauley v. Univ. of the V.I.*, 618 F.3d 232, 244 (3d Cir. 2010). TAMU recognizes this vital principle, promising students that "[i]n fulfilling its multiple missions as an institution of higher learning, it encourages the free exchange of ideas."[2] And as one judge of this Court remarked, a public university "should not be intended to make people comfortable; it is meant to make them think." *Spectrum WT v. Wendler*, 151 F.4th 714, 733 (5th Cir. 2025) (Ho, J., dissenting) (quoting *Comm. on Freedom of Expression*, Univ. of Chicago, Report of the Comm. on Freedom of Expression (2015)), *reh'g granted & vacated*, 157 F.4th 673 (5th Cir. 2025) (per curiam).

To that end, the First Amendment stands resolute against public university administrators who suppress student expression based on the idea, perspective, or ideology it conveys. *Rosenberger*, 515 U.S. at 829, 836. That includes when administrators stifle expression based on their subjective judgment that the expression will offend others. *Papish v. Bd.*

[2] Texas A&M Univ. Student Rules, *Appendix XI*: *Texas A&M Rules on Freedom of Expression*, https://student-rules.tamu.edu/appendix-xi/ (rev. 2015) ("TAMU Student Rule—Freedom of Expression").

*of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973). And no matter what mission statement, policy, or preferences an administrator invokes to target student expression, those reasons "do[] not exempt its actions from constitutional scrutiny." *Widmar*, 454 U.S. at 268–69.

For instance, the First Amendment prohibits a public university from suppressing a student group's expression because administrators find its "philosophy" "abhorrent." *Healy*, 408 U.S. at 187–88; *see also Gay Student Servs. v. Tex. A&M Univ.*, 737 F.2d 1317, 1327–28 (5th Cir. 1984). Likewise, it forbids a public university from regulating student speech based on "conventions of decency," "no matter how offensive to good taste." *Papish*, 410 U.S. at 670. Nor can public university officials trumpet the school's mission or values in the name of silencing disfavored perspectives. *Widmar*, 454 U.S. at 268–69; *see also IOTA XI*, 993 F.2d at 392–93 (holding a public university violated the First Amendment when it punished students for holding an "ugly woman" skit the vice-president deemed "incompatible with … the University's mission of promoting diversity"). So no matter how ardently Defendants invoke TAMU's "mission and core values," they are no cover for suppressing QEC's expression based on disagreement with the "ideology" drag shows

"promote" or the view that the shows might "demean." *See* Defs. Br. 1, 39; ROA.37–38; *see also infra*, Section II.B.

Nor does the Board's appeal to curbing discriminatory harassment, ROA.37, exempt its drag show ban from First Amendment scrutiny. Because laws and campus policies addressing discriminatory harassment tend to invite censorship, they face demanding First Amendment obstacles. *E.g.*, *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1121 (11th Cir. 2022) (holding a university's "discriminatory-harassment policy objectively chills speech because its operation would cause a reasonable student to fear expressing potentially unpopular beliefs").

To begin, there is no "categorical harassment exception" to the First Amendment. *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 211 (3d Cir. 2001). That includes gender-related harassment, like that which Defendants' ban purports to target. ROA.37–38. Otherwise, universities "could conceivably" restrict "any speech" of a "'gender-motivated' nature" that "offends someone," including "'core' political and religious speech, such as gender politics and sexual morality." *DeJohn v. Temple Univ.*, 537 F.3d 301, 317–18 (3d Cir. 2008) (quoting *Saxe*, 240 F.3d at 217).

In the same way, Title IX, the federal law prohibiting discrimination based on sex, is no safe haven from First Amendment protections. As the Supreme Court made clear, Title IX does not require an institution to take "action that would expose it to constitutional … claims." *Davis*, 526 U.S. at 649. Instead, public universities cannot punish conduct based on discriminatory harassment unless it is "so severe, pervasive, and objectively offensive that it denies its victims [ ] equal access to education." *Id.* at 652; *see also DeJohn*, 537 F.3d at 318. So while campus officials may have an interest in curbing discriminatory harassment, they cannot simply gesture at that interest as a reason for suppressing student expression, as Defendants have here. *See infra*, Section II.E.1.

This is not to say, of course, that public universities have no leeway to regulate expression. They may enforce discriminatory harassment policies against conduct with evidence proving it meets the *Davis* standard. *See Davis*, 526 U.S. at 652. They may punish unprotected speech, like true threats. They may enforce content-neutral "reasonable regulations as to the time, place, and manner of speech and its dissemination." *Papish*, 410 U.S. at 670. And they may enforce rules

preventing substantial disruption to the university's academic functions. *See Healy*, 408 U.S. at 184.

But in all cases, a public university *must* meet its constitutional burden to justify restricting campus speech. When a university restricts student speech based on its content, like barring a category of artistic performance from campus theatres, it must satisfy strict scrutiny. *Widmar*, 454 U.S. at 269–70. If it imposes a prior restraint on student speech, it faces a "heavy burden" to justify its constitutionality. *Healy*, 408 U.S. at 184. And no matter the forum, the First Amendment bars public universities from suppressing speech because of its ideology, perceived offensiveness, or other viewpoint. *Rosenberger*, 515 U.S. at 829–30; *accord Matal*, 582 U.S. at 243.

Those heavy burdens exist even when a public university appeals to its mission, policies, or similar interests to suppress campus expression. A university cannot, for instance, punish or restrict speech based on mere "fear or apprehension" of campus disruption. *Healy*, 408 U.S. at 191. Nor can it exclude student groups from speaking in campus forums open to student groups without "empirical evidence" that the group will violate the law or university policy. *Widmar*, 454 U.S. at 275;

*see also Gay Student Servs.*, 737 F.2d at 1328. In the same way, Defendants' speculation that QEC's drag performance "*might* rise to the level of harassment or discrimination," Defs. Br. 44 (emphasis added), fails to meet their heavy burden to justify suppressing expression. *See infra*, Sections II.C, E.1.

### B. Defendants' reliance on *CLS* and *Hazelwood* is wrong.

Despite those enduring First Amendment protections, Defendants propose a different standard. They want courts "to respect" public university officials' decisions to restrict expression when they invoke the university's "mission and core values," concerns over the "educational environment," and interests in curbing discriminatory harassment. Defs. Br. 1–2 (citing *CLS*, 561 U.S. at 696). But as explained above, that is not the law when university officials target the expressive content of student speech, like Defendants have here.

Still, hoping to shield their categorical ban on drag performances in campus venues from rigorous scrutiny, Defendants retreat into two Supreme Court decisions: *CLS* and *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 271, 273 (1988). *E.g.*, Defs. Br. 1–2, 16, 38, 40. Neither decision impacts the constitutional questions here.

To start, *CLS* is a narrow decision involving “a novel question”: “May a public law school condition its official recognition of a student group—and the attendant use of school funds and facilities—on the organization’s agreement to open eligibility for membership and leadership to all students?” 561 U.S. at 668. That question is far afield from the one here. TAMU has granted QEC recognized student group status. ROA.12 ¶ 12. So this case is not about the “subsidy” of granting recognized status. *See CLS*, 561 U.S. at 683. Rather, it centers on a prohibition against student groups engaging in protected expression. *See infra*, Sections II.A–D; *cf. CLS*, 561 U.S. at 683.

That discrepancy is even sharper considering two more distinctions rendering *CLS* irrelevant. First, Rudder Theatre is a designated public forum open to student group expression, unlike the narrow limited public forum for recognizing student organizations *CLS* considered. *See infra*, Section II.D; *cf. CLS*, 561 U.S. at 679. And second, *CLS* did not involve viewpoint discrimination, unlike this case. *See infra*, Section II.B. Rather, it centered on a viewpoint-neutral policy requiring registered student organizations to “allow any student to participate, become a member, or seek leadership positions in the organization, regardless of

[her] status or beliefs"—a fact to which the policy's challenger stipulated. *CLS*, 561 U.S. at 675.

To that end, the Supreme Court in *CLS* emphasized another key distinction. When public universities target the expressive content of a student group's speech, they face more rigorous scrutiny than when they do not. *See id.* at 684 n.15, 696. To illustrate that distinction, the Supreme Court pointedly stressed in *CLS* its "series of decisions" that invalidated a public university's efforts to deny student speakers access to campus forums based on the expressive content of their speech. *Id.* at 667–68 (citing *Rosenberger*, *Healy*, and *Widmar*).

Those decisions, not *CLS*, control this case. In essence, Defendants seek to overextend *CLS* in a way that would render those enduring decisions a nullity—and give campus censors free rein to suppress speech under the cover of curbing harassment, preventing offense, or any other justification they can imagine. Given the Supreme Court's clear instruction in *CLS* that precedents like *Healy*, *Rosenberger*, and *Widmar* remain in full force, this Court should reject Defendants' argument.

It should also reject Defendants' invitation to apply *Hazelwood*'s allowance for K-12 schools to limit student speech based on "pedagogical

concerns." Defs. Br. 38. For one thing, Defendants offer no decision in which this Court has extended *Hazelwood* to public universities. Nor should the Court do so. As the Third Circuit explained, the "university atmosphere of speculation, experiment, and creation" differs starkly from the K-12 atmosphere at issue in *Hazelwood*, where staff acts "in loco parentis." *McCauley*, 618 F.3d at 243–46. At public universities, on the other hand, "students are given opportunities to acquit themselves as adults." *Id.* at 246.

Even assuming *Hazelwood* could extend to public universities, it does not apply here. "*Hazelwood*'s permissive 'legitimate pedagogical concern' test governs only when a student's school-sponsored speech could reasonably be viewed as speech of the school itself." *Saxe*, 240 F.3d at 213–14 (citing *Rosenberger*, 515 U.S. at 834). When it comes to a student group's speech, the notion that public universities "do not endorse everything they fail to censor is not complicated." *Bd. of Educ. of the Westside Cmty. Schs. v. Mergens*, 496 U.S. 226, 250 (1990) (plurality opinion). Take *Widmar*. In invalidating a university's exclusion of religious group from campus meeting spaces, the Court concluded, "an open forum in a public university does not confer *any* imprimatur of state

approval on religious sects or practices." *Widmar*, 454 U.S. at 275 (emphasis added).

So too here. No one would view QEC's after-hours drag performance as the speech of TAMU. And if TAMU wants to distance itself from QEC's message, "the school's proper response is to educate the audience rather than squelch the speaker." *Saxe*, 240 F.3d at 213–14 (citation omitted). Imagine the opposite rule. Public universities could censor a host of disfavored student speech based on the mere possibility that donors, politicians, or the public might misperceive the speech as that of the university. In effect, students would be left to parrot administrators' preferred views. That's no way to secure "vigilant protection of constitutional freedoms" at public universities like TAMU. *Healy*, 408 U.S. at 180. *Hazelwood* has no place in this First Amendment dispute at a public university system.

## II. The District Court Correctly Held QEC is Likely to Succeed on the Merits.

### A. The First Amendment protects QEC's *Draggieland* performance.

The district court correctly held the First Amendment protects *Draggieland*. ROA.378. Live theatre is a classic expressive medium, and *Draggieland* bears every conventional marker of a theatrical

performance, combining costumes, music, lighting, makeup, stage personas, the spoken word, and choreography in a ticketed production. ROA.12 ¶ 15; ROA.17–18 ¶¶ 41–45, 50. Its expressive character is unmistakable, even if some viewers might disagree about its precise meaning. And the Drag Ban Resolution removes any doubt about the show's inherent expressiveness: It bans drag performances the Board regards as "demeaning" to women and as "promot[ing]" an "ideology." ROA.37–38. Defendants cannot attribute those messages to *Draggieland* while simultaneously denying the performance is expressive. ROA.377.

#### 1. Live stage performances are inherently expressive and need not convey a single, particularized message.

Regardless of the medium, "the basic principles of freedom of speech … do not vary." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952). One such principle is that when conduct is "inherently expressive," the First Amendment protects it. *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006) (*FAIR*) (citing *Texas v. Johnson*, 491 U.S. 397, 406 (1989)); *see also 303 Creative LLC v. Elenis*, 600 U.S. 570, 600 (2023) (First Amendment protects "all persons engaged in expressive conduct").

Live theatre, including drag shows, falls comfortably within the First Amendment protection for inherently expressive conduct. The Supreme Court has long recognized that "live entertainment, such as musical and dramatic works, fall within the First Amendment guarantee." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981); *see also Se. Promotions*, 420 U.S. at 557–58. The same is true of "plays," "movies," and "video games." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011). Stage performances on- and off-campus receive full First Amendment protection, whether "crude and amateurish" or polished and highbrow. *Schacht v. United States*, 398 U.S. 58, 61–62 (1970); *see also IOTA XI*, 993 F.2d at 390–93 (holding a fraternity's "ugly woman contest" was protected expressive conduct even if university officials might find it "low quality" or "crude"). Given these principles, it is no surprise that a sister Circuit and lower courts have time and again held drag performances are protected expression.[3]

[3] *See, e.g.*, *Imperial Sovereign Ct. of Mont. v. Knudsen*, 170 F.4th 820, 855–58 (9th Cir. 2026); *Norma Kristie, Inc. v. City of Oklahoma City*, 572 F. Supp. 88 (W.D. Okla. 1983); *S. Utah Drag Stars v. City of St. George*, 677 F. Supp. 3d 1252 (D. Utah 2023). The only contrary decision is *Spectrum WT v. Wendler*, 816 F. Supp. 3d 648 (N.D. Tex. 2026), which is

Critically, a theatrical production need not convey "a narrow, succinctly articulable message" to receive First Amendment protection. *Hurley*, 515 U.S. at 569. A work of art does not lose that protection because its meaning is subtle, multifaceted, or open to competing interpretations. Otherwise, the First Amendment "would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll." *Id.*[4]

Defendants therefore misread *Spence v. Washington* and *Texas v. Johnson* in asserting the First Amendment demands a "great likelihood" *Draggieland*'s audience would understand a single, specific message. *See* Defs. Br. 19, 25 (citing *Spence v. Washington*, 418 U.S. 405 (1974) and *Johnson*, 491 U.S. 397 (1989)). Such a rule would leave no performance, parade, or other inherently expressive work whose meaning is open to interpretation safe from government censors. It would protect Pollock's paintings and Carroll's verse only if viewers were near-certain to identify

pending in this Court and consolidated with this appeal for en banc argument.

[4] "'Twas brillig, and the slithy toves / Did gyre and gimble in the wabe: / All mimsy were the borogoves, / And the mome raths outgrabe." Lewis Carroll, *Jabberwocky*, *in* Jabberwocky and Other Poems 17 (Courier Dover Publ'ns 2001) (1871).

the artist's meaning—the very result *Hurley* rejected. The right standard is "whether the reasonable person would interpret [the activity] as [conveying] *some* sort of message, not whether an observer would necessarily infer a *specific* message." *Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004); *see also Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1241–43 (11th Cir. 2018).

*Hurley*'s commonsense rule underscores the difference between conduct whose expressive character depends entirely on context, like flag burning, and activity that is plainly expressive by its nature, like drag shows and other theatrical performances. *Spence* and *Johnson* may strictly apply when determining whether otherwise non-expressive conduct *becomes* expressive in context. But *Hurley* "liberalized" the test from those decisions, *Holloman*, 370 F.3d at 1270, making clear the government may not invoke *Spence*'s "particularized message" language to deny constitutional protection to art, parades, stage performances, or any other inherently expressive activity just because audience members might not readily perceive a specific message. *Hurley*, 515 U.S. at 569; *see also FAIR*, 547 U.S. at 63–64, 66 (citing both *Johnson* and *Hurley*

with approval and distinguishing activities whose "expressive nature" or "expressive quality" is clear).

These principles underscore why QEC's performances are inherently expressive conduct protected under the First Amendment. It does not matter if different viewers might perceive different messages—that is a feature inherent to artistic expression. So a performance conveying a "multiplicity of messages," Defs. Br. 23, is no less protected than one conveying a singular meaning. *See Hurley*, 515 U.S. at 569. However audience members ultimately interpret *Draggieland*, they would understand the performance is conveying *something*. That is all the First Amendment requires. *See Holloman*, 370 F.3d at 1270.

### 2. ***Draggieland*'s expressive character is unmistakable to its ticketed audience.**

The district court put it well: "The [*Draggieland*] performers are just that: performers. They are acting. The performance is theater." ROA.384. Thus, even apart from stage performance's inherently expressive nature, every feature of *Draggieland*, viewed in context, confirms its communicative character.

*Draggieland* is a ticketed production presented on a theatre stage before a voluntary audience. ROA.20 ¶ 67; ROA.21 ¶ 77; ROA.28 ¶ 127.

Performers assume stage personas and coordinate with each other about costumes, makeup, hairstyles, music, lighting, and choreography. ROA.17–18 ¶¶ 40–45, 50. Student organizers appoint judges, hold auditions, and conduct rehearsals. ROA.18 ¶¶ 48–53.

Those efforts culminate in QEC's most prominent annual event, which celebrates LGBTQ+ identity and culture and expresses challenges to gender norms. ROA.12 ¶ 15; ROA.20 ¶¶ 71–73. The performers reinforce those themes by discussing with the host what drag means to them. ROA.17 ¶ 47. Taken together, those features make *Draggieland*'s communicative character unmistakable. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984) ("[A] message may be delivered by conduct that is intended to be communicative and that, in context, would reasonably be understood by the viewer to be communicative").

The Rudder Theatre setting reinforces that expressive nature. Audience members purchase tickets to enter and watch auditioned and rehearsed performers portray gender-challenging characters who dance under lights to choreographed music. ROA.17 ¶¶ 41–46; ROA.18 ¶¶ 54, 56; ROA.20 ¶¶ 70–73. Those cues readily communicate that QEC means to express *something*, even if individual audience members might vary

on how they interpret the performance's precise meaning.[5] If the long history of *outdoor* theatre provides sufficient context to alert passersby that a street skit is performative, *see Schacht*, 398 U.S. at 61–62, a ticketed production *inside* a theatre is clearer still. *Accord Se. Promotions*, 420 U.S. at 557.

That is why Defendants' reliance on *City of Dallas v. Stanglin*, 490 U.S. 19 (1989), is wrong. *See* Defs. Br. 21. *Stanglin* involved a sock hop—an informal gathering of hundreds of teenage "strangers" who gathered at a dance hall to "engage in recreational dancing." 490 U.S. at 24–25. In stark contrast, *Draggieland* involves an organized student group presenting an auditioned, rehearsed, and choreographed stage production *to an audience*. Just as context distinguishes an ordinary picnic from an organized food-sharing event intended to communicate a message of "community and care," *Food Not Bombs*, 901 F.3d at 1243–44, context distinguishes recreational dancing from a choreographed stage performance.

[5] Defendants characterize the record on this issue as "thin." *See, e.g.*, Defs. Br. 17, 20–21. Not so. QEC's verified complaint describes in detail both *Draggieland*'s expressive elements and the broader themes QEC seeks to convey. *E.g.*, ROA.17–18 ¶¶ 39–53; ROA.20 ¶¶ 69–73.

And the Drag Ban Resolution confirms *Draggieland*'s expressive nature. In it, the Board asserts that drag performances "parody" and "mock[]" women and "promote" an "ideology." ROA.22 ¶¶ 82, 86; ROA.37–38. But how can QEC's performance "promote," "parody," or "mock" except through expression? By attributing those meanings to drag shows, the Resolution underscores *Draggieland*'s expressive character.

The Fourth Circuit confronted the same contradiction in *IOTA XI*. There, university officials maintained that an "ugly woman contest" was not expressive while simultaneously condemning it for communicating racist and sexist stereotypes. 993 F.2d at 392. The court described that position as "self-defeating," as the university's own interpretation evidenced the production was "intended to convey a message." *Id.*

So too here. As the district court explained, "[t]he Board cannot assert both that the performance promotes an ideology and that it is not expressive conduct." ROA.377. Defendants may dislike the message they perceive, but that disagreement confirms rather than negates *Draggieland*'s expressive character.

### 3. The spoken words of *Draggieland* underscore why the First Amendment protects it.

The interviews *Draggieland* performers have with the host only reinforce why the First Amendment protects the show. Live theatre "frequently mixes speech with live action or conduct." *Se. Promotions*, 420 U.S. at 557–58. Following that tradition, the performers' conversations are intrinsic to *Draggieland*'s expressive nature, just as their choreography and gender-challenging costume choices are.

To that end, Defendants cannot separate the performers' routines from their conversations with the host, evaluate each component in isolation, and paint the conversations as merely "explanatory." *See* Defs. Br. 14, 20, 23–24. That approach clashes with the Supreme Court's instruction that there is "no reason to hold theater subject to a drastically different standard" from other expressive mediums. *Se. Promotions*, 420 U.S. at 557–58. As the district court explained, courts do not "deconstruct the elements of a live drama, theatrical performance, or work of art to separate out components that are 'expressive' or 'non-expressive.'" ROA.378. Rather, "[t]he performance must be considered as a whole, like any other artwork." *Id.* And considered as a whole, *Draggieland*'s expressive nature is unmistakable.

For the same reasons, Defendants fail in trying to recast the performers' spoken words as "explanatory speech" that deprives *Draggieland* of First Amendment protection. Defs. Br. 24 (citing *FAIR*, 547 U.S. at 66). Defendants misread *FAIR*. The relevant question is not whether expressive conduct is accompanied by speech, as is "frequently" the case in live theatre. *Se. Promotions*, 420 U.S. at 557–58. Rather, as *FAIR* makes clear, it is whether that speech is "necessary" for an observer to perceive a message from the conduct. *FAIR*, 547 U.S. at 66; *see also Food Not Bombs*, 901 F.3d at 1244.

As Chief Justice Roberts stressed during a recent argument, *FAIR* "involved [law] schools providing rooms for the military recruiter," and "what the Court said is empty rooms don't speak." Transcript of Oral Arg. at 65:1–9, *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) (No. 21-476). So whatever "expressive component" the law school wanted to convey with "empty rooms," it could emanate *only* from "the speech that accompanie[d] it." *FAIR*, 547 U.S. at 66.

Drag shows are no empty room, and no comparable explanation is necessary. Even before the host asks a question, an audience member watching a costumed, choreographed drag performance on a theatre

stage understands the performers are engaged in expression. The interviews only *augment* that expression, no different than a narrator augments a play's expression, or album notes augment a musician's message. They do not create the expression.

### B. Banning *Draggieland* because of the "ideology" it "promotes" and the perception that it is "demeaning" is unconstitutional viewpoint discrimination.

This is a straightforward case of viewpoint discrimination, the most "egregious form of content discrimination" which is "presumptively unconstitutional," *Rosenberger*, 515 U.S. at 829–30, in "any forum," *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 350 (5th Cir. 2001). This Court can affirm on that basis alone.

#### 1. Defendants are engaging in viewpoint discrimination by suppressing an "ideology."

"Ideology" is simply a codeword for "viewpoint." So by targeting what the Board considers the "gender ideology" that drag shows "promote," Defendants are engaging in classic viewpoint discrimination. *Rosenberger* alone answers this question, holding that when public university officials suppress expression out of disagreement with a "specific motivating ideology," they engage in unconstitutional viewpoint discrimination. 515 U.S. at 829. And as the district court fittingly

explained, "that the Board justifies its ban on drag shows by saying it aligns with the rejection of a certain ideology belies the Board's contrary position that the ban is viewpoint neutral." ROA.383.

Defendants gain no cover by invoking Executive Order 14168, which singles out "gender ideology" as a disfavored idea. *See* ROA.38. For one thing, the Executive Order applies to federal agencies, not state universities like TAMU. ROA.235; *see also infra*, Section II.E.2. And as several courts have held, by targeting expression that "promotes" an "ideology," the Executive Order violates the First Amendment.[6] An irrelevant and viewpoint-driven Executive Order targeting a disfavored "ideology" does not relieve TAMU of its unyielding constitutional obligation to uphold its students' First Amendment rights.

Yet by stifling what they perceive as the "ideology" of *Draggieland*, Defendants "seek[] not just to restrict speech based on its subject matter, but also [] to dictate what particular 'opinion or perspective'" QEC "may express on that subject." *Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026)

---

[6] *See San Francisco A.I.D.S. Found. v. Trump*, 786 F. Supp. 3d 1184, 1220 (N.D. Cal. 2025); *Rhode Island Latino Arts v. Nat'l Endowment for the Arts*, 800 F. Supp. 3d 351, 368–69 (D.R.I. 2025); *Schiff v. U.S. Off. of Pers. Mgmt.*, 784 F. Supp. 3d 380, 393–94 (D. Mass. 2025).

(quoting *Rosenberger*, 515 U.S. at 829). That makes "'the violation of the First Amendment [] all the more blatant.'" *Id.*

### 2. The Drag Ban Resolution expressly targets perspectives the Board considers offensive.

The Drag Ban Resolution is also viewpoint discriminatory because it regulates expression based on the "subjective judgment that the content is … offensive or inappropriate." *Robinson v. Hunt Cnty.*, 921 F.3d 440, 447 (5th Cir. 2019). Its plain text leaves no doubt. The Resolution prohibits "Drag Show Events" because they "demean[]," "mock[]," and "parody" women. ROA.37–38. So the district court got it right: "Whether drag shows are 'demeaning' is precisely the type of subjective judgment that [this] court in *Robinson* held cannot form the basis for a restriction on expression." ROA.382.

*Matal v. Tam* cements this point. There, the lead singer of "The Slants" sought to trademark the band's name, which they selected "in order to 'reclaim' and 'take ownership' of stereotypes about people of Asian ethnicity." 582 U.S. at 228. The Trademark Office denied registration under a provision of the Trademark Act barring marks "that disparage[] any person, group, or institution." *Id.* at 223, 246 (emphasis omitted).

The Supreme Court invalidated the disparagement clause because it discriminated based on viewpoint. *Id.* at 243. The Court rejected the government's argument that the prohibition was viewpoint neutral because it "evenhandedly" barred disparagement. *Id.* Even though the disparagement clause "applie[d] equally to marks that damn Democrats and Republicans, capitalists and socialists, and those arrayed on both sides of every possible issue," it still discriminated based on viewpoint because, ultimately, "[g]iving offense is a viewpoint." *Id.* "Our cases," the Court explained, "use the term 'viewpoint' discrimination in a broad sense." *Id.*

The Drag Ban Resolution permits expression about women, gender, and sexuality the Board considers acceptable while prohibiting expression it regards as demeaning or ideologically offensive. But just as the Trademark Office in *Matal* could not refuse to register marks it considered disparaging, Texas A&M cannot cancel a theatrical production because the Board considers it demeaning. That remains true whether the performance "support[s]" or "oppose[s]" LGBTQ+ rights, Defs. Br. 43, the very distinction *Matal* forecloses.

Though some may argue the Resolution's definition of "Drag Show Events" does not predetermine that *all* performances featuring "biological males dressing in women's clothing" are "demeaning," instead vesting TAMU officials with discretion to make that decision, it makes no constitutional difference. In all cases, when officials restrict expression because they believe it is offensive—as Defendants have in blocking *Draggieland* from the Rudder Theatre stage—they violate the First Amendment. *Matal*, 582 U.S. at 243; *Robinson*, 921 F.3d at 447.

Consider the question the district court posed: "When do performances in which men dress as women cross the line from entertaining to demeaning?" ROA.383. "The impossibility of objectively answering that question," the court explained, "demonstrates why such standards are impermissible as the basis for a restriction on expressive conduct." *Id. Matal* cements that point, too, holding the Trademark Office could not decide the line between inoffensive and disparaging without violating the First Amendment. 582 U.S. at 243. Likewise, the Constitution prohibits TAMU officials from deciding, for example, that a live adaptation of *Mrs. Doubtfire* is "respectful" enough to allow on campus, but *Draggieland* is not.

Whether it be a prayer gathering in a university meeting space, a racial justice walk across campus, or a drag performance in a campus theatre, the First Amendment guarantees that university officials do not get to decide what expression is palatable enough for the campus community. *Papish*, 410 U.S. at 670. "[T]he Constitution leaves matters of taste and style so largely to the individual." *Cohen v. California*, 403 U.S. 15, 25 (1971). Any other rule would give officials "a convenient guise for banning the expression of unpopular views." *Id.* at 26.

### 3. Labeling the Drag Ban Resolution a regulation of an expressive means or "conduct" does not make it viewpoint neutral.

The First Amendment bars Defendants from dictating that QEC may express its views on gender and LGBTQ+ identity only through means the Board regards as sufficiently respectful or inoffensive. *See* Defs. Br. 42–43. "The First Amendment's viewpoint neutrality principle protects more than the right to identify with a particular side." *Matal*, 582 U.S. at 249 (Kennedy, J., concurring). It also "protects the right to create and present arguments for particular positions in particular ways, as the speaker chooses." *Id.* In short, Defendants cannot cure their blatant viewpoint discrimination by arguing that they object not to QEC's

ideas but to the protected expression it uses to convey those ideas. Defs. Br. 42–43.

The Supreme Court's reason for adopting its "broad" view of viewpoint discrimination is an important one. *Matal*, 582 U.S. at 243. If the government could circumvent the First Amendment's bar on viewpoint discrimination by censoring views conveyed in ways it deems offensive, First Amendment protection would mean little. Officials could say, for instance, that while they have no objection to pro-life views, they find images of aborted fetuses offensive, limiting pro-life advocates to text-only flyers. That is not the law, as decisions like *Matal* and *Robinson* affirm. *See also Utah Pol. Watch, Inc. v. Musselman*, 179 F.4th 1241, 1257 (10th Cir. 2026) ("[V]iewpoint covers more than an individual's ideology or ideas on a particular subject matter—viewpoint includes the perspective of the speaker and how he speaks") (citing *Chiles*, 146 S. Ct. at 1021).

Just as some pro-life advocates find images of aborted fetuses an especially effective form of advocacy, and some dissidents find that burning a flag in protest is more effective than handing out pamphlets, drag conveys ideas in ways that other types of expression cannot. ROA.20

¶¶ 71–73. In other words, the *means is essential to the message*. And the government cannot "justify a restraint on some particular means that the speaker finds more effective." *Reeves v. McConn*, 631 F.2d 377, 382 (5th Cir. 1980); *see also City of Ladue v. Gilleo*, 512 U.S. 43, 56 (1994) (invalidating ordinance banning residential signs even though other avenues for expression existed).

Defendants fare no better in characterizing *Draggieland* as regulable "conduct" rather than expression. Defs. Br. 43–44. "The First Amendment is no word game. And the rights it protects cannot be renamed away or their protections nullified by 'mere labels.'" *Chiles*, 146 S. Ct. at 1023 (quoting *NAACP v. Button*, 371 U.S. 415, 429 (1963)). As explained above, *Draggieland* is protected theatrical expression. The performance "does not become conduct just because [Defendants] may call it that." *Id.*

As the district court reasoned, Defendants' proposed distinction "could be used to justify restraints on a wide variety of expressive conduct that is intended to convey a message but may be construed as offensive, shocking, or demeaning by state actors." ROA.382. Just as the government may not "foster its own view of the flag by prohibiting

expressive conduct relating to it," *Johnson*, 491 U.S. at 415, Defendants cannot prohibit drag shows to prevent offense and promote TAMU's preferred view of gender.

### C. Defendants' ban imposes an unconstitutional prior restraint.

The district court correctly held that by banning *Draggieland* before anyone took the stage, Defendants imposed a viewpoint-based prior restraint. ROA.386–87. Defendants' prior restraint is the "most serious and … least tolerable infringement on First Amendment rights." *Neb. Press Ass'n*, 427 U.S. at 559. That is why it carries a "heavy presumption against its constitutionality." *Gay Student Servs.*, 737 F.2d at 1325 (citation and internal quotation marks omitted). Because Defendants cannot overcome that burden, this Court should affirm.

#### 1. Defendants' ban mirrors the unconstitutional prior restraint in *Southeastern Promotions*.

*Southeastern Promotions v. Conrad* controls the prior restraint question. There, the Supreme Court held city officials imposed an unconstitutional prior restraint by excluding the musical *Hair* from a municipal theatre because the show did not fit the city's requirement for entertainment to be "clean and healthful and culturally uplifting." 420 U.S. at 549. Defendants' ban is a 21st-century reboot of the prior restraint

in *Southeastern Promotions*. They have excluded drag performances from campus venues because the shows do not fit Defendants' preferred "ideology" and their opinion about appropriate perspectives for others to hear. ROA.37–38.

Under *Southeastern Promotions*, Defendants cannot bar stage performances "in advance of actual expression" unless they meet two stringent requirements. First, the performance "must fit within one of the narrowly defined exceptions" to the First Amendment, like obscenity; and second, any scheme for preemptively banning the performance must be "bounded" by "narrow, objective, and definite standards." 420 U.S. at 553, 559 (quoting, in part, *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969)). Yet Defendants make no attempt to meet either requirement. *See* Defs. Br. 47–48.

The Drag Ban Resolution does not hint at obscenity, let alone include the constitutional test for it.[7] Instead, it defines "Drag Show Events" as involving "biological males" choosing to perform in "women's

[7] See *Miller v. California*, 413 U.S. 15, 24 (1973) (unprotected obscenity must "appeal to the prurient interest in sex," "portray sexual conduct in a patently offensive way," and "not have serious literary, artistic, political, or scientific value").

clothing." ROA.37. To state the obvious, wearing clothes, even if those clothes might offend some, falls far short of the Constitution's obscenity line. *See Cohen*, 403 U.S. at 20.

Nor is the Drag Ban Resolution bounded by narrow, objective, and definite standards. The Resolution stands on unbounded and subjective criteria that govern what performances are barred from campus event venues. ROA.37. For instance, while the ban prohibits Drag Show Events that "demean" women, what offends another is necessarily subjective and cannot justify a prior restraint on student speech. *Healy*, 408 U.S. at 184, 187–88; *see also Matal*, 582 U.S. at 243; ROA.383.

Likewise, though the ban prohibits Drag Show Events that include "sexualized, vulgar, or lewd conduct," ROA.37, that vague term—defined neither in the Board's resolution nor any campus rule—invites subjective application that is fatal under the First Amendment. *Se. Promotions*, 420 U.S. at 560–61 (striking down prior restraint that turned on official's view of what was "culturally uplifting or healthful"). As the district court rightly reasoned, "[t]o some, *Draggieland*, which features fully clothed performers, would be considered no more 'lewd' or 'indecent' than the scantily clad performers in The Cher Show that was performed in the

Rudder Theatre, and no more demeaning to women than a beauty pageant." ROA.386–87. At the same time, those subjective terms unconstitutionally vest TAMU officials with power to arbitrarily prohibit a drag performance before it occurs.

The ban's lack of narrow, objective criteria also underscores why Defendants misrely on *CLS*. *See* Defs. Br. 48; *see also supra*, Section I.B. In *CLS*, the law school's "all comers" policy constrained administrators to a binary choice: grant recognized status if a student group agreed to let all students join, regardless of their beliefs, or deny it if they did not. *See* 561 U.S. at 675. That is a far cry from the unfettered discretion the Drag Ban Resolution gives TAMU officials—the type that invites the very viewpoint discrimination the Supreme Court warned about in *CLS*. *Id.* at 667–68 ("[T]his Court has emphasized that the First Amendment generally precludes public universities from denying student organizations access to school-sponsored forums because of the groups' viewpoints").

### 2. Defendants fail to meet their heavy burden to justify a prior restraint.

Unable to overcome *Southeastern Promotions*, Defendants insist they can deny QEC use of a campus forum over "concerns" that

*Draggieland* "would run counter to the University and System policies and antidiscrimination law." Defs. Br. 47. But *Healy* proves them wrong.

There, the Supreme Court held a university president imposed an unconstitutional prior restraint by denying a student group recognition based on his belief that its "philosophy was antithetical to the school's policies." *Healy*, 408 U.S. at 175, 184, 194. The constitutional problem, the Court explained, was "there was no substantial evidence" the group "would constitute a disruptive force on campus." *Id.* at 190–91. That "sort of undifferentiated fear or apprehension of disturbance [ ] is not enough to overcome the right to freedom of expression." *Id.* at 191 (quoting *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503, 508 (1969)) (cleaned up); *see also Pro-Life Cougars v. Univ. of Hou.*, 259 F. Supp. 2d 575, 583–84 (S.D. Tex. 2003) (granting preliminary injunction against campus prior restraint due to administrator's discretion about "potentially disruptive" expressive activity).

So too here. The record lacks any evidence students complained of discriminatory harassment, or that a ticketed drag show in an enclosed venue after class hours would substantially disrupt campus. Defendants all but concede this, leaving them to argue only that in their view,

*Draggieland* "might border on harassment or discrimination." Defs. Br. 40.

"Might" exemplifies the kind of "undifferentiated fear or apprehension" that *Healy* rejects as grounds for stopping expression in advance. 408 U.S. at 191. And rightfully so. "A free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand" because "the risks of freewheeling censorship are formidable." *Se. Promotions*, 420 U.S. at 559.

Defendants also maintain their prior restraint is "reasonable" because Rudder Theatre is a limited public forum. Of course, because Rudder Theatre is a designated public forum, "reasonableness" is the wrong standard. *See infra*, Section II.D; ROA.379–81. And in any event, there is nothing reasonable about a categorical ban on a genre of protected expression in a public campus' performance venue based on mere speculation it "might" harass or discriminate.

Finally, Defendants argue the ban passes constitutional muster because QEC can simply take *Draggieland* off campus. Defs. Br. 41. Once again, *Southeastern Promotions* stands in their way. "Whether petitioner might have used some other, privately owned, theater in the city for the

production is of no consequence," the Supreme Court reasoned, because "'one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.'" *Se. Promotions*, 420 U.S. at 556 (quoting *Schneider v. State*, 308 U.S. 147, 163 (1939)); *see also Healy*, 408 U.S. at 183 (explaining that a student group's "possible ability to exist outside the campus community does not ameliorate" the injury because courts "are not free to disregard the practical realities").

### D. Defendants are imposing a content-based speech restriction in a designated public forum.

In public forums like Rudder Theatre, viewpoint discrimination "is forbidden." *Matal*, 582 U.S. at 243. With that, and the heavy presumption against prior restraints Defendants fail to overcome, the Court need go no further to affirm. Still, there is another basis to affirm.

As the district court rightly held, Defendants cannot satisfy the strict scrutiny their content-based ban on drag performances in a designated public forum demands. ROA.378–81, 387–90. Defendants' arguments on appeal prove the district court right. They largely ignore TAMU's policies and practice establishing Rudder Theatre as a

designated public forum. And Defendants make scant effort to address strict scrutiny, let alone satisfy it.

#### 1. TAMU's policy and practice establish Rudder Theatre is a designated public forum.

Despite arguing at length—incorrectly—that Rudder Theatre is a limited public forum, Defs. Br. 28–37, Defendants fail to acknowledge the central factors for forum analysis: the government's "policy and practice" and the venue's "compatibility with expressive activity." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802–03 (1985) (citing *Widmar*, 454 U.S. at 267; *Se. Promotions*, 420 U.S. at 555). Applying those factors, both TAMU's policy and its practice as to Rudder Theatre establish it as a designated public forum.

Take first TAMU's policies. Nothing in TAMU's Expressive Activity Policy or its student rules deem Rudder Theatre a limited public forum or limit it to certain speakers or topics.[8] Quite to the contrary, the TAMU Expressive Activity Policy promises student groups like QEC that TAMU

[8] Texas A&M University Rule 08.02.99.M1, *Expressive Activity on Campus* (rev. Mar. 19, 2026), https://rules-saps.tamu.edu/PDFs/08.02.99.M1.pdf ("Expressive Activity Policy"); TAMU Student Rule—Freedom of Expression, *supra* note 2.

will not base reservation confirmations for spaces like Rudder Theatre "on the content or viewpoint of the expressive activity."[9]

What's more, TAMU System Policy guarantees student groups the right "to engage in expressive activities on campus"—which includes "buildings" like Rudder Theatre—free of campus officials targeting their "political, religious, philosophical, ideological, or academic viewpoint."[10] That mirrors the policy this Court held to establish a designated public forum in *Justice for All v. Faulkner*, 410 F.3d 760, 768 (5th Cir. 2005).

In sum, TAMU and System Policy place no content limits on expressive activities in Rudder Theatre. And where a university imposes no or "minimal" limits on the "substance" of expression in a campus space, it creates a designated public forum. *Id.* at 766–69, 766 n.8.

TAMU's practice with Rudder Theatre likewise establishes it as a designated public forum. The district court found no evidence showing TAMU had ever denied a reservation for Rudder Theatre before the Board enforced the Drag Ban Resolution. ROA.380. And in recent years,

[9] Expressive Activity Policy § 5.3.

[10] Texas A&M Sys. Policy 08.02.01, *Expressive Activity on Campus* (Nov. 13, 2025), https://policies.tamus.edu/08-02-01.pdf.

Rudder Theatre has hosted musicals with "mature themes," *The Cher Show*, beauty pageants, concerts, and comedy shows. ROA.16–17 ¶ 38. As the district court correctly concluded, QEC's "*Draggieland* event is consistent with" these events, further establishing Rudder Theatre as a designated public forum. ROA.380 (citing *Pro-Life Cougars*, 259 F. Supp. 2d at 582; *Widmar*, 454 U.S. at 267 n.5).

Unable to avoid TAMU's policy and practice, Defendants try several other avenues in arguing Rudder Theatre is a limited public forum. But the record and the law render each argument futile.

First, Defendants insist the Rudder Theatre operations manual and reservation system bear on Rudder Hall's status. Defs. Br. 33–34. They don't. Rather, the record confirms these guidelines involve "ministerial judgments" about logistics, *see* ROA.276–318, which do not alter a forum's classification. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 680 (1998). Nothing in the operations manual or reservation process limits the venue to certain speakers or topics, the hallmark of a limited public forum. *Rosenberger*, 515 U.S. at 829. Rather, the reservation system highlights TAMU's intent to open Rudder Theatre to all kinds of expression, including "Performance/Concert/Recital," "Ceremony," and

the catch-all "Other." ROA.279 (linking to https://tx.ag/reserverudder, which leads to a reservation form with those categories).

Next, Defendants suggest Rudder Theatre cannot be a designated public forum because it is indoors. This Court's decision in *Concerned Women for America, Inc. v. Lafayette County*, holding a library was a designated public forum, proves otherwise. 883 F.2d at 34–35. And while TAMU's rules declare certain indoor spaces like classrooms, dorms, and academic buildings are "non public forums," they impose no such limit for event venues like Rudder Theatre.[11]

Defendants also discount the lack of content restrictions and reservation refusals at Rudder Theatre, arguing that "past events at Rudder Theatre" do not pose "the same risks" as drag performances. Defs. Br. 36–37. But that makes little sense: TAMU readily permitted *Draggieland* at Rudder Theatre in the five years preceding the ban, with no resulting complaints about discriminatory harassment or reports of substantial disruption. *See* ROA.18–19.

[11] TAMU Student Rule—Freedom of Expression at I, *supra* note 2.

What's more, that argument clashes with this Court's holding that public university "property ... does not automatically cease to be a designated public forum because the government restricts some speech on the property. Otherwise, the restriction of speech on government property would be self-justifying." *Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 117 (5th Cir. 1992). At bottom, Defendants cannot use the Drag Ban Resolution to transform Rudder Theatre into a limited public forum. *See* Defs. Br. 34–35. "[T]he government's policy is indicated by its *consistent* practice, not each exceptional regulation that departs from the consistent practice." *Hays Cnty. Guardian*, 969 F.2d at 117–18.[12] And as QEC has detailed, TAMU's consistent practice establishes Rudder Theatre as a designated public forum.

[12] This is another point on which Defendants misread *CLS*. *CLS* was not about defining a public forum—no one disputed that a recognized student organization program, limited to student groups, was a limited public forum. *CLS*, 561 U.S. at 679 n.12. Rather, the case centered on whether the law school's viewpoint-neutral "all comers" policy was a reasonable restriction in that undisputed limited public forum. *Id.* at 668. Here, by contrast, Defendants assert they can redefine a designated public forum through an *ad hoc* speech restriction. *See* Defs. Br. 35. That is precisely what this Court rejected in *Hays County Guardian*.

#### 2. By excluding expression from Rudder Theatre based on its content, Defendants' ban triggers strict scrutiny.

The Drag Ban Resolution is content-based because it "target[s] speech based on its communicative content." *Reed*, 576 U.S. at 163. For instance, it targets performers' costume choices, whether they "parody the female body type," and whether the performance "demeans." ROA.37. And as a content-based restriction in a designated public forum, strict scrutiny applies. *Reed*, 576 U.S. at 163; *Widmar*, 454 U.S. at 269–70. Even if Rudder Theatre were a limited public forum, strict scrutiny still governs, because the drag show ban excludes students "who fall[] within the class to which" Rudder Theatre "is made generally available." *Just. for All*, 410 F.3d at 766–67 (*quoting Ark. Educ. Television Comm'n*, 523 U.S. at 677); ROA.15 ¶¶ 30–31.

### E. Defendants cannot satisfy strict scrutiny.

Strict scrutiny dooms the Drag Ban Resolution. Defendants cannot show the ban is "necessary to serve a compelling state interest." *Widmar*, 454 U.S. at 270. At every turn, Defendants fail to "identify an 'actual problem' in need of solving." *Brown*, 564 U.S. at 799 (quoting *United States v. Playboy Ent. Grp. Inc.*, 529 U.S. 803, 822–823 (2000)). And even assuming they could identify such a need, a categorical ban on protected

expression is not narrowly tailored to achieve that interest using the least speech-restrictive means. *Widmar*, 454 U.S. at 270.

### 1. The drag show ban's purported interest in preventing discriminatory harassment does not satisfy strict scrutiny.

In claiming "Drag Show Events are likely to create or contribute to a hostile environment for women contrary to System anti-discrimination policy and Title IX," ROA.37, Defendants seek to solve a nonexistent problem. They offer no complaints from members of the TAMU community or other evidence validating their professed concern over discriminatory harassment. Nor can they explain how a once-a-year event in an indoor performance venue meets the "severe" and "pervasive" criteria required for Title IX discriminatory harassment, or how the show is "objectively offensive" to its ticketed, voluntary audience. *Davis*, 526 U.S. at 652; *see also DeJohn*, 537 F.3d at 318.

As to addressing discriminatory harassment, the Drag Ban Resolution also fails to meet the least-restrictive means requirement. If Defendants want to curb unlawful harassment and discrimination, it should use available, less restrictive means of doing so: addressing misconduct *after* it occurs. For instance, TAMU System Policy, which

incorporates the *Davis* standard, lays out an investigation and adjudication policy for discrimination complaints.[13] That process aligns with the First Amendment's demand that the government punish the few who break valid rules instead of "throttl[ing] them and all others beforehand." *Se. Promotions*, 420 U.S. at 559.

On the other hand, stopping expression in advance based on conjecture is not the least restrictive means of achieving any interest. *See IOTA XI*, 993 F.2d at 393 ("[A] public university has many constitutionally permissible means to protect female and minority students" short of censorship.). It is an unconstitutional viewpoint-based prior restraint.

And by failing to faithfully track the *Davis* standard, the Drag Ban Resolution is not narrowly tailored because it is overinclusive. At its core, the ban looms over a host of protected expression of a "'gender-motivated' nature," like *Draggieland*, including "'core' political and religious speech, such as gender politics and sexual morality." *DeJohn*, 537 F.3d at 317–18. That sweeping censorship exemplifies the danger untethered

[13] Texas A&M Sys. Policy 08.01.01, *Civil Rights Compliance* (Aug. 15, 2022), https://policies.tamus.edu/08-01-01.pdf.

discriminatory harassment regulations pose to expressive freedoms on campus. *See id.*; *Cartwright*, 32 F.4th at 1121.

The ban is also underinclusive, leaving untouched music, visual art, books, cheerleading, and other campus expression that some might think "demeans women," is "sexualized," or "promotes gender ideology." Just consider the recent "Miss Black and Gold" pageant at Rudder Theatre, which some may argue objectifies women but remains unimpeded by the Drag Ban. ROA.16 ¶ 38(b). At the same time, the Resolution permits students to "mock" men or "parody" the male body type—selectivity that "raises serious doubts" Defendants are pursuing any interest in addressing actual gender-based discriminatory harassment rather than disfavoring drag's message. *See Brown*, 564 U.S. at 802.

The ban is underinclusive for another reason. At the district court, Defendants conceded the Drag Ban Resolution does not prohibit drag performances in outdoor campus spaces. ROA.475 at 55:1–3. As the district court correctly reasoned, that is "inconsistent with the Board's stated concerns about the effect of the performance on students," as "a drag show held outdoors" would expose many more to those claimed effects. ROA.389.

### 2. Defendants cannot satisfy strict scrutiny by relying on Executive Order 14168.

Executive Order 14168 does not make out an "actual problem" supporting a compelling interest. Defs. Br. 10–11. In fact, the Executive Order does not compel Defendants to act *at all*. On its face, it concerns only federal agencies and federal spending, not state public universities. ROA.235.

And even if it applies, the Executive Order merely states that "Federal funds shall not be used to promote gender ideology," *id.* § 3(g), while QEC funds *Draggieland* using funds from past ticket sales and private donors. ROA.12 ¶ 16; ROA.20 ¶¶ 65–66. Defendants offer no evidence that federal funds support QEC or *Draggieland*. And if Defendants are concerned about the loss of federal funds, the constitutional path is to take it up with the federal government, not censor student expression. *See generally San Francisco A.I.D.S. Found.*, 786 F. Supp. 3d at 1220 (enjoining the Executive Order's funding provisions because their "censorious purpose" violates the First Amendment).

Guidance from the U.S. Department of Education highlights why the Executive Order cannot sustain a compelling interest. On the same

day the Board adopted the Drag Ban Resolution, the Department reminded TAMU that it "enforces federal civil rights law consistent with the First Amendment," pointing university officials to existing guidance that harassment requires "something beyond the mere expression of views, words, symbols or thoughts that some person finds offensive."[14]

Most importantly, the Executive Order does not—and cannot—overrule *Davis*, which recognized that university officials need only take "reasonable" steps to address harassment. 526 U.S. at 648–49. Such reasonable steps do not include violating First Amendment rights, let alone doing so on mere speculation over "harassment." What's more, there is no remote possibility the federal administration will hold TAMU to a different standard, after it reaffirmed *Davis*'s "severe, pervasive, and

[14] U.S. Dep't of Educ., *Frequently Asked Questions About Racial Preferences and Stereotypes Under Title VI of the Civil Rights Act* (Feb. 28, 2025), https://www.ed.gov/media/document/frequently-asked-questions-about-racial-preferences-and-stereotypes-under-title-vi-of-civil-rights-act-109530.pdf (citing "Dear Colleague" Letter from Gerald A. Reynolds, Assistant Sec'y for C.R., U.S. Dep't of Educ. (July 28, 2003), https://bit.ly/4krQvqV).

objectively offensive" standard governs universities' obligations under Title IX.[15]

#### 3. TAMU's apprehensions about the "educational environment" and "lewdness" do not satisfy strict scrutiny.

Defendants' stated concerns about drag shows' "effect on the educational environment" fall equally flat. Defs. Br. 2; *see also id.* 36, 39. While Defendants may have a general interest in preserving the educational environment, the Drag Ban Resolution is a wildly overbroad means of meeting it. To start, Defendants offer no evidence that a ticketed, after-hours performance, in an indoor performance venue, would harm the educational environment. And given how Rudder Theatre regularly hosts performances like *Draggieland*, ROA.16–17 ¶ 38, Defendants' stated concern is simply overblown.

If Defendants believe that "demeaning" expression is enough to sustain their interest in preserving the educational environment, they are wrong. "[M]ere offensiveness does not qualify as 'disruptive' speech."

[15] "Dear Colleague" Letter from Craig Trainor, Acting Assistant Sec'y for C.R., U.S. Dep't of Educ. (Feb. 4, 2025), https://bit.ly/43QqrzG (citing Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026 (May 19, 2020)).

*McCauley*, 618 F.3d at 249 (citation omitted). This only underscores why the Drag Ban Resolution is not narrowly tailored.

While the drag show ban also targets "sexualized, lewd, and vulgar conduct," that does not establish a compelling interest. The Supreme Court effectively settled in *Papish* that censoring speech on a state university campus in the name of "lewdness" does not serve a compelling interest. 410 U.S. at 669–70; *see also IOTA XI*, 993 F.2d at 392–93. And in no case does mere apprehension about "lewdness" justify blocking a stage performance before it occurs. *Se. Promotions*, 420 U.S. at 555. And how could it? Defendants approved *Draggieland* for five consecutive years without complaining about "lewdness." *See* ROA.18–19.

Again, if TAMU wants to tackle student behavior that violates constitutionally permissible restrictions on "lewd" or "sexualized" conduct, it can do so after the fact. TAMU rules establish a procedure for adjudicating student conduct violations.[16] Its administrators should follow that procedure, not impose a preemptive blanket ban on protected expression in campus venues.

[16] Texas A&M Univ. Student Rules, *Rule 25*, *Student Conduct Code Procedures* (rev. 2013), https://student-rules.tamu.edu/rule25/.

And whatever interest Defendants have in curbing "sexualized, lewd, and vulgar conduct," the Drag Ban Resolution is not narrowly tailored to address it. It is underinclusive, leaving untouched, for instance, art, books, and movies that some might consider "lewd, sexualized, or vulgar." So too is it overinclusive. Merely labeling expression as "lewd" or "vulgar" does not deprive it of constitutional protection. *See Sable Commc'ns v. FCC*, 492 U.S. 115, 126 (1989) ("Sexual expression which is indecent but not obscene is protected by the First Amendment"). Instead, it opens the door for campus officials, like Defendants here, to censor protected speech based on their personal preferences, at a campus where adults come to live and learn. *Papish*, 410 U.S. at 670; *see also Cohen*, 403 U.S. at 25 ("one man's vulgarity is another man's lyric").

In sum, strict scrutiny demands more than what TAMU offers—and for good reason. Permitting public university officials to quash speech in advance based on flimsy concerns about harassment or federal funds would imperil protected campus expression from political speech to pure entertainment. *DeJohn*, 537 F.3d at 316–20. This Court should thwart that danger and affirm.

## III. Without an Injunction, the Drag Ban Resolution Will Irreparably Harm QEC.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025) (quotation marks and alterations omitted); *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013). Because enforcement of the Drag Ban Resolution would violate QEC's First Amendment rights, it would cause irreparable harm. *See Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996) (irreparable harm necessarily flows from a threat to First Amendment rights).

With no injunction, the Resolution would bar QEC from staging future *Draggieland* productions in Rudder Theatre, impairing QEC's ability to fulfill its unique expressive role on campus, with *Draggieland* as the group's most prominent expressive event. ROA.12 ¶ 15; ROA.20 ¶¶ 71–73. QEC's mission is to express itself *at* Texas A&M and *to* the students enrolled there. *See* ROA.12 ¶¶ 12–13; ROA.20 ¶¶ 71–73.

But it cannot fulfill that mission by taking *Draggieland* off campus, as the Resolution suggests. ROA.38. Put simply, denial of access to an "appropriate" venue is itself an irreparable injury even if alternative

locations are available. *Knights of Ku Klux Klan, Realm of La. v. E. Baton Rouge Par. Sch. Bd.*, 578 F.2d 1122, 1126 (5th Cir. 1978); *see also supra*, Section II.C.2 (explaining the Supreme Court's rejection of Defendants' argument that alternative venues justify suppressing speech in a public forum). That principle controls here.

Exiling *Draggieland* off campus would, as a practical matter, lead to a backwards result: frustrating QEC's ability to reach its intended audience through exercising its First Amendment freedoms, *see* ROA.363–65 ¶¶ 18–19, while advancing Defendants' unconstitutional goal of silencing a disfavored "ideology" on campus, ROA.37–38. Affirming the district court's preliminary injunction will avoid that untenable outcome.

## IV. The Public Interest Favors Enjoining a Public University System From Imposing Viewpoint-Driven Bans on Student Expression.

"Injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter.*, 732 F.3d at 539 (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)).[17]

[17] "When a preliminary injunction is sought against the Government, the interests of the Government and the public merge." *Tex. Trib. v. Caldwell Cnty.*, 121 F.4th 520, 525 (5th Cir. 2024).

Here, "the injunction, not the ban, serves the public interest," ROA.394, by ensuring the First Amendment remains a bulwark against government censorship at public universities like TAMU.

Defendants' prediction that affirming the injunction would "disincline universities" from maintaining public forums for expression, Defs. Br. 49, finds no support in the record or precedent. Public universities did not shut down student meeting spaces after *Widmar*, end student publication funding after *Rosenberger*, or close public forums after courts struck down anti-discrimination speech codes at public universities, *see Speech First, Inc. v. Fenves*, 979 F.3d 319, 339–40 & n.17 (5th Cir. 2020). Those decisions simply upheld the constitutional rules public university officials must follow when they target protected expression in the name of preventing discrimination or advancing similar institutional goals.

Upholding the injunction also advances the public interest in preserving public universities as forums for competing ideas. *See* ROA.394. Texas law broadly protects students' freedom of expression and prohibits administrators from denying student organizations access to campus facilities based on the "ideological" perspectives they advance.

Tex. Educ. Code § 51.9315(b)(1), (g). In the same way, TAMU policy recognizes that "exposure to a variety of ideas, including ideas that may offend some or many listeners, is a critical part of the education it promises to provide." ROA.369.

Most fundamentally, preserving the injunction would serve as an antidote to the "poison" of viewpoint discrimination. *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) (Alito, J., concurring). As the district court explained, the First Amendment protects "politically conservative speakers, politically progressive, and politically radical speakers, and those in between, even—or especially—when their views may be unpopular with vocal members of the A&M community." ROA.393.

Judge Ho recently echoed that bedrock principle: "[O]ur rulings must be scrupulously viewpoint neutral. We must apply the same standards, regardless of whether the views at issue are favored or disfavored by judges, cultural elites, or society at large." *Ford v. Mckesson*, No. 24-30494, 2026 WL 2206584, at *1 (5th Cir. July 30, 2026) (Ho, J., concurring in the denial of rehearing en banc). No matter one's personal views on *Draggieland*, QEC has a First Amendment right to take the Rudder Theatre stage, just as others have the right to disagree

with the show. The Constitution bars Defendants from silencing either side. The Court should reaffirm that fundamental principle here.

## CONCLUSION

For these reasons, the Court should affirm the district court's preliminary injunction.

Dated: August 17, 2026

Respectfully,

/s/ JT Morris

JT Morris
*Counsel of Record*
Samuel Rudovsky
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
Tel: (215) 717-3473
jt.morris@fire.org
sam.rudovsky@fire.org

Adam Steinbaugh
Jeffrey Daniel Zeman
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut Street, Ste. 900
Philadelphia, PA 19106
Tel: (215) 717-3473
adam@fire.org
jeff.zeman@fire.org

*Attorneys for Plaintiff-Appellee*

## CERTIFICATE OF COMPLIANCE

1. This principal brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,758 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Local Rule 32.1 because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font, and in 14-point Century Schoolbook font for footnotes.

Dated: August 17, 2026

/s/ JT Morris
JT Morris
*Counsel of Record for*
*Plaintiff-Appellee*

## CERTIFICATE OF SERVICE

This certifies that on August 17, 2026, in compliance with Rules 25(b) and (c) of the Federal Rules of Appellate Procedure, the undersigned served the foregoing via the Court's ECF filing system on all registered counsel of record.

Dated: August 17, 2026

/s/ JT Morris
JT Morris
*Counsel of Record for*
*Plaintiff-Appellee*