**No. 25-20108**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

TEXAS A&M QUEER EMPOWERMENT COUNCIL,

*Plaintiff-Appellee*,

v.

WILLIAM MAHOMES, in his official capacity as a member of the Board of Regents of the Texas A&M University System; ROBERT L. ALBRITTON, in his official capacity as a member of the Board of Regents of the Texas A&M University System; DAVID C. BAGGETT, in his official capacity as a member of the Board of Regents of the Texas A&M University System; JAMES R. BROOKS, in his official capacity as a member of the Board of Regents of the Texas A&M University System; JOHN W. BELLINGER, in his official capacity as a member of the Board of Regents of the Texas A&M University System; JAY GRAHAM, in his official capacity as a member of the Board of Regents of the Texas A&M University System; MICHAEL A. HERNANDEZ, III, in his official capacity as a member of the Board of Regents of the Texas A&M University System; KELLEY SULLIVAN GEORGIADES, in her official capacity as a member of the Board of Regents of the Texas A&M University System; SAM TORN, in his official capacity as a member of the Board of Regents of the Texas A&M University System; LISA D. CANTU, in her official capacity as a member of the Board of Regents of the Texas A&M University System; GLENN HEGAR, in his official capacity as Chancellor of the Texas A&M University System; DR. SUSAN BALLABINA, in her official capacity as President of Texas A&M University,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Southern District of Texas, Houston Division

**BRIEF OF *AMICI CURIAE* PROFESSORS SPECIALIZING IN LGBT+ STUDIES, LGBT+ LEGAL ISSUES, AND THE HISTORY OF DRAG IN SUPPORT OF PLAINTIFF-APPELLEE**

Martin J. Siegel
LAW OFFICES OF
MARTIN J. SIEGEL, P.C.
2222 Dunstan Road
Houston, Texas 77005
Telephone: (281) 772-4568
Martin@Siegelfirm.com

*Counsel for Amici Curiae*

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities, as described in Fifth Circuit Rule 28.2.1, have an interest in the outcome of this case. This representation, supplemental to that of the parties and other *amici*, is made in order that the Judges of this Court may evaluate possible disqualification or recusal.

1. *Amici Curiae* Esther Newton, Eliot Tracz, Mark Satta, Joe E. Jeffreys, Scott Skinner-Thompson, Luke Boso, Carlos Ball, and Nancy Marcus

2. Martin J. Siegel, Law Offices of Martin J. Siegel, P.C., Attorney for *Amici Curiae*

s/ *Martin J. Siegel*
Martin J. Siegel
Attorney for *Amici Curiae*

## TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS .................................. i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES ...................................................................... iii

*AMICI'S* STATEMENT OF IDENTITY AND INTEREST .......................................... 1

INTRODUCTION ............................................................................ 4

ARGUMENT ................................................................................ 5

I. QEC's Planned Drag Show is Expressive Speech ................................................. 5

A. A QEC Drag Show Would Express Support for LGBT+ Culture and Equality and the Gay and Transgender Community .............................. 7

B. QEC's Show Would Also Communicate a Message About Gender Identity and Fluidity ............... 14

C. The Board's Resolution and Other Officials' Statements About Drag and Changing Genders Confirm That Drag is Expressive.................................... 18

II. Texas A&M's Suppression of QEC's Show is Clear Viewpoint Discrimination ....................................................... 22

CONCLUSION ............................................................................. 26

CERTIFICATE OF SERVICE ................................................................. 27

CERTIFICATE OF COMPLIANCE .............................................................. 28

## TABLE OF AUTHORITIES

page:

**Cases**

*Bostock v. Clayton Cty.*,
590 U.S. 644 (2020)........................................................................ 10

*Defending Education v. Olentangy Local Sch. Dist. Bd. of Educ.*,
158 F.4th 732 (6th Cir. 2025) (*en banc*)................................ 19, 22, 23, 25

*Friends of George's, Inc. v. Mulroy*,
675 F. Supp. 3d 831 (W.D. Tenn. 2023),
*rev'd on other grounds*, 108 F.4th 431 (6th Cir. 2024)........................... 17

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*,
515 U.S. 557 (1995)....................................................................*passim*

*Imperial Sovereign Court of Montana v. Knudsen*,
170 F.4th 820 (9th Cir. 2026) .................................................................. 17

*Janus v. Am. Fed. of State, Cty. and Mun. Employees Council 31*,
585 U.S. 878 (2018)........................................................................ 4, 5

*Masterpiece Cakeshop v. Colorado Civil Rts. Comm.*,
584 U.S. 617 (2018).................................................................. 5, 6, 25

*Matal v. Tam*,
582 U.S. 218 (2017)........................................................................ 23

*Meriwether v. Hartop*,
992 F.3d 492 (6th Cir. 2021) ............................................................ 19, 23

*Naples Pride, Inc. v. City of Naples*,
2025 WL 1370174 (M.D. Fl., May 12, 2025), *stay granted on other grounds*, 2025 WL 2382975 (11th Cir., June 6, 2025)............. 13

*Rosenberger v. Rector and Visitors of the Univ. of Virginia,*
515 U.S. 819 (1995)........................................................................ 23

*Snyder v. Phelps*,
562 U.S. 443 (2011) ........ 25

*Southern Utah Drag Stars v. City of St. George*,
677 F. Supp. 3d 1252 (D. Utah 2023) ........ 13, 16, 17

*Spectrum v. Wendler*,
151 F. 4th 714 (5th Cir. 2025), *reh'g granted*,
157 F.4th 673 (5th Cir. 2025), *dismissed as moot*,
2026 WL 184215 (Jan. 20, 2026) ........ 12, 15, 16, 24

*Spence v. Washington*,
418 U.S. 405 (1974) ........ 6

*Texas v. Johnson,*
491 U.S. 397 (1989) ........ 6, 14, 24

*Trump v. Orr*,
146 S. Ct. 44 (2025) ........ 21

*United States v. Skrmetti*,
145 S. Ct. 1816 (2025) ........ 21

*United States v. Varner*,
948 F.3d 250 (5th Cir. 2020) ........ 19

*Woodlands Pride, Inc. v. Paxton*,
694 F. Supp. 3d 820 (S.D. Tex. 2023),
*rev'd on other grounds*, 168 F.4th 293 (5th Cir. 2026) ........ 13

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) ........ 5

**Constitutional, Statutory, and Administrative Provisions**

U.S. CONST. amend. I ........ *passim*

Exec. Order No. 14183, 90 Fed. Reg. 8757 (Feb, 23, 2025) ........ 21

**Miscellaneous Authorities**

CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/English/indoctrination........................................................ 20

Giulia Carbonaro, *Greg Abbott Issues Blistering Response to Drag Show Ban Controversy*, NEWSWEEK, March 16, 2024, https://www.newsweek.com/greg-abbott-issues-blistering-response-drag-show-ban-controversy-1879949 ....................................... 20

*The Latex Ball 2024*, GMHC, https://gmhc.org/gmhc_events/latex-ball-2024/ ......................................... 9

Matt Lavietes and Jay Valle, *Who Belongs in Drag? First Straight Man on 'RuPaul's Drag Race' Reignites Debate*, NBC NEWS, Dec. 9, 2021, https://www.nbcnews.com/nbc-out/out-pop-culture/belongs-drag-first-straight-man-rupauls-drag-race-reignites-debate-rcna8112.................................................................. 12

Emily Martin, *From Police Raids to Pop Culture: The Early History of Modern Drag*, NAT'L GEOGRAPHIC, June 2, 2023, https://www.national geographic.com/history/article/drag-queen-drag-balls-early-history-pop-culture ........................... 8

Sergio Martinez-Beltran, *Texas Panel Debates Measure That Would Prohibit Drag Performances in Front of Minors*, KUT NEWS, March 23, 2023, https://www.kut.org/politics/2023-03-23/texas-senate-panel-debates-measure-that-would-prohibit-drag-performances-in-front-of-minors ....................................... 21

MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/drag................................. 15

Jennifer Minear, *Performance and Politics, An Argument for Expanded First Amendment Protection of Homosexual Expression*, 10 CORNELL J. L. PUB. POL'Y 601 (2001)............................. 16

Thaddeus Morgan, *How 19th-Century Drag Balls Evolved into House Balls, Birthplace of Voguing*, HISTORY, https://www.history.com/articles/drag-balls-house-ballroom-voguing ........................................................................................ 8

Joshua Nelkin-Zitser, *By Championing Self-Expression, RuPaul's 'Drag Race' Has Encouraged a Generation of Young LGBTQ+ Fans to Come Out*, BUSINESS INSIDER, June 23, 2022, https://www.businessinsider.com/rupauls-drag-race-helped-lgbtq-teens-to-come-out-2021-1 ................................................................ 12

Esther Newton, *Mother Camp: Female Impersonators in America* (1979 ed.) ............................................................ 8, 10, 15, 16

James Michael Nichols and Cole Delbyck, *"RuPaul's Drag Race" is Leaving TV's Biggest Gay Network – Now What?*, HUFFPOST, March 23, 2017, https://www.huffpost.com/entry/rupauls-drag-race-logo-vh1_n_58d1b0bce4b0b22b0d17f9aa.................. 17

Office of the Texas Attorney General, *Press Release: Attorney General Ken Paxton Defends Texas A&M's Ban on Drag Shows Against Lawsuit from Left-Wing Group*, March 14, 2025, https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-defends-texas-ams-ban-drag-shows-against-lawsuit-left-wing-group ........................................................................ 20

Office of the Lt. Governor, *Press Release: Lt. Gov. Dan Patrick: Statement on the Passage of Senate Bill 12 – Banning Children's Exposure to Drag Shows*, April 5, 2023, tgov.texas.gov/ 2023/04/05/ lt-gov-dan-patrick-statement-on-the-passage-of-senate-bill-12-banning-childrens-exposure-to-drag-shows/#:~:text=Lt., Shows%20 %20Lieutenant %20Governor%20Dan% 20Patrick ............. 20

Luna Luis Ortiz, *How GMHC's Latex Ball Has Been Promoting LGBTQ+ Health for 30 Years*, ADVOCATE, Mar. 22, 2022, https://www.advocate.com/commentary/2022/3/22/how-gmhcs-latex-ball-has-been-promoting-lgbtq-health-30-years-luna-luis-ortiz........ 9

Jessica Priest, *Texas A&M System Tightens Restrictions on Discussing Race and Gender in Class*, TEXAS TRIBUNE, Dec. 18, 2025, https://www.texastribune.org/2025/12/18/texas-am-race-gender-courses-new-rules/ ....................... 18, 19

Brett V. Ries, *Don't Be a Drag: How Drag Bans Can Violate the First Amendment*, 33 TUL. J. LAW & SEX. 1 (2025) ............... 22

Mark Satta, *Shantay Drag Stays: Anti-Drag Laws Violate the First Amendment*, 25 GEO. J. GENDER & L. 95 (2023) ................. 10, 11, 16

Brooke Schultz, *Ed Dept. Imposes Funding Restrictions for 5 Districts Over Transgender Policies*, EDUC. WEEK, Aug. 19, 2025, https://www.edweek.org/policy-politics/ed-dept-imposes-funding-restrictions-for-5-districts-over-transgender-policies/2025/08................. 21

Laurence Senelick, THE CHANGING ROOM: SEX, DRAG AND THEATRE (2000)................................................................... 9

Craig Seligman, *You Just Don't Silence a Drag Queen*, TIME, Mar. 23, 2023, https:// time.com/6265333/drag-queen-political-act/ ..................................................................... 9, 11

Kiana Shelton, *The Joy of Drag*, PSYCHIATRIC TIMES, June 29, 2022, https://www. psychiatrictimes.com /view/the-joy-of-drag ......................................................................... 8, 9

Jazz Tangcay, *'RuPaul's Drag Race' Blends Art and Politics in a Potent Pop Stew That Continues to Draw Viewers,* VARIETY, Aug. 21, 2024, https://variety.com/2024/artisans/news/rupauls-drag-race-politics-1236109870/ ......................................... 12

Eliot Tracz, *Drag: Art. Obscenity. Crime*, 23 CONN. PUB. INT. L.J. 2024 (2024)................................................. 15, 16

Sasha Velour, *The Big Reveal: An Illustrated Manifesto of Drag* (2023).................................................. 16

## *AMICI'S* STATEMENT OF IDENTITY AND INTEREST

*Amici* are professors of LGBT+ studies, law, philosophy, and other disciplines with an extensive record of scholarship and practice concentrating on LGBT+ rights, constitutional law, and the history and legal status of drag. As leading authorities in these fields, they are deeply concerned with the development of First Amendment law governing drag and with ensuring that this artistic means of social and political expression receives full constitutional protection.

<u>Esther Newton</u> is Professor *Emerita* of Anthropology at State University of New York College at Purchase and retired Term Professor in Gender and Women's Studies at the University of Michigan. She is considered one of the founders of LGBT+ studies and is the author of *Mother Camp: Female Impersonators in America*, the first sociological examination of drag performance. Her articles have been published in many edited collections and academic journals and have been translated into a number of foreign languages.

<u>Carlos A. Ball</u> is Distinguished Professor of Law and Judge Frederick Lacey Scholar at Rutgers Law School. He is a nationally recognized expert in both LGBT+ rights and First Amendment law. His books include *The First Amendment and LGBT Equality* and *Cases and Materials on Sexuality, Gender Identity and the Law* (with Jane Schacter and Douglas NeJaime). His articles on the intersection of

LGBT+ law and the First Amendment have been published in the *Harvard Law Review Forum*, the *Yale Law Journal Forum*, and elsewhere.

Joe E. Jeffreys is a nationally recognized historian of drag who teaches at the Tisch School of the Arts at New York University and the Eugene Lang College of Liberal Arts at the New School. He has published widely on drag in encyclopedias, academic journals, and essay anthologies. He has also appeared on the topic on CNN, the BBC, PBS, and other outlets, and has been quoted in *Time*, *The New York Times*, and *The Washington Post*.

Scott Skinner-Thompson is a professor and Dean's Scholar at University of Colorado Law School. He researches and teaches constitutional law, civil rights, privacy law, and LGBT+ issues. His current writing focuses on the legal construction of gender and legal protections for transgender people.

Nancy Marcus is an Associate Professor of Law at California Western School of Law. Her scholarship includes works on constitutional law, LGBT+ rights, torts, and race discrimination and has been cited in a U.S. Commission on Civil Rights report, a United Nations shadow report, judicial opinions, casebooks, and treatises. She has also served as a senior attorney at Lambda Legal Defense and Education Fund, chaired the LGBT+ Rights Subcommittee of the ABA's Civil Rights Litigation Section, and served on the board of the National Lesbian and Gay Law Foundation.

Luke Boso is a co-associate dean of research and a law professor at Southwestern Law School, where he teaches constitutional law and criminal law. His scholarship examines the intersections of law and sexuality, gender, race, and class. He has published on drag and the First Amendment and twice received the Dukeminier Award, an annual prize given by UCLA Law School's Williams Institute honoring the best legal article on sexual orientation and gender identity.

Mark Satta is Associate Professor of Philosophy and Law with a joint appointment in the Philosophy Department and Law School at Wayne State University. He specializes in LGBT+ civil rights, constitutional law, the First Amendment, legal philosophy, and the philosophy of language. He has published on the First Amendment's coverage of drag and other First Amendment topics.

Eliot Tracz is an Assistant Professor of Law at New England Law, Boston, where he teaches property; law and economics; and a seminar on sexual orientation, gender identity and the law. He is the author of the forthcoming casebook *Cases and Problems on Sexual Orientation, Gender Identity, and the Law*, as well as numerous articles on LGBT+ rights.[1]

[1] No counsel for any party authored this brief in whole or in part, and no party, party's counsel, or other person contributed money to fund its preparation or submission. All parties have consented to the filing of this brief. The undersigned author of this brief gratefully

## INTRODUCTION

The LGBT+ student group Texas A&M Queer Empowerment Council ("QEC") planned to hold a drag show at a theater on Texas A&M's College Station campus in March 2025, but the university prohibited it because the Board of Regents concluded that drag shows demean women. The district court correctly enjoined the Board's action, deciding that drag is expressive conduct protected by the First Amendment and that Texas A&M committed obvious viewpoint discrimination in suppressing the show.

Both these conclusions are correct. The history of drag and its surrounding culture confirms that it is an art form developed and understood to communicate celebration of LGBT+ culture and equality. More than that, drag necessarily defies gender norms and stereotypes and consequently makes the controversial suggestion that gender might be mutable.

Of course, many people disagree with what drag has to say. How to regard gender and the scope of LGBT+ rights and acceptance are now being hotly debated in social settings and the political arena. As the Supreme Court has commented, "sexual orientation and gender identity… are sensitive political topics, and they are undoubtedly matters of profound value and concern to the public." *Janus v. Am.*

---

acknowledges the contributions of Amy Abbott, Caroline Rodriguez, Grace Burgert, and Lauren Santibanez, students at the University of Houston Law Center enrolled in the author's Appellate Civil Rights Clinic in Spring 2025.

*Fed. of State, Cty. and Mun. Employees Council 31*, 585 U.S. 878, 913-14 (2018) (quotation omitted). But no one is confused about the fact that drag shows play a role in that discussion, as witnessed by the controversy they have aroused.

Further, the resolution of Texas A&M's Board of Regents makes clear that the university squelched QEC's show *precisely because of* its perceived message about women, sex and gender identity. Texas officials have also condemned drag because it supposedly "indoctrinates" viewers with what they see as a harmful point of view, and Texas A&M cited Governor Abbott's order to this effect as grounds for its decision. The impermissible viewpoint discrimination at the heart of this case therefore couldn't be clearer. Accordingly, the Court should enforce the constitutional guarantee of free speech, affirm the judgment below, and permit QEC's show to go forward.

## ARGUMENT

### I. QEC's Planned Drag Show is Expressive Speech

The Supreme Court "has long held that the Constitution looks beyond written or spoken words as mediums of expression, and that symbolism is a primitive but effective way of communicating ideas." *Masterpiece Cakeshop v. Colorado Civil Rts. Comm*., 584 U.S. 617, 656 (2018) (Thomas, J., concurring in part) (cleaned up). Thus "[t]he First Amendment extends to all persons engaged in expressive conduct." *303 Creative LLC v. Elenis*, 600 U.S. 570, 600 (2023).

Moreover, "a wide array of conduct… can qualify as expressive, including nude dancing, burning the American flag, flying an upside-down American flag with a taped-on peace sign, wearing a military uniform, wearing a black armband, conducting a silent sit-in, refusing to salute the American flag, and flying a plain red flag." *Masterpiece Cakeshop*, 584 U.S. at 657 (Thomas, J., concurring in part); *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995). Such diverse conduct must only be intended to be communicative and, "in context," be "reasonably [] understood by the viewer" as such in order to merit constitutional protection. *Masterpiece Cakeshop*, 584 U.S. at 657 (Thomas, J., concurring in part)*; see also Texas v. Johnson,* 491 U.S. 397, 404 (1989); *Spence v. Washington*, 418 U.S. 405, 410-11 (1974).

In addition, expressive conduct need not convey only "a narrow, succinctly articulable message" or a single "particularized" meaning. *Hurley*, 515 U.S. at 569. Rather, live performances, like other art forms such as music or literature, are susceptible to various different interpretations by audience members – a truism that in no way diminishes their constitutional protection. *Id.* Many of us struggle with James Joyce, for example, but *Ulysses* and *Finnegans Wake* are no less expressive and no less protected because readers take a wide variety of different messages from them (if we understand them at all!). And as QEC points out, live stage

performances of all kinds are in the heartland of traditionally protected expressive activity. *See* QEC Brf. 25-29.

Turning to this case, QEC exists "to foster unity among LGBTQ+ organizations on campus, and to serve as a resource for LGBTQ+ students, creating spaces that empower individuals regardless of their gender identity or sexual orientation." ROA.370. It sponsors the Draggieland event, which has been performed in Texas A&M's Rudder Theatre for years, and describes the show as one in which performers "often make clothing choices that contrast with the expected presentation based on their sex; a male performer may dress in women's clothing, while a female performer may dress in men's clothing." ROA.370.

### A. A QEC Drag Show Would Express Support for LGBT+ Culture and Equality and the Gay and Transgender Community

All QEC need show is that its drag performance will be understood by viewers to "convey[] *something*," as *Hurley* and other cases confirm. QEC Brf. 29 (emphasis in original). But in fact, a drag show communicates easily intelligible messages. First, drag is an art form unmistakably linked with the LGBT+ community, which originated it. Consequently, QEC's planned drag show is intended to convey and would be received as a message of solidarity and affinity with that community as well as an endorsement of LGBT+ culture and equality.

While men impersonating women on stage dates to Shakespearean theater if not ancient Greece, the drag familiar to contemporary Americans is deeply rooted in gay and transgender life over the last few decades.[2] "Modern-day drag grew in the 1970s and 80s" in so-called "house balls" in New York and other cities, where LGBT+ performers could express themselves freely and cultivate devoted followings.[3] In her 1972 book, *Mother Camp: Female Impersonators in America*, *Amicus* Esther Newton, a leading cultural anthropologist and one of the founders of LGBT+ studies, observed: "female impersonators are an integral part of the homosexual subculture."[4] In those days, before broader acceptance of openly LGBT+ people and gay rights, drag represented "the stigma of the gay world."[5] Straight people interpreted its message as both gay and threatening:

> The framework is that of a normal audience and a perverted performer; the performer knows the audience finds his condition bizarre and/or funny, and he laughs with them at himself. The straight audience is then relaxed and ready to be entertained.

---

[2] *See* Kiana Shelton, *The Joy of Drag*, PSYCHIATRIC TIMES, June 29, 2022, https://www.psychiatrictimes.com/view/the-joy-of-drag; Emily Martin, *From Police Raids to Pop Culture: The Early History of Modern Drag*, NAT'L GEOGRAPHIC, June 2, 2023, https://www.nationalgeographic.com/history/article/drag-queen-drag-balls-early-history-pop-culture.

[3] Shelton, *supra* note 2; Thaddeus Morgan, *How 19th-Century Drag Balls Evolved into House Balls, Birthplace of Voguing*, HISTORY, https://www.history.com/articles/drag-balls-house-ballroom-voguing.

[4] Esther Newton, *Mother Camp: Female Impersonators in America* 20 (1979 ed.).

[5] *Id*. at 3.

> There is no doubt at all that straight people, on the whole, find the fully costumed drag queen an object of both fright and contempt.[6]

In the 1980s, drag grew and began reaching wider audiences with the emergence of HIV. As LGBT+ people faced the AIDS crisis, drag performers "became recognized as keepers of the flame of gay culture by a gay population finally proud to acknowledge it *had* a culture."[7] Drag shows projected self-confidence and frank openness in an otherwise besieged community.[8] As important, "drag competitions and performances across the country raised awareness and money for research and treatment."[9] In 1989, the organization Gay Men's Health Crisis established a large drag ball fundraiser, the Latex Ball, which attracted wide publicity, drew tens of thousands of LGBT+ and straight attendees over the years, and continues to this day.[10]

More recently, LGBT+ people and gay culture enjoy much wider public understanding and acceptance. As Justice Alito has written, "[f]or most 21st

---

6 *Id.* at 65.

7 Craig Seligman, *You Just Don't Silence a Drag Queen*, TIME, Mar. 23, 2023 (emphasis in original), https://time.com/6265333/drag-queen-political-act/.

8 Laurence Senelick, THE CHANGING ROOM: SEX, DRAG AND THEATRE 469 (2000).

9 Shelton, *supra* note 3.

10 Luna Luis Ortiz, *How GMHC's Latex Ball Has Been Promoting LGBTQ+ Health for 30 Years*, ADVOCATE, Mar. 22, 2022, https://www.advocate.com/commentary/2022/3/22/how-gmhcs-latex-ball-has-been-promoting-lgbtq-health-30-years-luna-luis-ortiz; *The Latex Ball 2024*, GMHC, https://gmhc.org/gmhc_events/latex-ball-2024/.

century Americans, it is painful to be reminded of the way our society once treated gays and lesbians… To its credit, our society has now come to recognize the injustice of past practices." *Bostock v. Clayton Cty.*, 590 U.S. 644, 709, 713 (2020) (Alito, J., dissenting). In this more tolerant environment, drag communicates an open celebration of LGBT+ identity, culture and art, and many straight observers no longer feel the "fright and contempt" Newton recorded a half century ago.[11]

Rather, drag "seems to send the message that LGBTQIA+ people exist along with messages about the value, dignity, and worth of LGBTQIA+ people. Drag performances often also send the message that such people and such views are worth celebrating, promoting, patronizing, and applauding."[12] This is essentially identical to the point made by GLIB, the Irish-American Gay, Lesbian & Bisexual Group of Boston, and recognized as expressive in *Hurley*: "a contingent marching behind the organization's banner would at least bear witness to the fact that some Irish are gay, lesbian, or bisexual, and the presence of the organized marchers would suggest their view that people of their sexual orientations have as much claim to unqualified social acceptance as heterosexuals." 515 U.S. at 574.

---

[11] Newton, *supra* note 4 at 65.

[12] Mark Satta, *Shantay Drag Stays: Anti-Drag Laws Violate the First Amendment*, 25 GEO. J. GENDER & L. 95, 104 (2023).

Indeed, beyond simply winning understanding and acceptance, drag has flourished and gone mainstream. Straight people began "flocking" to performances to signal their approval of LGBT+ culture; "the shows were terrific and hilarious, and they got them. Camp humor, which had begun as a secret code among a coterie of in-the-know urban gay men, had invaded popular culture. And so, somehow, had queer people – and middle Americans were giving them a thumbs-up."[13] Just as drag artists make a positive statement about LGBT+ culture and equality, spectators express their own comprehension and support: "Drag performances also create a unique medium from which audience members can send messages and convey viewpoints. Standing in line to watch, cheering loudly for, and tipping drag performers are all ways of expressing approval of drag and of the various viewpoints that drag represents."[14]

The best example of drag's broader appeal and the public's comprehension of its message may be "RuPaul's Drag Race." For seventeen seasons, the TV show has popularized drag performers competing against each other before a panel of judges and host RuPaul Charles. The show has reached millions of viewers

---

13 Seligman, *supra* note 7.

14 Satta, *supra* note 12 at 107.

globally, earned high ratings, won 24 Emmy Awards, and generated multiple spin-offs.[15] It "shed[s] light on issues important to LGBTQ+ communities, such as HIV, substance abuse, transgender identities, family abandonment and coming out. It has also brought the art of female impersonation into the mainstream."[16] As one performer who tracks the show put it, drag is now "a celebration of LGBTQ+ Pride."[17]

Considering the past and present of drag as an important feature of LGBTQ+ culture, the interlocutory appeal panel in the *Spectrum* case correctly determined that "a drag show can communicate a message of solidarity and support for the LGBT+ community." *Spectrum v. Wendler*, 151 F.4th 714, 725 (5th Cir. 2025), *reh'g granted*, 157 F.4th 673 (5th Cir. 2025), *dismissed as moot*, 2026 WL 184215 (Jan. 20, 2026). The district court in this case reached the same conclusion: "The Draggieland performance and the conversation that follows provide a way for

---

[15] Jazz Tangcay, *'RuPaul's Drag Race' Blends Art and Politics in a Potent Pop Stew That Continues to Draw Viewers,* VARIETY, Aug. 21, 2024, https://variety.com/2024/artisans/news/rupauls-drag-race-politics-1236109870/; Matt Lavietes and Jay Valle, *Who Belongs in Drag? First Straight Man on 'RuPaul's Drag Race' Reignites Debate*, NBC NEWS, Dec. 9, 2021, https://www.nbcnews.com/nbc-out/out-pop-culture/belongs-drag-first-straight-man-rupauls-drag-race-reignites-debate-rcna8112.

[16] Joshua Nelkin-Zitser, *By Championing Self-Expression, RuPaul's 'Drag Race' Has Encouraged a Generation of Young LGBTQ+ Fans to Come Out*, BUSINESS INSIDER, June 23, 2022, https://www.businessinsider.com/rupauls-drag-race-helped-lgbtq-teens-to-come-out-2021-1.

[17] Lavietes and Valle, *supra* note 15.

students to express messages supporting the LGBTQ+ community and educate the broader university community about LGBTQ+ culture through the performance." ROA.377 (cleaned up). Most other courts to consider the question have also seen drag performances this way. *See* QEC Brf. 26 n. 3 (citing cases). They recognize that shows "reflect the historical and current importance of drag performance in the LGBTQ+ community;"[18] that drag is a form of activism conveying political and social messages about "self-expression, gender stereotypes and roles, and LGBTQIA+ identity;"[19] and that there are "often political, social, and cultural messages involved in drag performances."[20]

To rebut this idea, Texas A&M argues that observers wouldn't necessarily think Draggieland's costumed performers were trying to convey support for LGBTQ+ rights and culture, and that cross dressing has occurred in other contexts, such as the "'ugly woman' skit involving members of a fraternity." Texas A&M Brf. 21-22. As the university anticipates, however, *see id.* at 22-23, the answer to this is that the context of *QEC's show* – one offered by a campus LGBTQ+ rights

[18] *Naples Pride, Inc. v. City of Naples*, 2025 WL 1370174 at ** 1-2, 10 (M.D. Fla., May 12, 2025), *stay granted on other grounds*, 2025 WL 2382975 (11th Cir., June 6, 2025) (staying district court order because city ordinance governing open air performances based solely on public safety, not nature of performance or viewpoint).

[19] *Southern Utah Drag Stars v. City of St. George*, 677 F. Supp. 3d 1252, 1286 (D. Utah 2023).

[20] *Woodlands Pride, Inc. v. Paxton*, 694 F. Supp. 3d 820, 844 (S.D. Tex. 2023), *rev'd on other grounds*, 168 F.4th 293 (5th Cir. 2026) (reversing for lack of standing).

group at a time when drag is generally a subject of political and cultural controversy – makes the message very clear, as does the whole history and evolution of modern drag discussed above. *See Johnson*, 491 U.S. at 405 ("in characterizing such action for First Amendment purposes, we have considered the context in which it occurred"). "[N]ot everything an LGBTQ+ organization does is expressive," Texas A&M contends, Texas A&M Brf. 22, which is true as far as it goes; groups do all sorts of things in order to organize, function, and so forth. But drag is a live performance – a very specific sort of show staged for voluntary and interested spectators pioneered by the LGBT+ community and virtually always sponsored by LGBTQ+ advocacy groups. By now, and especially in the current atmosphere when evaluated by sophisticated adults obtaining a college or graduate education, *see* Point I(C) below, it is broadly known to celebrate LGBT+ life and equality. No additional level of unique or specialized expertise in cultural history or sociology is necessary to appreciate this basic link Texas A&M claims not to see.

In sum, the district court was right that QEC's proposed show would have been expressive conduct protected by the First Amendment.

### B. QEC's Show Would Also Communicate a Message About Gender Identity and Fluidity

QEC's proposed show would also present a more specific message than simply celebrating one important facet of LGBT+ culture – it would

controversially suggest that gender isn't necessarily immutable and that sex-related stereotypes aren't always accurate or uniformly obeyed. As the interlocutory appeal panel in *Spectrum* rightly recognized, drag represents a "deliberate and theatrical subversion of gender-based expectations." *Spectrum,* 151 F. 4th at 725-26.

By definition, drag shows upend gender norms by depicting performers costumed as and behaving like members of the opposite sex. Merriam-Webster Dictionary actually defines drag as "entertainment in which performers caricature or *challenge gender stereotypes* (as by dressing in clothing that is stereotypical of another gender, by using exaggeratedly gendered mannerisms, or by combining elements of stereotypically male and female dress) and often wear elaborate or outrageous costumes."[21]

Put differently, drag inherently defies sex roles and gender norms by communicating that what appears normal and expected can actually be altered. This was apparent when Newton completed her groundbreaking study of drag performers in 1972 and remains true today. "Anthropologists say that sex-role behavior is learned," Newton wrote, adding: "The gay world, via drag, says that sex-role behavior is an appearance; it is an 'outside.' It can be manipulated at

---

[21] *Drag*, MERRIAM-WEBSTER (emphasis added), https://www.merriam-webster.com/dictionary/drag; *see also* Eliot Tracz, *Drag: Art. Obscenity. Crime*, 23 CONN. PUB. INT. L.J. 46, 49 (2024) (citing definition).

will."[22] In this sense, another commentator notes, drag "plays with, and often violates, norms of gender expression."[23] When drag artists "misperform their gender… they are exposing gender as a construction."[24] Some people are "burdened" by gender-related norms and "expectations" and therefore seek escape through drag. *Spectrum*, 151 F.4th at 726. Consequently, drag artists are necessarily "transgressive, challenging gender hierarchies through the idea that 'all expressions of gender could be worthy and useful.'"[25]

The proposition that gender might be mutable also has specifically political resonance today, as discussed more fully below, further cementing drag's expressiveness. For example, one district court recently emphasized "current political events and discussions" as a reason why the performance at issue there was "indisputably protected speech." *Southern Utah Drag Stars*, 677 F. Supp. 3d at 1286. The court quoted a performer who testified that drag transmits "a valuable political message…. that individuals with gender presentation and identities

---

[22] Newton, *supra* note 4 at 103.

[23] Satta, *supra* note 12 at 97-98.

[24] Jennifer Minear, *Performance and Politics, An Argument for Expanded First Amendment Protection of Homosexual Expression*, 10 CORNELL J. L. PUB. POL'Y 601, 624 (2001).

[25] Tracz, *supra* note 21 at 50 (*quoting* Sasha Velour, *The Big Reveal: An Illustrated Manifesto of Drag* 11 (2023)).

outside the majoritarian norm are welcome in public places." *Id.* RuPaul Charles has been quoted making the same point:

> "Drag challenges the status quo," RuPaul told HuffPost. "It's always challenged the matrix – the matrix being choose an identity and stick with it the rest of your life because that's how we want to sell products to you, so we'll know who you are and can put you in a box and then sell you beer and shampoo. Well, drag says 'I'm a shapeshifter, I do whatever the hell I want at any given time.' And that is very, very political."[26]

As with the message that drag supports the LGBT+ community, drag's provocative message about defying gender norms has also been found to be expressive by other courts. "Performing a male or feminine persona that expresses a view about masculinity or femininity is… expressive activity." *Imperial Sovereign Court of Montana v. Knudsen*, 170 F.4th 820, 855 (9th Cir. 2026); *Friends of George's, Inc. v. Mulroy*, 675 F. Supp. 3d 831, 865 (W.D. Tenn. 2023), *rev'd on other grounds*, 108 F.4th 431 (6th Cir. 2024) (reversing for lack of standing).

The idea of gender fluidity is therefore a second and more specific meaning attendees would absorb by witnessing a QEC show.

---

[26] James Michael Nichols and Cole Delbyck, *"RuPaul's Drag Race" is Leaving TV's Biggest Gay Network – Now What?*, HUFFPOST, March 23, 2017, https://www.huffpost.com/entry/rupauls-drag-race-logo-vh1_n_58d1b0bce4b0b22b0d17f9aa.

### C. The Board's Resolution and Other Officials' Statements About Drag and Changing Genders Confirm That Drag is Expressive

Perhaps the best evidence that QEC's drag show would be expressive is the fact that Texas A&M's Board of Regents plainly saw it that way. That's why the show was nixed – because of the negative statement the Board thought it would make. Other government officials have also condemned drag because of its perceived message, eliminating any doubt that drag is expressive conduct.

The Board acted to prohibit drag shows like QEC's because it views them as inconsistent with the "value of respect for others" since they "parody the female body type" and "demean[] women." ROA.371-72 (quoting Board resolution). As such, the Board concluded, drag shows "are likely to create or contribute to a hostile environment for women." ROA.372. To the Board, they also "often involve unwelcome and objectively offensive conduct based on sex for many members of the respective communities of the Universities, particularly when they involve the mockery or objectification of women." ROA.372. Thus, the Board believed that use of university facilities could be "considered promotion of gender ideology" – the "view that there is a vast spectrum of genders that are disconnected from one's sex." ROA.372, ROA.383.[27]

[27] This tracks Texas A&M's similar, recent prohibition of any "system academic course" from "advocat[ing]… gender ideology, or topics related to sexual orientation or gender identity," with exceptions for certain non-core or graduate-level classes. *See* Jessica Priest, *Texas A&M System*

To the Board, then, drag transmits a clear and inescapable message: contempt for, hostility to, and objectification of women in furtherance of "gender ideology." While *amici* respectfully disagree with this view of drag, its accuracy is beside the point. All that matters is that the Board perceived a specific social message and stifled that message because of its content. The district court correctly pointed out the obvious: "The Board's contention that drag shows, and Draggieland, are not expressive conduct directly contradicts the Board's simultaneous assertion that drag performances promote an ideology. The Board cannot assert both that the performance promotes an ideology and that it is not expressive conduct." ROA.377.

More generally, there is a "passionate political and social debate in our society" that has "spilled over into the broader political arena" over drag and closely related questions like whether gender can be conceived of as chosen or fluid. *Defending Education v. Olentangy Local Sch. Dist. Bd. of Educ.*, 158 F.4th 732, 754 (6th Cir. 2025) (*en banc*); *accord Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021) (noting "contentious political debate"). This Court has recognized the existence of this public controversy and therefore counseled official neutrality. *See United States v. Varner*, 948 F.3d 250, 256 (5th Cir. 2020)

---

*Tightens Restrictions on Discussing Race and Gender in Class*, TEXAS TRIBUNE, Dec. 18, 2025, https://www.texastribune.org/2025/12/18/texas-am-race-gender-courses-new-rules/.

("Increasingly, federal courts today are asked to decide cases that turn on hotly debated issues of sex and gender identity").

In addition, high-ranking Texas officials have joined the political and social debate over gender identity in recent years and specifically condemned drag for the message it sends. Governor Abbott called the cancelled 2023 Spectrum show "indoctrinat[ion]."[28] How can drag indoctrinate viewers if it expresses nothing?[29] Attorney General Ken Paxton has called drag shows events "where men pretending to be women engage in obscene, offensive, and degrading behavior… [and] vulgar assaults on our values."[30] Lieutenant Governor Dan Patrick similarly called drag an example of the "radical Left's degradation of our society and values,"[31] while the Texas senator who sponsored a bill banning drag shows open to minors

---

[28] Giulia Carbonaro, *Greg Abbott Issues Blistering Response to Drag Show Ban Controversy*, NEWSWEEK, March 16, 2024, https://www.newsweek.com/greg-abbott-issues-blistering-response-drag-show-ban-controversy-1879949.

[29] *See, e.g.*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/ us/dictionary/English/ indoctrination (defining "indoctrination" as "the process of repeating an idea or belief to someone until they accept it without criticism or question").

[30] Office of the Texas Attorney General, *Press Release: Attorney General Ken Paxton Defends Texas A&M's Ban on Drag Shows Against Lawsuit from Left-Wing Group*, March 14, 2025, https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-defends-texas-ams-ban-drag-shows-against-lawsuit-left-wing-group.

[31] Office of the Lt. Governor, *Press Release: Lt. Gov. Dan Patrick: Statement on the Passage of Senate Bill 12 – Banning Children's Exposure to Drag Shows*, April 5, 2023, https://www.ltgov.texas.gov/2023/04/05/lt-gov-dan-patrick-statement-on-the-passage-of-senate-bill-12-banning-childrens-exposure-to-drag-shows/.

critiqued them for "expos[ing] children to issues of sexuality and identity."[32] With this much *amici* agree: drag shows do express a particular viewpoint about "issues of sexuality and identity."

Texas and federal officials have also condemned the larger concept of gender as mutable or fluid, which, as discussed above, is central to drag. Governor Abbott has stressed that Texas "recognizes only two sexes." ROA.372. A federal executive order does likewise and criticizes "gender ideology." ROA.372. The federal government's view on the immutability of gender has further been expressed through a wide range of policies implemented since the Trump Administration took office.[33] The Board stated that it issued its resolution in order to comply with these orders and statements. ROA.372.

Of course, all "voices in these debates raise sincere concerns," and "the implications for all are profound." *United States v. Skrmetti*, 145 S. Ct. 1816, 1837 (2025). People of good will strongly agree with state and federal officials on these

---

[32] Sergio Martinez-Beltran, *Texas Panel Debates Measure That Would Prohibit Drag Performances in Front of Minors*, KUT NEWS, March 23, 2023, https://www.kut.org/politics/2023-03-23/texas-senate-panel-debates-measure-that-would-prohibit-drag-performances-in-front-of-minors.

[33] These include an executive order barring transgender service members, Exec. Order No. 14183, 90 Fed. Reg. 8757 (Feb. 23, 2025); the State Department's policy requiring passports to reflect sex assigned at birth rather than sex later adopted by the passport holder, *see Trump v. Orr*, 146 S. Ct. 44 (2025); and various new policies instituted by the Department of Education, *see, e.g.*, Brooke Schultz, *Ed Dept. Imposes Funding Restrictions for 5 Districts Over Transgender Policies*, EDUC. WEEK, Aug. 19, 2025, https://www.edweek.org/policy-politics/ed-dept-imposes-funding-restrictions-for-5-districts-over-transgender-policies/2025/08.

topics, just as others ardently agree with the other side. *See, e.g., Defending Education,* 158 F.4th at 753-54. The point is only that drag is a recognized and fully understood part of this ongoing public dialogue. And the contextual expressiveness of drag shows like the one QEC planned is heightened and confirmed by the existence of this lively debate. As one commentator has written, everyone knows full well what drag is saying in the current atmosphere, whether they agree or disagree:

> Put simply, everything about drag – the definition, makeup, hair, costuming, performance, and even its opposition – stems from its inherent viewpoint about gender nonconformity and expression. It seems that everyone, proponents and opponents alike, are on the same page that drag contains a viewpoint about gender nonconformity. They differ, though, as to whether that viewpoint – expressed through a *particular* form of expressive conduct (drag) – should be shared with others.[34]

## II. Texas A&M's Suppression of QEC's Show is Clear Viewpoint Discrimination

Lastly, Texas A&M's prohibition of QEC's planned drag show on the ground that it threatened to demean and objectify women while promoting "gender ideology" confirms that the university committed constitutionally forbidden viewpoint discrimination.

[34] Brett V. Ries, *Don't Be a Drag: How Drag Bans Can Violate the First Amendment*, 33 TUL. J. LAW & SEX. 1, 13 (2025) (emphasis in original).

Restricting speech because the message communicated is perceived as wrong or gives offense is clearly proscribed by the First Amendment. *See Matal v. Tam*, 582 U.S. 218, 244 (2017) ("the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers" (quotation removed)); *Rosenberger v. Rector and Visitors of the Univ. of Virginia,* 515 U.S. 819, 828 (1995) ("government may not regulate speech based on its substantive content or the message it conveys"). Yet the viewpoint discrimination that occurred here is plain as day. Indeed, in its brief, Texas A&M admits that QEC's show was barred because it was likely to be offensive – because it might "rise to the level of… objectively offensive conduct based on sex." Texas A&M Brf. 43 (quoting Board resolution). As the district court observed: "The fact that the Board justifies its ban on drag shows by saying it aligns with the rejection of a certain ideology belies the Board's contrary position that the ban is viewpoint neutral." ROA.383.

Even beyond drag performances, other courts have found that suppressing speech on the topic of gender mutability constitutes viewpoint discrimination at odds with the First Amendment. *See, e.g., Defending Education,* 158 F.4th at 754-56; *Meriwether*, 992 F.3d at 517. If teachers' use of one or another pronoun is protected expression on the important question of how to regard gender identity,

*see id*., the same is true of an artistic performance by an LGBT+ student group exploring the same question.

Texas A&M contests the district court's finding of viewpoint discrimination by distinguishing between the message of QEC's drag show and "*the way in which* [QEC] wished to deliver its message." Texas A&M Brf. 42 (emphasis in original, *quoting in part Spectrum*, 151 F.4th at 728). That is, the university claims its objections were "*not to the message* but to the way it would be delivered." *Id.* (emphasis in original).

As QEC correctly argues, however, this doesn't cure the problem. *See* QEC Brf. 40-42. That's because protection of expressive conduct doesn't hinge on whether government decisionmakers believe there is a kinder and gentler way to make the speakers' point. Said differently, the First Amendment – fortunately – bars government from dictating the medium and method by which we can express ourselves. Were it otherwise, offensive and even profane speech like flag burning, stalking a private memorial, or neo-Nazis marching through Skokie could be curtailed because the speaker could have used more decorous ways of communicating, like giving a respectful speech at a public meeting or writing a thoughtful Op-Ed. Yet free speech may "best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Johnson*, 491 U.S. at 408-09 (cleaned up). To reprise

Justice Thomas, "symbolism is a primitive but effective way of communicating ideas," *Masterpiece Cakeshop*, 584 U.S. at 656, and "speech cannot be restricted simply because it is upsetting or arouses contempt." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011). In *Snyder*, for instance, Westboro Baptist Church members picketing a serviceman's private funeral with anti-LGBT signs enjoyed core First Amendment protection for their message "in the whole context of *how and where* [they] chose to say it." *Id*. at 458 (emphasis added).

Here too, QEC retained the First Amendment right to decide for itself how to communicate support for LGBT+ life and challenge accepted views on gender. Texas A&M's prohibition of QEC's show was therefore viewpoint discrimination regardless of how the university might have treated a different form of expression it might prefer to drag shows. *See* Texas A&M Brf. 46 ("the University permits QEC to host other events that might convey messages regarding 'gender ideology'"). As the Sixth Circuit held in rejecting this exact argument in *Defending Education*: "the fact that people may speak in other ways does nothing to eliminate the viewpoint discrimination." 158 F. 4th at 756.

## CONCLUSION

QEC's proposed drag show is expressive conduct fully protected by the First Amendment from viewpoint discrimination. Accordingly, the Court should affirm the judgment of the district court.

August 24, 2026

Respectfully Submitted,

s/ *Martin J. Siegel*
Martin J. Siegel
LAW OFFICES OF
MARTIN J. SIEGEL, P.C.
2222 Dunstan Road
Houston, Texas 77005
Telephone: (281) 772-4568
Email: Martin@Siegelfirm.com

*Attorneys for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 28, 2026, in compliance with Rules 25(b) and (c) of the Federal Rules of Appellate Procedure, the undersigned served the foregoing brief on all registered counsel of record via the Court's ECF Filing system.

s/ *Martin J. Siegel*
Martin J. Siegel

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. Civ. P. 32(a)(7)(B) because this brief contains 5,711 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief is printed in a proportionally spaced typeface using the Microsoft Word 2004 for Mac, Version 11.5.6, program in 14 point, Times New Roman font in body text and 12 point, Times New Roman font in footnote text.

s/ *Martin J. Siegel*
Martin J. Siegel

Dated: August 24, 2026