No. 25-20108

# In the United States Court of Appeals for the Fifth Circuit

Texas A&M Queer Empowerment Council,

*Plaintiff-Appellee*,

*v.*

William Mahomes, in his official capacity as a member of the Board of Regents of the Texas A&M University System; Robert L. Albritton, in his official capacity as a member of the Board of Regents of the Texas A&M University System; David C. Baggett, in his official capacity as a member of the Board of Regents of the Texas A&M University System; James R. Brooks, in his official capacity as a member of the Board of Regents of the Texas A&M University System; John W. Bellinger, in his official capacity as a member of the Board of Regents of the Texas A&M University System; Jay Graham, in his official capacity as a member of the Board of Regents of the Texas A&M University System; Michael A. Hernandez, III, in his official capacity as a member of the Board of Regents of the Texas A&M University System; Kelley Sullivan Georgiades, in her official capacity as a member of the Board of Regents of the Texas A&M University System; Sam Torn, in his official capacity as a member of the Board of Regents of the Texas A&M University System; Lisa D. Cantu, in her official capacity as a member of the Board of Regents of the Texas A&M University System; Glenn Hegar, in his official capacity as Chancellor of the Texas A&M University System; Dr. Susan Ballabina, in her official capacity as President of Texas A&M University,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Southern District of Texas, Houston Division

# APPELLANTS' EN BANC REPLY BRIEF

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

William R. Peterson
Solicitor General

William F. Cole
Principal Deputy Solicitor General
William.Cole@oag.texas.gov

Christopher J. Pavlinec
Assistant Attorney General

*Counsel for Defendants-Appellants*

# Table of Contents

Page

Table of Contents ..... ii
Table of Authorities ..... iii
Introduction ..... 1
I. QEC Is Unlikely to Succeed on Its First Amendment Claims. ..... 2
A. QEC did not meet its burden to demonstrate that it wished to engage in inherently expressive conduct. ..... 2
B. Appellants applied reasonable, viewpoint-neutral restrictions in a limited public forum. ..... 10
1. Rudder Theatre is a limited public forum. ..... 10
2. Appellants' actions survive constitutional scrutiny. ..... 14
a. Appellants' restriction is reasonable in the light of the forum's purpose. ..... 14
b. Appellants' restriction was viewpoint neutral. ..... 16
C. Appellants' forum-based restriction is not a prior restraint. ..... 22
II. The Remaining Preliminary Injunction Factors Support Reversal. ..... 23
Conclusion ..... 25
Certificate of Compliance ..... 26

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) ........................................ 2, 7, 20
*AK Tournament Play, Inc. v. Town of Wallkill*,
444 F. App'x 475 (2d Cir. 2011) ........................................ 7
*Alexander v. United States*,
509 U.S. 544 (1993) ........................................ 22
*Cath. Leadership Coal. of Tex. v. Reisman*,
764 F.3d 409 (5th Cir. 2014) ........................................ 22
*Celebrity Attractions, Inc. v. Okla. City Pub. Prop. Auth.*,
660 F. App'x 600 (10th Cir. 2016) ........................................ 22
*Chiles v. Salazar*,
146 S. Ct. 1010 (2026) ........................................ 20, 21, 22
*Chiu v. Plano Indep. Sch. Dist.*,
260 F.3d 330 (5th Cir. 2001) ........................................ 11, 14, 24
*Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*,
561 U.S. 661 (2010) ........................ 2, 11, 12, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23
*City of Erie v. Pap's AM*,
529 U.S. 277 (2000) ........................................ 4-5
*City of Ladue v. Gilleo*,
512 U.S. 43 (1994) ........................................ 19
*Cressman v. Thompson*,
798 F.3d 938 (10th Cir. 2015) ........................................ 2, 7
*Currier v. Potter*,
379 F.3d 716 (9th Cir. 2004) ........................................ 12
*Freedom From Religion Found., Inc. v. Abbott*,
955 F.3d 417 (5th Cir. 2020) ........................................ 22
*Freedom From Religion Found., Inc. v. Abbott*,
58 F.4th 824 (5th Cir. 2023) ........................................ 12
*Good News Club v. Milford Cent. Sch.*,
533 U.S. 98 (2001) ........................................ 14
*Green v. Miss U.S. of Am.*,
52 F.4th 733 (9th Cir. 2022) ........................................ 4

*Hays Cnty. Guardian v. Supple*,
969 F.2d 111 (5th Cir. 1992) ....................................................11, 13, 14
*Healy v. James*,
408 U.S. 169 (1972).................................................................... 16, 23
*Heaney v. Roberts*,
846 F.3d 795 (5th Cir. 2017).................................................................16
*Hill v. Colorado*,
530 U.S. 703 (2000) ..............................................................................16
*Holloman v. Harland*,
370 F.3d 1252 (11th Cir. 2004) ..........................................................6, 7
*Imperial Sovereign Ct. of Mont. v. Knudsen*,
170 F.4th 820 (9th Cir. 2026)...............................................................5, 6
*IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*,
993 F.2d 386 (4th Cir. 1993)............................................................ 9, 10
*Jones v. Schneiderman*,
974 F.Supp.2d 322 (S.D.N.Y. 2013).........................................................7
*Just. for All v. Faulkner*,
410 F.3d 760 (5th Cir. 2005) .............................................................12, 13
*Justice v. NCAA*,
577 F.Supp. 356 (D. Ariz. 1983)................................................................7
*Keister v. Bell*,
24 F.4th 1239 (11th Cir. 2022)............................................................... 11
*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
508 U.S. 384 (1993).................................................................................. 11
*Lichtenstein v. Hargett*,
83 F.4th 575 (6th Cir. 2023) ............................................................. 3, 6, 8
*Matal v. Tam*,
582 U.S. 218 (2017)...................................................................................17, 18
*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
460 U.S. 37 (1983).......................................................................................12
*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992) ........................................................... 17, 18, 19, 20
*Reeves v. McConn*,
631 F.2d 377 (5th Cir. 1980) ...................................................................19
*Robinson v. Hunt County*,
921 F.3d 440 (5th Cir. 2019)...............................................................17, 18

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995)....................................................................16-17, 23
*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
547 U.S. 47 (2006) ..................................................3, 6, 7, 8, 18, 19, 20
*Schact v. United States*,
398 U.S. 58 (1970)....................................................................................5
*Schad v. Borough of Mount Ephraim*,
452 U.S. 61 (1981) .................................................................................4, 5
*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ................................................................................. 20
*Se. Promotions, Ltd. v. Conrad*,
420 U.S. 546 (1975)...............................................................................4, 22
*Speech First, Inc. v. Fenves*,
979 F.3d 319 (5th Cir. 2020).......................................................................23
*Spence v. Washington*,
418 U.S. 405 (1974) (per curiam) ...............................................................3
*Texas v. Johnson*,
491 U.S. 397 (1989) ................................................... 3, 6, 7, 10, 18, 20
*The Bail Project, Inc. v. Comm'r, Ind. Dep't of Ins.*,
76 F.4th 569 (7th Cir. 2023) ..................................................................... 6
*United States v. Bjerke*,
796 F.2d 643 (3d Cir. 1986) .......................................................................12
*United States v. O'Brien*,
391 U.S. 367 (1968) ...................................................................................18
*Wandering Dago, Inc. v. Destito*,
879 F.3d 20 (2d Cir. 2018) .........................................................................18
*Widmar v. Vincent*,
454 U.S. 263 (1981) ............................................................................ 16, 23
*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......................................................................................23
*Ysleta Fed'n of Tchrs. v. Ysleta Indep. Sch. Dist.*,
720 F.2d 1429 (5th Cir. 1983).....................................................................12

**Other Authorities**

System Regulation 08.02.01, Texas A&M University System (Nov. 13, 2025),
https://perma.cc/NYF8-JWQT ........................................................ 13
University Rule 08.02.99.M1, Texas A&M University (Mar. 16, 2026),
https://perma.cc/JTZ7-GQ9R ........................................................ 13

## Introduction

Despite QEC's rhetoric about censors patrolling the campuses of the Texas A&M University System to banish disfavored viewpoints, this appeal presents a far more prosaic set of facts. In 2025, the Board of Regents determined that its indoor meeting rooms, theaters, and auditoriums should not be open to host certain "drag show events," which the Board concluded involve "unwelcome and objectively offensive conduct based on sex" and are inconsistent with "the System's mission and core values" and antidiscrimination law. ROA.37. Applying that policy, Appellants cancelled QEC's planned drag show, *Draggieland*, which was set to take place in Rudder Theatre.

The Board has not banned QEC from speaking about LGBTQ+ issues or gender norms on its campuses. And Appellants have not even forbidden QEC from staging such drag shows in other areas of the University campus. Appellants have merely determined that one venue on Texas A&M's flagship campus shall not be made available for a single type of event. Under those circumstances, Appellants' adoption and application of the Board's policy to QEC's drag show did not violate the First Amendment. Even assuming QEC met its evidentiary burden to show it was engaged in First Amendment protected conduct (it has not), Appellants' exclusion of QEC's drag show from Rudder Theatre was a reasonable, viewpoint-neutral restriction in a limited public forum.

In arguing otherwise, QEC tries to avoid the Supreme Court's dispositive instruction that, in limited public forums, universities are entitled to adopt

reasonable, viewpoint-neutral policies, "due decent respect" by federal courts, that help advance their educational mission and enforce "[n]ondiscrimination" policies and "state-law proscriptions on discrimination." *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 688-89 (2010) ("*CLS*").

In its bid to classify Rudder Theatre as a designated public forum—which would trigger strict scrutiny and sidestep *CLS*—QEC's arguments ignore the Board's Resolution expressly classifying university theaters as limited public forums reserved for mission-consistent activities, as well as established precedent authorizing the government to alter the character of a forum. QEC's effort to render unreasonable Appellants' judgments about the educational environment and antidiscrimination law depends upon irrelevant and incorrect factual distinctions of *CLS*. And QEC's attempt to conjure the specter of viewpoint discrimination overlooks that universities may lawfully regulate discriminatory conduct, even when that regulation has an incidental effect on expression—a fundamental premise that undergirds all of antidiscrimination law. This Court should reverse.

## I. QEC Is Unlikely to Succeed on Its First Amendment Claims.

### A. QEC did not meet its burden to demonstrate that it wished to engage in inherently expressive conduct.

In addition to "pure speech," *Cressman v. Thompson*, 798 F.3d 938, 952 (10th Cir. 2015)—which includes everything from "pictures, films, paintings, drawings, and engravings" to "oral utterance[s] and the printed word," *303 Creative LLC v. Elenis*, 600 U.S. 570, 587 (2023) (citations omitted)—the First Amendment's

protections extend to certain nonverbal "conduct that is inherently expressive," *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006) ("*FAIR*"); *id.* at 65 ("symbolic speech"). Such conduct qualifies for protection if "[1] 'an intent to convey a particularized message was present, and [2] the likelihood was great that the message would be understood by those who viewed it.'" *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (alterations omitted) (quoting *Spence v. Washington*, 418 U.S. 405, 410-11 (1974) (per curiam)). While the "first element"—an intent to convey a particularized message—may "not pose a high bar" following *Hurley*, "[t]he second element—that the audience will likely understand the message—has more bite." *Lichtenstein v. Hargett*, 83 F.4th 575, 594 (6th Cir. 2023).

As Appellants have explained (at 20-23), on this scant[1] preliminary-injunction record, QEC failed to carry its evidentiary burden on this second prong: It supplied no evidence to show that the likelihood is "great," *Johnson*, 491 U.S. at 404, or "high" that, standing "alone," *Lichtenstein*, 83 F.4th at 594, it would be "overwhelmingly apparent," *FAIR*, 547 U.S. at 66, to viewers that students dancing to music on stage while clad in costume (sometimes, but not always, associated with the opposite sex) are transmitting messages of support for the LGBTQ+ community or challenges to gender norms. QEC offers several rejoinders, but none has merit.

*First*, QEC argues (at 26, 27, 28) that its drag shows are just like "live theatre," "stage performances," and "theatrical production[s]," which are "plainly

---

[1] QEC disputes (at 31 n.5) that the record on expressive conduct is "thin," but it cannot dispute that the only evidence on this issue is a handful of vaguely worded paragraphs in a verified complaint. ROA.17, 20.

expressive by [their] nature." Yet QEC reads the cases it cites at far too high a level of generality and ignores the differences between the conduct at issue in those cases and this one.

*Southeastern Promotions, Ltd. v. Conrad*, for example, involved a "rock musical 'Hair,'" which involved "the acting out—or singing out—of the written word" and "mix[ing] speech with live action or conduct." 420 U.S. 546, 547, 557-58 (1975). But nothing in the record indicates that *Draggieland* involves "the acting out—or singing out—of the written word," *id.* at 557-58; instead, QEC alleges that *Draggieland* is a pageant[2] in which performers don costumes that "frequently, but not always" are associated with the opposite sex and perform "dance routines" to "songs" or display "other talents" that "advance" unspecified "themes." ROA.17. Perhaps with additional fact development QEC can show that that its performers "assume stage personas" and "portray gender-challenging characters," QEC.Br.30, in a way that resembles a musical or a play, but the limited record here does not show that.

*Schad v. Borough of Mount Ephraim*, 452 U.S. 61 (1981), is even further afield. There, the Supreme Court invalidated the convictions of the proprietors of an adult bookstore who wanted to host nude dancing on the premises. *Id.* at 72-76. But QEC does not claim its performers are engaged in "nude dancing," which enjoys limited constitutional protection because it conveys "an erotic message." *City of Erie v.*

[2] While the Ninth Circuit has held that beauty pageants are inherently expressive because they convey "the ideal vision of American womanhood," *Green v. Miss U.S. of Am.*, 52 F.4th 733, 780 (9th Cir. 2022), QEC has not explained what ideal vision, if any, *Draggieland* is intended to express.

*Pap's AM*, 529 U.S. 277, 290 (2000). As QEC explained, "*Draggieland* performers put clothes *on*; they are not nude or partially-nude." ROA.17. And though in *Schad* the Court invalidated an overbroad ordinance that totally banned "live entertainment," the Court did not categorically hold that all "live entertainment," or anything that could be described as such, qualifies for First Amendment protection. 452 U.S. at 65.

QEC is closer to the mark by citing *Schact v. United States*, 398 U.S. 58 (1970), which involved an individual participating in a "street skit" in which three individuals portrayed two American soldiers shooting a pregnant woman who they mistook for a VietCong soldier. *Id.* at. 60, 61. This is a classic case of conduct that is inherently expressive only because of context. *Cf. id.* at 69-70 (White, J., concurring); *see* Appellants.Br.19-20 (collecting similar examples). The defendant "wore the army uniform as a costume . . . to expose the evil of the American presence in Vietnam." *Schact*, 398 U.S. at 60. And this skit "was part of a larger, peaceful antiwar demonstration at the induction center that morning." *Id.* It was through those contextual clues—not simply because the defendant claimed he was engaged in a "theatrical production" or because it was "outdoor[s]," QEC.Br.31—that this "street skit" would "create in the audience an understanding of and opposition to [America's] participation in the Vietnam war." *Schact*, 398 U.S. at 61. Those same contextual clues, however, are lacking from the dancing and costuming at issue here. *See* Appellants.Br.21-24.

Finally, *Imperial Sovereign Court of Montana v. Knudsen*, 170 F.4th 820, 855-58 (9th Cir. 2026)—a case that QEC says (at 26 & n.1) "held drag performances are

protected expression"—underscores QEC's resort to broad generalities and the imprecision of the catchall term "drag shows." *See* Appellants.Br.23. The Ninth Circuit held that "[a] drag story hour is purely expressive activity" because "[r]eading a book out loud is purely expressive activity." *Imperial Sovereign Ct.*, 170 F.4th at 855. But QEC does not argue that its drag shows involve "[r]eading a book out loud," *cf.* ROA.17, so the case does not show that "drag performances" like QEC's are inherently expressive conduct.

*Second*, QEC contends (at 27-29) that the second prong of the *Johnson* test is satisfied so long as audience members "would understand the performance is conveying *something*" and that they need not identify any "specific" or "particularized" message. But as QEC's own authority confirms, the audience still must at least infer "a generalized message"—even if after *Hurley* they need not understand a granular, "specific message" that the performer "was attempting to convey." *Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004). The problem for QEC is that no evidence supports the argument that QEC's audience was overwhelmingly likely to understand even its generalized messages from its conduct "*alone*." *Lichtenstein*, 83 F.4th at 594; *cf. The Bail Project, Inc. v. Comm'r, Ind. Dep't of Ins.*, 76 F.4th 569, 577 (7th Cir. 2023) ("On its own, paying bail for a pretrial defendant does not communicate even the most general version of The Bail Project's message—its opposition to cash bail."). QEC's argument ultimately echoes the long-rejected notion that "conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *FAIR*, 547 U.S. at 65-

66; *see* QEC.Br.34-35 (asserting that the audience "understands the performers are engaged in expression").[3]

*Third*, QEC asserts (at 29-31) that *Draggieland* is inherently expressive because it is "a ticketed production presented on a theatre stage before a voluntary audience." This argument sweeps far too broadly. Not every ticketed event performed indoors before an audience is inherently expressive First Amendment conduct. A juggling competition, basketball game, poker tournament, or chess match would not become expressive just because audiences may pay for admission to watch. *Cf. AK Tournament Play, Inc. v. Town of Wallkill*, 444 F. App'x 475, 477 (2d Cir. 2011) (poker); *Jones v. Schneiderman*, 974 F.Supp.2d 322, 333 (S.D.N.Y. 2013) ("live performance MMA"); *Justice v. NCAA*, 577 F.Supp. 356, 374 (D. Ariz. 1983) ("intercollegiate football"). Nor is *Draggieland* inherently expressive because it involves "costumes, makeup, hairstyles, music, lighting, and choreography," or "auditions," "rehearsals," and performers "danc[ing] under lights to choreographed music." QEC.Br.30. These are aspects of any performance and they do not, alone, transmit any discernable message—even a "generalized" one, *Holloman*, 370 F.3d at 1271.

*Fourth*, QEC says (at 30) that the inherently expressive nature of *Draggieland* is "reinforce[d]" by the performers "discussing with the host what drag means to

[3] QEC's wrongly asserts (at 27-28) that applying *Johnson*'s second prong here would leave unprotected Jackson Pollock's paintings or Lewis Carroll's Jabberwocky verse. But paintings and written communications are forms of "pure speech," *303 Creative*, 600 U.S. at 587, which is not analyzed through *Johnson*'s test for inherently expressive *conduct*, *cf. FAIR*, 547 U.S. at 65-66; *Cressman*, 798 F.3d at 954-55.

them." But as Appellants explained (at 23-24), "[w]hen a party must include 'explanatory speech' for the audience to get the message, the conduct does not warrant protection." *Lichtenstein*, 83 F.4th at 594 (quoting *FAIR*, 547 U.S. at 66). Like the district court, QEC argues (at 33) that Appellants "cannot separate the performers' routines from their conversations with the host." But QEC ignores its concession that these conversations—which Appellants have never objected to—take place "after the performance" itself. ROA.75; *see* ROA.17 ("*Draggieland* performers *then* discuss what drag means to them in conversation with the host." (emphasis added)).

QEC rightly recognizes (at 34) that *FAIR*'s test is whether explanatory "speech is 'necessary' for an observer to perceive a message from the conduct." It just disputes that principle's application here with the bare assertion (at 34-35) that "an audience member watching a costumed, choreographed drag performance on a theatre stage understands the performers are engaged in expression." But even if audience members would understand that the performers are engaged in some sort of expression, that is not enough. *Supra* at 6-7. QEC was required to provide evidence that it would be "overwhelmingly apparent," *FAIR*, 547 U.S. at 66, to audience members that these costumed performers dancing to music are transmitting at least a generalized message—here, pro-LGBTQ+ messages or challenges to gender norms, *see* ROA.20. As discussed, it did not do so. *See* Appellants.Br.21-24.

*Fifth*, QEC claims (at 32) that the Board's Resolution itself shows *Draggieland* is expressive because the Board concluded that drag shows "involve the *mockery* or

objectification of women," the use of "exaggerated prosthetics meant to *parody* the female body type," and to the extent they "promote gender ideology" (as defined by the federal government), they might cost universities federal funds. ROA.37, 38 (emphases added). But even if the Board's Resolution could be a proxy for the views of QEC's audience (and it is far from clear that it can), the words "mockery" and "parody" are being used to describe the "conduct," ROA.37, of drag shows that the Board finds to be inconsistent with university policy and antidiscrimination law—not the message of those shows.

Moreover, the record does not support QEC's argument (at 32) that Appellants cancelled QEC's drag show because they thought it impermissibly "promot[ed] gender ideology." While the Board's Resolution "acknowledges" President Trump's Executive Order and tentatively concludes that "the use of facilities at the Universities for Drag Show Events"—in general—"may be considered promotion of gender ideology in violation of" that Executive Order and cost Appellants federal funding, ROA.38, no evidence indicates that University officials applied that reasoning—rather than because it violates university policy and antidiscrimination law—to cancel *Draggieland*. Instead, the record shows only that, on instructions from the University President, its Vice-President cancelled *Draggieland* due to the Board Resolution's adoption. ROA.23, 245. And indeed, the record shows that the University permits QEC to host other events that might "promote gender ideology." *See* ROA.12, 245-46.

QEC cites (at 32) *IOTA XI Chapter of Sigma Chi Fraternity v. George Mason University*, 993 F.2d 386 (4th Cir. 1993), for the proposition that Appellants'

arguments about expressive conduct are "self defeating" in the light of the Board's Resolution. But in *IOTA XI*, the Fourth Circuit deemed "self-defeating" the university's attempt to dispute the plaintiff's "intent to convey a message" in the light of a university Vice-President's affidavit "stat[ing] that the message conveyed by the Fraternity's conduct—that racial and sexual themes should be treated lightly—was completely antithetical to the University's mission." 993 F.2d at 392. But here, Appellants do not dispute that QEC has met the first prong of the *Johnson* test, only the second prong. And on that issue, *IOTA XI* offers little, other than the terse statement that "there was a great likelihood that at least some of the audience viewing the skit would understand the Fraternity's message of satire and humor" because "[s]ome students paid to attend the performance and were entertained." *Id.* But as indicated above, the test for inherently expressive conduct does not turn on whether spectators paid to attend for entertainment. *See supra* at 7.

### B. Appellants applied reasonable, viewpoint-neutral restrictions in a limited public forum.

Even if QEC planned to engage in inherently expressive conduct protected by the First Amendment, Appellants' exclusion of *Draggieland* from Rudder Theatre comported with the Constitution because Rudder Theatre is a limited public forum, and Appellants' policy was reasonable and viewpoint neutral.

#### 1. Rudder Theatre is a limited public forum.

The standard of review for assessing Appellants' "access barrier" to Rudder Theatre hinges on the proper classification of that venue. As Appellants have demonstrated (at 32-35), both "the government's intent with respect to the forum"

and "the nature of the [forum] and its compatibility with the speech at issue," *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 346 (5th Cir. 2001) (per curiam), indicate that Rudder Theatre is a limited, rather than designated, public forum.

As to intent, the Rudder Theatre is not "open for indiscriminate public use for communicative purposes," *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 392 (1993); instead, student groups must obtain approval from the University to use it through a multi-step approval process, Appellants.Br.32-33. Moreover, when the University intends to create a designated public forum, it does so explicitly. Appellants.Br.33. But here the Board has expressly determined that "meeting rooms, theaters, [and] auditoriums" like Rudder Theatre are "limited forums for the purpose of promoting the mission of the System." ROA.37. Because "the special characteristics of the school environment," *CLS*, 561 U.S. at 685, make it appropriate for the University to reserve its indoor venues for mission-consistent use, *Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 117 (5th Cir. 1992); *Keister v. Bell*, 24 F.4th 1239, 1252 (11th Cir. 2022), the "nature" of the forum also supports its classification as a limited public forum, Appellants.Br.34.

QEC's rejoinders miss the mark. *First*, QEC contends (at 51) that "TAMU and System Policy place no content limits on expressive activities in Rudder Theatre," which demonstrates it is a designated public forum. But the Board's Resolution expressly designates University "meeting rooms, theaters, [and] auditoriums" as "limited forums for the purpose of promoting the mission of the System." ROA.37. It expressly restricts the staging of "drag show events" in these limited public forums because the Board concluded that they are inconsistent with the System's

"mission and core values" and antidiscrimination law. ROA.37. This is a "limit on expressive activities in Rudder Theatre." And that makes this case distinguishable from *Justice for All v. Faulkner*, which concerned the "outdoor open areas of the University campus" where the university "affirmatively and expressly guaranteed its students, faculty, and staff virtually all of the rights that the Constitution provides speakers in traditional public spaces." 410 F.3d 760, 767, 768 (5th Cir. 2005).

*Second*, QEC argues (at 51-52) that the University's "practice with Rudder Theatre" shows that Appellants intended it to be a "designated public forum," because the record reveals no evidence that it "had ever denied a reservation for Rudder Theatre before" *Draggieland*. But in *CLS*, the fact that the University had not previously enforced the limits on its forum—possibly even during the pendency of the litigation—did not change the Supreme Court's conclusion that it was still confronting a limited public forum. 561 U.S. at 707, 712-13 (Alito, J., dissenting).

QEC further contends (at 53) that the fact the University had permitted *Draggieland* performances in past years shows that there have historically been no limits on use of Rudder Theatre. But even if true, "the state is not required to indefinitely retain the open character of" a designated or limited public forum. *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983); *see also Freedom From Religion Found., Inc. v. Abbott*, 58 F.4th 824, 835 (5th Cir. 2023) (same); *Currier v. Potter*, 379 F.3d 716, 728 (9th Cir. 2004); *United States v. Bjerke*, 796 F.2d 643, 647 (3d Cir. 1986); *Ysleta Fed'n of Tchrs. v. Ysleta Indep. Sch. Dist.*, 720 F.2d 1429, 1432 (5th Cir. 1983). Even if Rudder Theatre was previously a designated public forum, it became a limited public forum no later than the date that the Board issued its

Resolution declaring university "meeting rooms, theaters, [and] auditoriums" to be "limited forums for the purpose of promoting the mission of the System." ROA.37.

QEC responds (at 54 & n.12) by referring to the Board's Resolution as an "ad hoc speech restriction" and citing *Hays County Guardian* for the proposition that "restrict[ing] some speech on the property" does not alter a forum's designation because the government's "consistent practice" is what counts. But the Board's Resolution is not a one-off, "anomalous" regulation, *Hays Cnty. Guardian*, 969 F.2d at 118; it is a generally applicable policy adopted by the Board of Regents. Moreover, QEC points to no "affirmative desire . . . or express policy . . . of allowing [unfettered] public discourse" in Rudder Theatre, so there is no "general policy of open access" like there was on "the outdoor grounds of a campus such as the sidewalks and plazas" in *Hays County Guardian*. *Id.* at 116, 117.[4] Were QEC's reading

[4] QEC points (at 50-51) to a University Rule that it says "promises student groups like QEC that TAMU will not base reservation confirmations for spaces like Rudder Theatre 'on the content or viewpoint of the expressive activity.'" But that Rule's reservation procedures concern "reservable designated public forums," not limited public forums like Rudder Theatre. University Rule 08.02.99.M1 at 1, Texas A&M University (Mar. 16, 2026), https://perma.cc/JTZ7-GQ9R.

QEC also points (at 51) to a System Regulation that guarantees student groups the right "to engage in expressive activities on campus," which it interprets to include "buildings" like Rudder Theatre. The System Regulation's definition of the word "campus" as including "buildings" cannot bear the weight QEC would assign it, lest the entirety of the campus be treated like a traditional public forum. *Cf. Just. For All*, 410 F.3d at 767. Instead, the System Regulation carefully distinguishes between "designated public forums," "limited public forums," "traditional public forums," and "nonpublic forums." System Regulation 08.02.01 at 1-2, Texas A&M University System (Nov. 13, 2025), https://perma.cc/NYF8-JWQT. And any

of *Hays County Guardian* correct, it would conflict with well-established precedent recognizing the government's power to alter the character of a forum. *Supra* at 12.

### 2. Appellants' actions survive constitutional scrutiny.

Because Rudder Theatre is a limited public forum, Appellants need only show that its "access barrier" is "reasonable and viewpoint neutral" to survive constitutional scrutiny. *CLS*, 561 U.S. at 679. It is both. *See* Appellants.Br.37-46.

#### a. Appellants' restriction is reasonable in the light of the forum's purpose.

In determining whether the University's restriction "is 'reasonable in light of the purpose served by the forum,'" *Chiu*, 260 F.3d at 346 (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 107 (2001)), the Supreme Court has instructed that the "inquiry [be] shaped by the educational context in which it arises," *CLS*, 561 U.S. at 685. And in that context, the Supreme Court has deemed "reasonable" universities' application of "access barriers" to limited public forums that help the university enforce "[n]ondiscrimination" policies and "state-law proscriptions on discrimination"—particularly where "substantial alternative channels . . . remain open" for communication. *Id.* at 688, 689-90. As Appellants have explained (at 39-41), those are the precise judgments Appellants made here when they excluded QEC's drag show, which prevented an event that would involve "unwelcome and objectively offensive conduct based on sex" that "mock[s] or objectif[ies] women"

---

ambiguity as to Rudder Theatre's proper classification was cleared up by the Board's Resolution declaring university "theaters" to be limited public forums. ROA.37.

through "parody [of] the female body type" in violation of the A&M System's "mission and core values" and antidiscrimination law. ROA.37.

QEC tries to render these judgments unreasonable by attempting to distinguish *CLS*. But each effort fails.

*First*, QEC argues (at 46) that the Board possesses "unfettered discretion" to prohibit drag shows through vague, subjective language unlike the administrators in *CLS* who were given a "binary" choice in applying its all-comers policy. But Hastings's "all comers" policy was an "interpret[ation]" of its "Nondiscrimination Policy," *CLS*, 561 U.S. at 671, the existence and formation of which was hotly contested by the dissenters, *cf. id.* at 708-15 (Alito, J., dissenting). Thus, administrators at Hastings Law School and the Board here had an equivalent amount of (broad) authority to determine whether certain conduct violated university policy or state-law proscriptions on discrimination. *Id.* at 688, 689-90 (majority op.). That is what QEC really takes issue with. But once the decision was made that the plaintiff was (in the university's view) violating those policies, the university's choice regarding "access" to the forum, *id.* at 679, was equally "binary" in each case—grant or deny access (there, RSO status; here, use of Rudder Theatre).

*Second*, QEC contends (at 19-20, 47-48) that the Board's determinations are not backed by "empirical evidence" or "student[] complain[ts]" but instead "mere 'fear or apprehension' of campus disruption." But *CLS* requires no such thing: "perceived harms" were enough to sustain Hastings's application of its all-comers policy even in the absence of empirical evidence of a problem. 561 U.S. at 696. Nor would a contrary rule make sense: the First Amendment does not preclude

universities from "tak[ing] a prophylactic approach," *Hill v. Colorado*, 530 U.S. 703, 729 (2000), to prevent discriminatory conduct on campus.

*Third*, QEC errs by arguing (at 21) that *CLS* is distinguishable because, unlike *CLS*, "this case is not about the 'subsidy' of granting recognized status" but "a prohibition against student groups engaging in protected expression." It is the opposite. This appeal concerns QEC's access to a single campus venue for a single type of performance. By excluding QEC's drag shows from Rudder Theatre, the University does not "require action" from QEC; it is simply "withhold[ing] benefits." *CLS*, 561 U.S. at 682. That is, Appellants *are* "dangling the carrot of subsidy"—use of a particular university-controlled forum—rather than "wielding the stick of prohibition." *Id.* at 683.

*Fourth*, QEC retreats (at 21-22) to the argument that *CLS* is distinguishable because this case concerns viewpoint discrimination in a designated public forum rather than viewpoint-neutral restrictions in a limited public forum. As Appellants have explained, that is incorrect. *See supra* at 10-14; *infra* at 16-22. For that reason, QEC's claim (at 22) that "*Rosenberger*, *Healy*, and *Widmar*," "not *CLS*, control this case" is without merit. *See CLS*, 561 U.S. at 694 (distinguishing those three cases as involving viewpoint discrimination).

**b. Appellants' restriction was viewpoint neutral.**

Appellants' exclusion of *Draggieland* from Rudder Theatre was also viewpoint neutral. "Viewpoint discrimination exists 'when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.'" *Heaney v. Roberts*, 846 F.3d 795, 802 (5th Cir. 2017) (quoting *Rosenberger v. Rector & Visitors*

*of Univ. of Va.*, 515 U.S. 819, 829 (1995)). But it is equally true that "nonverbal expressive activity can be banned because of the action it entails, but not because of the ideas it expresses." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 385 (1992). It is the latter principle that controls here.

As Appellants explained (at 42-46), application of the Board's Resolution to *Draggieland* was viewpoint neutral. Appellants did not exclude *Draggieland* from Rudder Theatre because the show conveyed pro-LGBTQ+ *speech* or *ideas* disfavored by the Board or University but because the drag show involved "conduct" that might rise to the level of "unwelcome and objectively offensive conduct based on sex" that violates "System anti-discrimination policy and Title IX." ROA.37. When a university's "policy aims at the *act*[*s*]" of a student group, *i.e.*, its "conduct—not its . . . perspective"—it is not viewpoint discriminatory. *CLS*, 561 U.S. at 696. QEC offers four main arguments in response, but none should persuade.

*First*, invoking *Matal v. Tam*, 582 U.S. 218 (2017), and *Robinson v. Hunt County*, 921 F.3d 440 (5th Cir. 2019), QEC argues that Appellants are improperly discriminating against speech they find inappropriate or offensive, which is a viewpoint. But *Matal* and *Robinson* are distinguishable because both cases involved "pure speech" rather than conduct and neither arose in the university context where *CLS* is controlling. *See Matal*, 582 U.S. at 227 (refusal by USPTO to register disparaging trademark); *Robinson*, 921 F.3d at 445 (removal of citizen posts criticizing the police from the department's public Facebook page). As the Supreme Court explained, where a university's "policy aims at the *act*[*s*]" of a student group,

*i.e.*, its "conduct—not its ... perspective," it is not engaged in viewpoint discrimination. *CLS*, 561 U.S. at 696.

Unlike in *Matal* and *Robinson*, the University is not attempting to shield students' sensibilities from *speech* it finds offensive but instead seeks to prevent *conduct* that might rise to the level of harassment or discrimination. "The government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word." *Johnson*, 491 U.S. at 406. And "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element"—such as preservation of mission-consistent use of school property—"can justify incidental limitations on First Amendment freedoms." *United States v. O'Brien*, 391 U.S. 367, 376 (1968).

That is particularly true here: "Most antidiscrimination laws 'regulate[]'" discriminatory practices "as conduct, not as expression," and "not because of the viewpoints such" practices express but "because of the immediate harms such discrimination causes." *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 32 (2d Cir. 2018) (citation modified). The Supreme Court has explained that even "words can in some circumstances violate laws directed not against speech but against conduct" and those laws still comport with First Amendment. *R.A.V.*, 505 U.S. at 389. That is why Congress can constitutionally "require an employer to take down a sign reading 'White Applicants Only'" as part of its effort to "prohibit employers from discriminating in hiring on the basis of race." *FAIR*, 547 U.S. at 62. Or why it may, consistent with the First Amendment, regulate "sexually derogatory" words that

"may produce a violation of Title VII's general prohibition against sexual discrimination in employment practices." *R.A.V.*, 505 U.S. at 389. In neither case should the law "be analyzed as one regulating the employer's speech rather than conduct." *FAIR*, 547 U.S. at 62. So too here.

*Second*, citing *City of Ladue v. Gilleo*, 512 U.S. 43, 56 (1994), and *Reeves v. McConn*, 631 F.2d 377, 382 (5th Cir. 1980), QEC contends (at 40-42) that the government may not restrict a "means" or medium of expression that a speaker finds effective even if other avenues of communication remain available. But neither case involved a limited public forum, so each is inapposite. *Gilleo*, for example, involved an overbroad city ordinance banning the display of most signs in one's home—private property where the government must have a particularly strong justification "to constrain a person's ability to *speak*." 512 U.S. at 58. And *Reeves* concerned a sound amplification ban on "the streets and sidewalks of a downtown business district"—quintessential traditional public forums. 631 F.3d at 384. By contrast, the availability of alternative channels of communication *is* relevant in the context of a limited public forum like Rudder Theatre. *See CLS*, 561 U.S. at 690.

QEC contends (at 41) that Appellants' position would permit "[o]fficials" to "limit[] pro-life advocates to text-only flyers" that do not include "images of aborted fetuses." Universities would face a tall order attempting to enforce such a restriction in a designated public forum like a campus quad. But if the university could articulate a viewpoint-neutral rationale for such a restriction in a limited public forum, grounded in concern for the educational environment and compliance with university policy and state and federal law, it is possible that a court might find such

a restriction consistent with the First Amendment under *CLS*.[5] And while a university could not require dissidents to "hand[] out pamphlets" instead of "burning a flag in protest," QEC.Br.41, if the reason for that restriction is to prevent "dishonoring the flag," it could assuredly do so to enforce a rule "against outdoor fires," *R.A.V.*, 505 U.S. at 385.

*Third*, quoting *Chiles v. Salazar*, 146 S. Ct. 1010, 1023 (2026), QEC calls (at 42) Appellants' distinction between speech and conduct a "word game" and contends that its "performance 'does not become conduct just because [Defendants] may call it that.'" But the distinction between speech and conduct is a cornerstone of First Amendment doctrine. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) (explaining that it "is true that restrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct"); *FAIR*, 547 U.S. at 65 ("Having rejected the view that the Solomon Amendment impermissibly regulates *speech*, we must still consider whether the expressive nature of the *conduct* regulated by the statute brings that conduct within the First Amendment's protection.").

---

[5] To be sure, a university would face a higher burden attempting to restrict "pure speech" like the images on QEC's hypothetical posterboard, *303 Creative*, 600 U.S. at 587, rather than (as here) expressive conduct, *cf. Johnson*, 491 U.S. at 406 ("The government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word."). But even "words can in some circumstances violate laws directed not against speech but against conduct" and those laws still comport with First Amendment. *R.A.V.*, 505 U.S. at 389. Thus, to the extent a university is regulating conduct in a way that has an incidental effect on speech, the restriction is more likely to survive constitutional review.

*Chiles* is not to the contrary. There Colorado attempted to regulate "talk therapy," *Chiles*, 146 S Ct. at 1025, and "the spoken word is perhaps the quintessential form of protected speech," *id.* at 1023. The Supreme Court rejected Colorado's "effort to recast speech as conduct" because "Ms. Chiles seeks to engage only in speech, and as applied to her the law regulates what she may say." *Id.* But QEC does not "seek[] to engage only in speech," *id.*; instead, it is undisputed that QEC is engaged in conduct it contends is inherently expressive, *see, e.g.*, QEC.Br.29 ("These principles underscore why QEC's performances are inherently expressive conduct protected under the First Amendment."). *Chiles* is therefore inapposite because, unlike here, it did not involve expressive conduct.

*Fourth*, QEC contends (at 35-37) that the Board Resolution's reference to "ideology" targets speech based on viewpoint. Not so. As Appellants explained (at 45-46), after "find[ing]" that "drag show events" would violate university policy and antidiscrimination law, ROA.37, the Board's Resolution then tentatively "acknowledge[s]" that the President has directed that "federal funds shall not be used to promote gender ideology," and explains that using the System's limited public forums to host drag shows "may be considered promotion of gender ideology in violation of the Executive Order and the Governor's directive," ROA.38.

The Board's concern was not dictating a viewpoint about gender but the possible loss of federal funding associated with permitting certain "conduct" in campus limited public forums. *CLS*, 561 U.S. at 696. Its definition of "drag show events" addresses "conduct"—not any message—and its effect on members of the University community. ROA.37. That is why both the Board's Resolution and the

University permit QEC to host other events that might convey messages regarding "gender ideology," ROA.245-46, and protests about drag shows on the university campus, ROA.251-54, 320-26. So Appellants have not "dictate[d] what particular 'opinion or perspective'" QEC "may express." *Contra* QEC.Br.36 (quoting *Chiles*, 146 S. Ct. at 1021). Appellants are regulating "conduct," and they have "draw[n] no distinction between groups based on their message or perspective," *CLS*, 561 U.S. at 694.

### C. Appellants' forum-based restriction is not a prior restraint.

As Appellants explained (at 46-48), the exclusion of *Draggieland* from Rudder Theatre is not a prior restraint that "forbid[s] certain communications when issued in advance." *Cath. Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 437 (5th Cir. 2014) (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993)). In a limited public forum, the prior restraint test asks whether the policy is reasonable and viewpoint neutral. *Freedom From Religion Found., Inc. v. Abbott*, 955 F.3d 417, 429 (5th Cir. 2020). QEC failed to show unreasonableness, *supra* at 14-16, or viewpoint discrimination, *supra* at 16-22.

QEC counters (at 43) that *Southeastern Promotions* "controls the prior restraint question." It does not. First, *Southeastern Promotions* does not account for permissible content-based restrictions in limited public forums developed in later cases like *CLS*. *See Celebrity Attractions, Inc. v. Okla. City Pub. Prop. Auth.*, 660 F. App'x 600, 604 (10th Cir. 2016). Second, *Southeastern Promotions* involved a "municipal theater[]," not a university, 420 U.S. at 555, and a "university differs in

significant respects from public forums such as streets or parks or even *municipal theaters*," *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981) (emphasis added).

If QEC's prior-restraint arguments were correct, moreover, *CLS* would have been a simpler case and come out the other way. Like QEC here, the Court could have pointed to *Healy* and held that Hastings "imposed an unconstitutional prior restraint by denying a student group recognition based on [its] belief that its 'philosophy was antithetical to the school's policies'" (there, CLS's beliefs about marriage). QEC.Br.47 (quoting *Healy v. James* 408 U.S. 169, 175, 184, 194 (1972)). But it did not. Instead, the Supreme Court distinguished *Healy* as a case concerning viewpoint discrimination, without invoking the prior restraint doctrine. *CLS*, 561 U.S. at 694.

## II. The Remaining Preliminary Injunction Factors Support Reversal.

As Appellants demonstrated (at 49-50), QEC also did not show that it is "likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

QEC's irreparable harm arguments (at 64-65) hinge on the merits of its First Amendment claims. They lack merit because Appellants' exclusion of *Draggieland* from Rudder Theatre did not violate QEC's First Amendment rights. *Supra* at 2-23.

On the equities, QEC offers two main points. First, QEC contends (at 65-68) that an injunction would not "disincline universities" from maintaining public forums because universities allegedly did not close public forums after cases like *Widmar*, *Rosenberger*, and *Speech First, Inc. v. Fenves*, 979 F.3d 319 (5th Cir. 2020).

But under QEC's framework (at 54), a university that has opened a forum to a wide range of speech cannot exclude certain conduct because it has necessarily created a designated public forum. And a university cannot change that designation to a limited public forum and exclude certain conduct—even through official policy promulgations—because any changes necessarily depart from past "consistent practice." Under this Catch-22, it would hardly be surprising that a university "might elect not to open such property for any public discourse . . . [in] conflict with the broad First Amendment policy of encouraging public discourse on issues of community interest." *Chiu*, 260 F.3d at 347 (citation omitted).

Second, QEC contends that an injunction would help "preserv[e] public universities as forums for competing ideas." QEC.Br.66. That is wrong. It is undisputed that QEC has been able to express its "ideas" through protests discussing drag, ROA.251-54, and through its many "non-drag performance[s]" in "Texas A&M facilities," ROA.245. But an injunction preventing a university from prohibiting "unwelcome and objectively offensive conduct based on sex" that "mock[s] or objectifi[es] women" through "parody [of] the female body type," ROA.37, would undermine educators' ability to ensure a safe learning environment for women and satisfy their Title IX obligations.

## Conclusion

The Court should reverse the district court's order granting QEC's motion for a preliminary injunction.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

William R. Peterson
Solicitor General

/s/ William F. Cole
William F. Cole
Principal Deputy Solicitor General
William.Cole@oag.texas.gov

Christopher J. Pavlinec
Assistant Attorney General

*Counsel for Defendants-Appellants*

## Certificate of Compliance

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,497 words, excluding the parts of the brief exempted by Rule 32(f) and Fifth Circuit Rule 32.2, according to the word count of Microsoft Word. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Equity font.

/s/ William F. Cole
William F. Cole