**No. 25-20108**

**IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**

TEXAS A&M QUEER EMPOWERMENT COUNCIL

*Plaintiff-Appellee,*

v.

WILLIAM MAHOMES, ET AL.

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Southern District of Texas, Houston Division, No. 4:25-992,
Hon. Lee H. Rosenthal, U.S. District Judge

# EN BANC BRIEF OF THE AMERICAN CIVIL LIBERTIES UNION OF TEXAS AND EQUALITY TEXAS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF-APPELLEE

***Counsel for*** **Amici Curiae ACLU of Texas and Equality Texas**

Brian Klosterboer
Charelle Lett
Chloe Kempf
Thomas Buser-Clancy
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF TEXAS
P.O. Box 8306
Houston, TX 77288
(346) 299-6811
bklosterboer@aclutx.org

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

**Case Number and Style**: 25-20108, *Texas A&M Queer Empowerment Council v. Mahomes*

The undersigned counsel of record adopts Plaintiff-Appellee's certificate of interested persons and supplements it to certify that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**1. *Amici-Curiae***

ACLU of Texas
Equality Texas

**2. Counsel for *All Amici-Curiae***

Brian Klosterboer
Charelle Lett
Chloe Kempf
Thomas Buser-Clancy

Respectfully,

*/s/ Brian Klosterboer*
Brian Klosterboer
*Counsel of Record for all*
Amici Curiae

# TABLE OF CONTENTS


INTEREST OF *AMICI CURIAE* .......... 1

INTRODUCTION .......... 2

ARGUMENT .......... 5

I. Drag Shows Must Be Analyzed Under the Same Standards as Other Live Performances .......... 5

II. Drag Shows Need Not Articulate a Single, Discernible Message to Be Subject to the First Amendment .......... 12

III. The Resolution's Own Text Confirms That Drag Is Expressive and That the Board Banned It Based on Viewpoint .......... 16

IV. The Board Is Not Alone in Targeting Drag Shows .......... 18

V. Drag Has a Rich History and Is Deeply Important to the LGBTQ+ Community .......... 21

A. Drag Has Existed for as Long as Theater Itself .......... 21

B. Drag in Texas Has a Rich History .......... 23

C. Appellants' Attempts to Distinguish this History Fail .......... 29

VI. Drag Is Neither Demeaning to Women Nor Inherently Sexual—and Even If It Were, the First Amendment Would Still Protect It .......... 28

CONCLUSION .......... 31

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) ....................3, 14

*Ashcroft v. Free Speech Coalition*,
535 U.S. 234 (2002) ....................6

*City of Dallas v. Stanglin*,
490 U.S. 19 (1989) ....................10, 11

*Dunagin v. City of Oxford*,
718 F.2d 738 (5th Cir. 1983) (en banc) ....................27

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975) ....................30

*Friends of George's, Inc. v. Mulroy*,
108 F.4th 431 (6th Cir. 2024) ....................20

*Green v. Miss United States of America, LLC*,
52 F.4th 773 (9th Cir. 2022) ....................9

*Healy v. James*,
408 U.S. 169 (1972) ....................5

*HM Fla.-ORL, LLC v. Governor of Florida*,
No. 23-12160, 2026 WL 2235960 (11th Cir. Aug. 4, 2026) (en banc) ....................20

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
515 U.S. 557 (1995) ....................3, 14

*Imperial Sovereign Court of Montana v. Knudsen*,
170 F.4th 820 (9th Cir. 2026) ....................20

*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason University*,
993 F.2d 386 (4th Cir. 1993) ............................................................17, 29

*Joseph Burstyn, Inc. v. Wilson*,
343 U.S. 495 (1952) ........................................................................ 17, 18

*Lichtenstein v. Hargett*,
83 F.4th 575 (6th Cir. 2023)...................................................................... 11

*Lockhart v. McCree*,
476 U.S. 162 (1986) ........................................................................ 27, 28

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,
584 U.S. 617 (2018) ..............................................................................12

*Matal v. Tam*,
582 U.S. 218 (2017) ............................................................................... 5

*Naples Pride, Inc. v. City of Naples*,
No. 2:25-cv-291, 2025 WL 1370174 (M.D. Fla. May 12, 2025)...............30

*Norma Kristie, Inc. v. City of Oklahoma City*,
572 F. Supp. 88 (W.D. Okla. 1983).........................................................28

*Robinson v. Hunt County*,
921 F.3d 440 (5th Cir. 2019).................................................................. 18

*Roth v. United States*,
354 U.S. 476 (1957)................................................................................. 6

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
547 U.S. 47 (2006).................................................................................15

*Sable Communications of California, Inc. v. FCC*,
492 U.S. 115 (1989) ...............................................................................30

*Schacht v. United States*,
398 U.S. 58 (1970) .................................................................................. 7

*Schad v. Borough of Mount Ephraim*,
452 U.S. 61 (1981)...........................................................................3, 7, 12

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ........ 10

*Southeastern Promotions, Ltd. v. Conrad*,
420 U.S. 546 (1975) ........ 7, 27

*Spectrum WT v. Wendler*,
816 F. Supp. 3d 648 (N.D. Tex. 2026) ........ 2, 19, 26

*Spence v. Washington*,
418 U.S. 405 (1974) ........ 12, 13, 14

*Texas A&M Queer Empowerment Council v. Mahomes*,
772 F. Supp. 3d 792 (S.D. Tex. 2025) ........ passim

*Texas v. Johnson*,
491 U.S. 397 (1989) ........ 12, 13, 21

*United States v. O'Brien*,
391 U.S. 367 (1968) ........ 15

*Whitney v. California*,
274 U.S. 357 (1927) ........ 30

*Woodlands Pride, Inc. v. Paxton*,
168 F.4th 293 (5th Cir. 2026) ........ 2, 19, 30

**Rules**

Fed. R. App. P. 29 ........ 1

5th Cir. R. 29.2 ........ 1, 2

**Other Authorities**

Brief of ACLU of Texas & Equality Texas as Amici Curiae, *Spectrum WT v. Wendler*, No. 23-10994, 2025 WL 3540028 (5th Cir. Dec. 3, 2025) ........ 2, 26

Benji Hart & Michael Roberson, *The Ballroom Scene Has Long Offered Radical Freedoms For Black and Brown Queer People. Today, That Matters More Than Ever*, TIME (Feb. 26, 2021) ........ 23

Cari Shane, *The First Self-Proclaimed Drag Queen Was a Formerly Enslaved Man*, Smithsonian Magazine (June 9, 2023) .......... 22

*Covering Anti-Drag Legislation*, Ass'n of LGBTQ+ Journalists (June 19, 2025) .......... 20

Emily Martin, *From police raids to pop culture: The early history of modern drag*, National Geographic (June 2, 2023) .......... 22, 23

*The fabulous history of drag*, BBC Bitesize (May 2019) .......... 21

Greg Abbott (@GregAbbott_TX), Twitter (June 24, 2023) .......... 19

Hugh Ryan, *How Dressing in Drag Was Labeled a Crime in the 20th Century*, History Channel (Sept. 14, 2023) .......... 24

Jennifer Wilber, *Gender Roles and Gender Relations in Shakespeare's "Twelfth Night"*, HubPages (Oct. 29, 2023) .......... 21

Kiana Shelton, *The Joy of Drag*, Psychiatric Times (June 29, 2022) .......... 6

Lauren McGaughy, *A brief history of drag queens in Texas*, The Dallas Morning News (Oct. 28, 2022) .......... 24

Pien Pullens & Anick Vollebergh, *'Work!' Ballroom Discipline, Faking, and the Production of Queer Freedom*, 25 Tijdschrift voor Genderstudies 318 (2022) .......... 8

Robert Downen, *How Texas activists turned drag events into fodder for outrage*, Texas Tribune (Feb. 24, 2023) .......... 26

Scottie Andrew, *The US has a rich drag history. Here's why the art form will likely outlast attempts to restrict it*, CNN (Apr. 29, 2023) .......... 8

Statement on the Adoption of Conference Committee Report for Senate Bill 12, Lieutenant Governor Dan Patrick (May 28, 2023) .......... 19

Steve Ramos & David Taffet, *Drag queens pulled us through, one dollar at a time*, Dallas Voice (Apr. 25, 2014) .......... 25

Todd Camp, *Fort Worth LGBT Community*, Texas State Historical Ass'n (May 12, 2021) ........ 25

Vienna J. Ainsworth, *Legalizing Homophobia*, 88 Alb. L. Rev. 643 (2025) ........ 29

*What Does LGBTQ+ Stand For?*, The Annie E. Casey Foundation ........ 1

## INTEREST OF *AMICI CURIAE*[1]

The American Civil Liberties Union of Texas ("ACLU of Texas") is a nonpartisan, nonprofit organization with thousands of members and supporters across the State. The ACLU of Texas works with communities, at the State Capitol, and in the courts to fulfill the promises of the Constitution for every Texan, no exceptions. From Amarillo to Brownsville and Beaumont to El Paso, we believe in a Texas that works for all of us—a Texas where each person has an equal say in the decisions that shape our future and everyone can build a good life. The ACLU of Texas has particular expertise in the First Amendment and a longstanding interest in guarding against government censorship of free expression and ideas.

Equality Texas engages, educates, and undertakes policy advocacy to secure full equality for LGBTQ+ Texans.[2] In addition to advocating to protect all forms of gender expression, Equality Texas is committed to defending safe spaces for LGBTQ+ Texans. Drag performances have also helped raise funds

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amici curiae*, their members, or their counsel, made any monetary contribution. *See* Fed. R. App. P. 29(a)(4)(E), (b)(4); 5th Cir. R. 29.2.

[2] LGBTQ+ is an umbrella term that includes people "who identify as lesbian, gay, bisexual, transgender, queer or questioning, with the plus sign representing other identities." *What Does LGBTQ+ Stand For?*, The Annie E. Casey Foundation, https://www.aecf.org/blog/lgbtq-definitions#LGBTQ (last visited Aug, 24, 2026).

to support the work that Equality Texas does on behalf of the LGBTQ+ community in Texas.

*Amici* bring to this appeal experience the parties' briefs do not. The ACLU of Texas represents the plaintiffs challenging Texas Senate Bill 12, the State's 2023 drag-performance law, in *Woodlands Pride, Inc. v. Paxton*, 168 F.4th 293 (5th Cir. 2026), and both *Amici* submitted a brief in *Spectrum WT v. Wendler*, No. 26-10127, which Appellants here specifically address. Appellants' Br. 23. Equality Texas has tracked every drag-related bill filed in the Texas Legislature and routinely attends and supports drag events across the state. Consistent with Fifth Circuit Rule 29.2, this brief supplies historical, artistic, and statewide context that the parties do not address.

## INTRODUCTION

Drag is a form of artistic and creative expression that is deeply rooted in our country's culture and tradition. Like theater, ballet, or abstract art, drag shows have a rich history, are inherently expressive, and are subject to constitutional protection. The First Amendment gives the performing arts breathing room, requiring officials to satisfy strict scrutiny when they suppress viewpoints in any forum or content in a designated public forum, and imposing mandatory safeguards before any prior restraint. Those

guardrails keep public universities robust marketplaces of ideas rather than places where officials may wantonly proscribe genres they dislike.

The district court held that Draggieland—the annual, ticketed, student-funded drag pageant staged by the Texas A&M Queer Empowerment Council ("QEC")—is protected expression, and that the Texas A&M Board of Regents ("Board")'s categorical ban on drag performances in campus event venues is a viewpoint-based prior restraint. *Texas A&M Queer Empowerment Council v. Mahomes*, 772 F. Supp. 3d 792, 802-07 (S.D. Tex. 2025). That holding is faithful to Supreme Court precedent and to the nature, context, and history of drag performance.

Appellants ask this Court to hold otherwise by insisting that a costumed, choreographed, rehearsed, ticketed stage production in a 750-seat theatre is not expression at all. The Supreme Court has steadfastly refused to require a "particularized message" for works like musicals, websites, or parades, finding them inherently expressive by nature. *See, e.g.*, *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995); *303 Creative LLC v. Elenis*, 600 U.S. 570, 588 (2023). The staging of drag performances is analytically indistinguishable from other performance art and should be treated the same under the First Amendment.

No one disputes that campus officials could discipline a performer after the fact for violating reasonable, viewpoint-neutral campus rules. But the Board went far beyond that. It banned ***all*** drag shows in every System event venue—***before*** any speech occurred—regardless of the shows' specifics and even for performances entirely staged before adults. *Mahomes*, 772 F. Supp. 3d at 799, 801. Draggieland had been staged in Rudder Theatre for five consecutive years, had been approved again by university officials nearly six months before the show date, and sold 168 tickets before the Board cancelled it sight unseen. *Id.* at 798-99. As the district court rightly found, "[t]he QEC has shown that the ban is a prior restraint by establishing that the ban is [a] viewpoint-based prohibition on expressive conduct imposed before it takes place, in a forum that is designated for a wide range of speech and conduct." *Id.* at 807.

The Board's rationale for categorically banning drag at Special Event Venues confirms that it treats the entire genre as conveying viewpoints it dislikes. The Board deemed drag shows that "parody the female body type" and "demean[] women" "inconsistent with the System's mission and core values." *Id.* at 804-05 (quotations omitted). As *Amici* explain in this brief, drag shows are not inherently demeaning to women and instead help to liberate all people from restrictive gender norms. *See infra* Section VI. But

even if the Board were correct in its animosity towards drag, QEC's performance would be no less shielded, for the Constitution does not permit government officials to censor viewpoints even if they find them "offensive," *Matal v. Tam*, 582 U.S. 218, 243 (2017), or "abhorrent," *Healy v. James*, 408 U.S. 169, 187 (1972). And far from lacking serious value, drag has a deep history as a source of joy and expression for LGBTQ+ Texans. Under any level of scrutiny, the Board cannot completely ban this art form at Texas A&M's Special Event Venues without violating the First Amendment. The preliminary injunction should be affirmed.

## ARGUMENT

Like other live performances, such as theater, opera, or modern dance, drag shows are inherently expressive and cannot be reduced to pure conduct. Although the Board misconstrues the history and meaning of drag, it plainly understands—and disapproves of—the gender-related messages drag conveys. Barring an entire genre of performance from university event venues is a quintessential example of viewpoint discrimination and prior restraint that the Constitution does not permit.

### I. Drag Shows Must Be Analyzed Under the Same Standards as Other Live Performances

Drag is not materially different from other types of performance art. Drag "is loosely defined as performing in an exaggerated way that caricatures

or challenges male or female stereotypes," through "bold costumes, makeup, and characters."[3] "At its core, drag is a creative act—a powerful and personal form of self-expression"[4]—which one could equally say of the symphony, modern dance, or abstract art.

Instead of assessing Draggieland as a whole, Appellants try to separate the performers' routines from their spoken words and evaluate each in isolation. Appellants' Br. 23–24. But the Supreme Court has squarely rejected that approach, since judging works "by the effect of isolated passages upon the most susceptible persons[] might well encompass material legitimately treating with sex" and "must be rejected as unconstitutionally restrictive of the freedoms of speech and press." *Roth v. United States*, 354 U.S. 476, 489 (1957); *see also Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 248 (2002) (explaining that performance art must be "judged by considering the work as a whole . . . even though the scene in isolation might be offensive").

Under Appellants' theory, each aspect of performance art could be picked apart, analyzed separately, and reduced to pure conduct divorced

---

3 Kiana Shelton, *The Joy of Drag*, PSYCHIATRIC TIMES (June 29, 2022), https://www.psychiatrictimes.com/view/the-joy-of-drag.

4 *Id.*

from any expressive message. A kiss in *Romeo and Juliet* could be viewed as a sexual act with no inherent message; a violinist drawing a bow across a string as conduct conveying nothing at all. But when performers take to the stage before an audience—as QEC has done for five straight years—the interrelated aspects of their performance, through song, dance, gestures, costumes, makeup, and the spoken word, are meant to express and connect with the audience. It does not matter whether a performance is "crude and amateurish," *Schacht v. United States*, 398 U.S. 58, 61-62 (1970), or whether the work is so abstract that the audience discerns no message at all. Live performances are inherently expressive and subject to the First Amendment.

As the Supreme Court has explained, "live entertainment, such as musical and dramatic works fall within the First Amendment guarantee." *Schad*, 452 U.S. at 65. Drag shows, like other live entertainment, "frequently mix[] speech"—"the acting out—or singing out—of the written word"—with "live action or conduct." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557–58 (1975).

Appellants try to distinguish this binding precedent by insisting that "nothing in the record indicates that Draggieland would involve 'the acting out—or singing out—of the written word,' so there is no reason to equate it to musical theater or 'live drama.'" Appellants' Br. 25; *see also id.* at 23–24.

The record says otherwise, and so does the art form. Draggieland performers audition, rehearse twice, assume stage personas, and coordinate costumes, makeup, hairstyles, music, lighting, and choreography before performing to song. ROA.17–18 ¶¶ 41–53. Contrary to Appellants' unsupported assertions, drag shows ***do*** contain the acting out of the written and spoken word: they often include singing, dancing, lip-synching, comedy, and verbal remarks.[5]

Appellants seem to suggest that only a highly scripted "acting out—or singing out—of the written word" finds constitutional shelter, like a Shakespeare play or *Oklahoma!* Although drag shows ***do*** often involve "highly scripted and codified movements and aesthetics,"[6] like a play or musical, they also sometimes involve improvisation and extemporaneous moments—like when the Draggieland host asks performers what drag and LGBTQ+ culture mean to them. *See* ROA.17 ¶ 47. While Appellants concede that ***this*** extemporaneous speaking is fully shielded by the First Amendment, *see* Appellants' Br. 24, they somehow imply that the dance

---

5 *See* Scottie Andrew, *The US has a rich drag history. Here's why the art form will likely outlast attempts to restrict it*, CNN (April 29, 2023), https://www.cnn.com/style/article/drag-queen-us-history-explainer-cec/index.html.

6 Pien Pullens & Anick Vollebergh, *'Work!' Ballroom Discipline, Faking, and the Production of Queer Freedom*, 25 Tijdschrift voor Genderstudies 318 (2022), https://www.aup-online.com/content/journals/10.5117/TVGN2022.4.003.PULL.

routines, songs, and choreography that contestants practice and rehearse before performing for a live audience are not scripted enough to be expressive. But Draggieland contestants clearly seek to express themselves when performing, regardless of whether their performance is entirely scripted or partly extemporaneous. Requiring a written script for constitutional shelter would expose all improvised comedy, theater, and dance contests—and nearly the entirety of jazz and other music genres—to unbridled government censorship.

Draggieland is, more specifically, a pageant. Competitors audition, are scored by appointed judges, and compete for the title of "Queen" or "King of Draggieland." ROA.17 ¶¶ 40–45; ROA.21 ¶ 77. Appellants themselves concede that pageants are inherently expressive, citing *Green v. Miss U.S. of America, LLC* for the proposition that "beauty pageants are generally designed to express the 'ideal vision of American womanhood.'" Appellants' Br. 23 (quoting 52 F.4th 773, 780 (9th Cir. 2022)). That concession is fatal to their position. A pageant does not shed its expressive character because its vision of womanhood is one the Board dislikes. And Rudder Theatre already hosts the "Miss Black & Gold" pageant without objection or worries about potential harms to women. *See* ROA.16 ¶ 38(b).

Appellants further claim that a "stage, lighting, sound, choreography, makeup, and costume[s]" are "part of any stage performance" and so signal nothing. Appellants' Br. 21–22. But these elements mark a performance as a performance, which is why they cannot be freely censored by the government. Claiming that stage lighting and choreography are constitutionally inert would mean that *Hair*, *Hadestown*, or *The Nutcracker* could all be shut down if the government orders the lights turned off or makeup and costumes removed. But "[l]awmakers may no more silence unwanted speech by burdening its utterance than by censoring its content." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011). Permitting the government to forbid the constituent components of drag shows therefore censors the medium itself and silences the views QEC seeks to express.

Appellants' reliance on *City of Dallas v. Stanglin*, *see* Appellants' Br. 21 (citing 490 U.S. 19, 25 (1989)), for the proposition that viewers of Draggieland might not understand its messages of support for the LGBTQ+ community or challenging gender norms, is also misplaced. As discussed below, *see infra* Section II, QEC does not need to establish that its shows convey any particularized message to receive shelter under the First Amendment. Even if that were required, attendees of events hosted by the "Queer Empowerment Council" would almost certainly infer a message of

support for the LGBTQ+ community, and it is undisputed that Draggieland performers "[f]requently, but not always" dress "[in] contrast to their expected gender presentation" while "express[ing] challenges to societal norms (including norms relating to gender and sexuality), and educat[ing] the broader university community about LGBTQ+ culture." ROA.12, 17, 20.

*Stanglin* involved teenagers going to a dance hall to "engage in recreational dancing"—patrons amusing themselves, with no performers, no audience, no script, and nothing staged for anyone to watch. 490 U.S. at 24-25. Draggieland is the opposite: auditioned and rehearsed performers, in costume, before a ticketed audience that came to watch them. The distinction between dancing recreationally for oneself and performing for others plainly places Draggieland on the protected side of the line.

Nor does *Lichtenstein v. Hargett* aid Appellants. *See* Appellants' Br. 21, 24, 25 (citing 83 F.4th 575, 594 (6th Cir. 2023)). First, *Lichtenstein* "opt[ed] not to settle these legal questions" about whether the plaintiffs' conduct was expressive, instead deciding the case on other grounds. *Id.* at 596. Second, *Lichtenstein* concerned a paid consultant's assistance in filling out absentee-ballot applications—clerical activity that required speech explaining it. *Id.* at 594. The Sixth Circuit's observation that "a viewer must be able to understand the message from the conduct alone," *id.*, poses no

obstacle here: a viewer watching costumed performers dance under stage lights before a ticketed audience understands that a performance is underway.

The district court therefore correctly concluded that drag is expressive and protected like other performance art.

## II. Drag Shows Need Not Articulate a Single, Discernible Message to Be Subject to the First Amendment

Appellants incorrectly assert that QEC must establish that each of its performances demonstrate "'[a]n intent to convey a particularized message was present, and . . . the likelihood was great that the message would be understood by those who viewed it.'" Appellants' Br. 25 (citing *Texas v. Johnson*, 491 U.S. 397, 404 (1989)). The Supreme Court has never applied this test to live performances, which are inherently expressive by their very nature. *See, e.g.*, *Schad*, 452 U.S. at 65. Instead, this test only applies to instances of conduct, such as "burning the American flag, flying an upside-down American flag with a taped-on peace sign, wearing a military uniform, wearing a black armband, conducting a silent sit-in, refusing to salute the American flag, and flying a plain red flag." *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 584 U.S. 617, 657 (2018) (Thomas, J., concurring).

Tellingly, Appellants cite no case applying the *Johnson-Spence* test to a play, musical, concert, ballet, or any other work staged for an audience.

Every example on the list above—and that Appellants cite in their brief, Appellants' Br. 18—concerns an ordinary act that acquires expressive meaning only from the circumstances surrounding it. That is precisely why the *Johnson-Spence* inquiry was needed in those cases: without context, a court could not tell expression from conduct. A staged pageant requires no such inquiry. It is inherently, and obviously, a performance.

Even assuming that an entire drag show could be reduced to pure conduct akin to flag burning, Appellants distort rule language from *Texas v. Johnson*, which asked whether the "conduct [of flag burning] possesses sufficient communicative elements to bring the First Amendment into play." 491 U.S. at 404. There, the Supreme Court noted that it had previously "asked whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Id.* (quoting *Spence v. Washington*, 418 U.S. 405, 411 (1974)). This quote comes from dicta in *Spence* that did not establish a rule that all expressive activities must convey a "particularized message." *Id.* at 410-11. While *Spence*'s observation about the flag display before it was instructive for when acts of pure conduct might be considered inherently expressive, neither *Spence* nor *Johnson* created a categorical rule

that every type of expression requires a "particularized message" that "would be understood by those who viewed it."

In *Hurley*, the Supreme Court expressly rejected this interpretation of *Spence* by holding that "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll." 515 U.S. at 569 (citation omitted). The Court thus held that a parade containing "multifarious voices" and no "exact message" was still fully shielded by the First Amendment. *Id.* In *303 Creative LLC v. Elenis*, the Supreme Court reaffirmed *Hurley*, explaining that a speaker "does not forfeit constitutional protection simply by combining multifarious voices" in a single communication. 600 U.S. 570, 588 (2023) (quoting *Hurley,* 515 U. S. at 569).

Appellants themselves acknowledge that "drag show[s], in general, could communicate a multiplicity of messages." Appellants' Br. 23. But this does not make Draggieland any less shielded by the First Amendment, since a show conveying "multifarious voices" is the paradigmatic example that *Hurley* and *303 Creative* protect. 515 U.S. at 569; 600 U.S. at 588.

Appellants' reliance on *United States v. O'Brien*, see Appellants' Br. 19, is misguided because *O'Brien* assumed that "the alleged communicative element [of burning a draft card] is sufficient to bring into play the First Amendment." 391 U.S. 367, 376 (1968). *FAIR* is not to the contrary: excluding military recruiters was not inherently expressive because "[t]he expressive component of a law school's actions is not created by the conduct itself but by the speech that accompanies it." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 65 (2006). In contrast, when drag artists take the stage, no explanation is needed to know that they are performing. Strip Draggieland of every spoken word and it would remain expressive—as a symphony is expressive without lyrics, and a ballet without dialogue. The host's interviews do not create Draggieland's expressive nature; they make it plainer still. That is the opposite of *FAIR*, where the law schools' empty rooms said nothing at all until speech was added. *See* 547 U.S. at 66.

Critically, Appellants also concede that Draggieland performers' conversations with the host are protected speech. Appellants' Br. 24. Yet the Board did not permit those conversations to continue. Instead, the university cancelled ***all*** of Draggieland outright, including the spoken word portion that Appellants now admit is constitutionally protected. *Id.*; ROA.23 ¶ 90. Shutting down the entire event, including its protected speech, is neither

"reasonable" nor the least restrictive means of achieving the Board's aims—even if those aims were permissible. And the government cannot claim that QEC's spoken words are merely explanatory and add nothing to the expressive nature of its performances when the government admits to censoring those same spoken words. While the Board now tries to bifurcate QEC's speech into what it views as protected and unprotected, it censored the entirety of Draggieland because it disagreed with the messages that it perceived the entire event to convey.

## III. The Resolution's Own Text Confirms That Drag Is Expressive and That the Board Banned It Based on Viewpoint

Even if QEC were required to show that its performances convey a particularized message that the audience would understand—an erroneous test—it would still prevail, because the Board banned drag from campus event venues precisely because it understands drag to challenge gender norms in ways it dislikes.

The Resolution says so on its face. It bars performances involving "exaggerated female make up and/or exaggerated prosthetics meant to parody the female body type"; it finds that such events "involve the mockery or objectification of women"; and it warns that hosting them "may be considered promotion of gender ideology." *Mahomes*, 772 F. Supp. 3d at 799.

Parody, mockery, and promotion are not descriptors of inert conduct. They are terms of communication. As the district court put it, "[t]he Board cannot assert both that the performance promotes an ideology and that it is not expressive conduct." *Id.* at 802.

The Fourth Circuit confronted this same contradiction in *Iota Xi*. University officials there maintained that an "ugly woman contest"—in which fraternity members appeared in women's clothing and blackface—was not expression, while condemning it for the racist and sexist message it communicated. The court called that position "self-defeating," because the University's own reading of the skit showed it was "intended to convey a message." *IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 392 (4th Cir. 1993). Appellants cite *Iota Xi* for the proposition that cross-dressing does not necessarily convey a pro-LGBTQ+ message, Appellants' Br. 22, but the decision they cite held that the cross-dressing skit ***was*** protected expression. *Id.* at 393.[7]

---

[7] Similarly, Appellants insinuate that Ronald Reagan's movie *This Is the Army* is not shielded by the First Amendment because actors engaged in cross-dressing. *See* Appellants' Br. 22. In fact, the United States Army itself produced the Broadway revue on which the film is based. Appellants explicitly name a message of the film—Army recruitment—and cite no case law suggesting that the film or the cross-dressing within it could be censored without meeting exacting constitutional scrutiny. *See Joseph Burstyn, Inc.*

The Resolution's asymmetry confirms the point. By its terms, it targets only "biological males dressing in women's clothing." *Mahomes*, 772 F. Supp. 3d at 799. Women who perform in men's clothing—drag kings—are untouched, as is any "parody" of the male body type. QEC's pageant crowns both a "Queen" and a "King of Draggieland," ROA.17 ¶¶ 40-45; ROA.21 ¶ 77, yet Appellants cancelled the entire event, including performances by drag kings that the Board did not seem to proscribe. A rule that permits students to mock men but forbids them from mocking women is not a neutral regulation of conduct. It is a judgment about which messages about gender may be expressed on campus. *See Robinson v. Hunt County*, 921 F.3d 440, 447 (5th Cir. 2019) ("Official censorship based on a state actor's subjective judgment that the content of protected speech is offensive or inappropriate is viewpoint discrimination.").

## IV. The Board Is Not Alone in Targeting Drag Shows

The Board's Resolution was also not written in a vacuum, nor based on a reasonable or viewpoint-neutral application of campus policies. President Walter Wendler barred drag from West Texas A&M University

---

*v. Wilson*, 343 U.S. 495, 501 (1952) (holding that even films for entertainment are fully shielded by the First Amendment because they "may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression").

("WTAMU")—another campus in this same System—for similar reasons the Board gives here, and that case is before this Court alongside this one. Wendler had previously permitted students to stage drag shows at WTAMU in 2019. *See Spectrum WT v. Wendler*, 816 F. Supp. 3d 648, 659 (N.D. Tex. 2026). But in 2023, he reversed course and prohibited drag shows entirely.

This timing tracks a wave of official action against drag across Texas and beyond. Two months before Wendler issued his proclamation, Lieutenant Governor Dan Patrick introduced a bill in the Texas Senate to "push back against the radical left's disgusting drag performances."[8] When signing that bill into law several months later, Governor Greg Abbott declared: "Texas Governor Signs Law Banning Drag Performances in Public. That's Right."[9] Senate Bill 12 remains in litigation,[10] and Arkansas,

---

[8] *Statement On The Adoption Of Conference Committee Report For Senate Bill 12, Banning Children's Exposure To Drag Shows*, LIEUTENANT GOVERNOR OF TEX. DAN PATRICK (May 28, 2023), https://www.ltgov.texas.gov/2023/05/28/statement-on-the-adoption-of-conference-committee-report-for-senate-bill-12-banning-childrens-exposure-to-drag-shows/.

[9] Greg Abbott (@GregAbbott_TX), TWITTER (June 24, 2023, 11:03 PM), https://twitter.com/gregabbott_tx/status/1672817859729162240?s=12&t=PdsS2XI_vKHecU3T2VPeyw.

[10] The Fifth Circuit recently vacated the permanent injunction that had blocked this law since September 2023 without identifying any error in the district court's core First Amendment holdings. *Woodlands Pride v. Paxton*,

Tennessee, Florida, and Montana enacted similar laws in 2023.[11] These laws have been enjoined, narrowly construed, or remain in litigation.[12]

Nor may the Board find shelter behind the federal executive order it invokes. As the district court correctly held, executive orders and statewide directives remain subject to constitutional scrutiny and cannot direct state actors to engage in viewpoint discrimination. *Mahomes*, 772 F. Supp. 3d at 806. Political winds do not authorize censorship or the abandonment of First Amendment principles.

---

168 F.4th 293, 308 (5th Cir. 2026). Instead, the court remanded with instructions to conduct further legal analysis of plaintiffs' facial challenges to the law, and the parties submitted supplemental briefing to the district court on July 14, 2026.

[11] *Covering Anti-Drag Legislation*, Ass'n of LGBTQ+ Journalists (June 19, 2025), https://www.nlgja.org/blog/2025/06/covering-anti-drag-legislation/.

[12] *See, e.g.*, *Imperial Sovereign Ct. of Montana v. Knudsen*, 170 F.4th 820, 832 (9th Cir. 2026) (affirming a preliminary injunction against a Montana law that banned "drag story hours" and other drag shows under the guise of "sexually oriented performances"); HM Fla.-ORL, LLC v. Governor of Fla., No. 23-12160, 2026 WL 2235960, at *7 (11th Cir. Aug. 4, 2026) (en banc) (holding that Florida's law implicating drag shows was limited to shows obscene for minors and not vague based on authoritative interpretation of terms from Florida state courts); *Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 440 (6th Cir. 2024) (adopting Tennessee courts' narrowing construction of a law targeting drag shows—requiring works to be judged as a whole from the perspective of a "reasonable 17-year-old"—while holding the challenger lacked standing).

## V. Drag Has a Rich History and Is Deeply Important to the LGBTQ+ Community

Appellants concede that "the context in which" alleged "conduct 'occurred' is key." Appellants' Br. 19 (quoting *Johnson*, 491 U.S. at 405). Here, the historical and political context of drag artistry independently strengthens its First Amendment protection, since drag has long been a source of joy, liberation, and economic empowerment for the LGBTQ+ community.

### A. Drag Has Existed for as Long as Theater Itself

Subverting and challenging gender roles has been a key element of live performance since the days of Shakespeare, when the Church of England allowed only men to perform on stage.[13] Some of Shakespeare's famous works wrote gender-bending roles into the script, including *As You Like It* and *Twelfth Night*.[14] Similar roles have existed for millennia in China, India, and Greece.

---

13 *The fabulous history of drag*, BBC BITESIZE (May 2019), https://www.bbc.co.uk/bitesize/articles/zbkmkmn.

14 Jennifer Wilber, *Gender Roles and Gender Relations in Shakespeare's "Twelfth Night"*, HUBPAGES (Oct. 29, 2023), https://discover.hubpages.com/literature/Gender-Roles-and-Gender-Relations-in-Shakespeares-Twelfth-Night.

In 1860s Victorian England, Ernest Boulton became the first person to describe his cross-dressing stage routine as drag.[15] Around the same time, a formerly enslaved person in Washington, D.C., named William Dorsey Swann, became the first self-proclaimed "queen of drag."[16] In the late 1880s, Swann was repeatedly arrested for throwing parties where guests dressed in gowns and danced together.[17] Newspapers said Swann's guests likely competed in a cakewalk, a dance resembling voguing that enslaved people invented to mimic plantation owners.[18]

These traditions live on in the LGBTQ+ community today. By the early 1900s, Black and Brown drag artists in Harlem hosted competitions that became some of the most popular social events in New York City.[19] At the same time, Vaudeville theater was popular across the country; and one of the

---

15 Emily Martin, *From police raids to pop culture: The early history of modern drag*, NATIONAL GEOGRAPHIC (June 2, 2023), https://www.nationalgeographic.com/history/article/drag-queen-drag-balls-early-history-pop-culture.

16 Cari Shane, *The First Self-Proclaimed Drag Queen Was a Formerly Enslaved Man*, SMITHSONIAN MAGAZINE (June 9, 2023), https://www.smithsonianmag.com/history/the-first-self-proclaimed-drag-queen-was-a-formerly-enslaved-man-180982311/.

17 *Id.*

18 *Id.*

19 *Id.*

country's first movie stars, Julian Eltinge, was a renowned female impersonator.[20]

Although Vaudeville eventually lost its appeal, the art of drag endured, particularly among drag performers who were Black, Brown, and LGBTQ+.[21] These artists used drag as a form of self-expression and liberation amidst overlapping discrimination, stigma, and oppression.[22] Excluded from much of society because of race, gender identity, and sexual orientation, Black and Brown drag artists hosted drag pageants that ignited a vibrant "House Ballroom" scene.[23] For decades, these drag ballrooms served as a refuge and epicenter for the LGBTQ+ community, and their artistry achieved worldwide acclaim.[24]

### B. Drag in Texas Has a Rich History

Drag has as long a history in Texas as it does across the country. In the late 19th century, female impersonators got top billing at the Texas State

---

[20] *Supra* note 15.

[21] *Id.*

[22] Benji Hart and Michael Roberson, *The Ballroom Scene Has Long Offered Radical Freedoms For Black and Brown Queer People. Today, That Matters More Than Ever*, TIME (Feb. 26, 2021), https://time.com/5941822/ballroom-voguing-queer-black-culture-renaissance/.

[23] *Id.*

[24] *Supra* note 15.

Fair.[25] Drag shows grew in popularity during Prohibition, when underground clubs drew large audiences to LGBTQ+ performers, but popularity did not stop law enforcement from targeting drag artists.[26] In the mid-1930s, a San Antonio club was raided and seven drag performers arrested.[27] In 1938, a Houston drag show venue was set on fire just after a grand jury decided to look into its "type of entertainment."[28]

Backlash intensified after World War II, when same-sex relations were criminalized and heavily policed.[29] Drag shows in the LGBTQ+ community were often forced underground and raided by police, who relied on local cross-dressing bans to surveil, target, and arrest drag performers and LGBTQ+ Texans.[30] In 1973, seven drag performers were arrested and charged in Fort Worth under a city ordinance that made it illegal for anyone

---

[25] Lauren McGaughy, *A brief history of drag queens in Texas*, THE DALLAS MORNING NEWS (Oct. 28, 2022), https://www.dallasnews.com/news/politics/2022/10/28/a-brief-history-of-drag-queens-in-texas/.

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *See* Hugh Ryan, *How Dressing in Drag Was Labeled a Crime in the 20th Century*, HISTORY CHANNEL (Sept. 14, 2023), https://www.history.com/news/stonewall-riots-lgbtq-drag-three-article-rule.

[30] *Id.*

to wear clothing "in a dress not belonging to his or her sex."[31] The charges were dismissed, and the city ordinance was ultimately overturned.[32]

By the 1980s, drag artists could perform with less risk of arrest, and they took to the stage "[i]n almost every gay bar in Texas" to raise money for those losing their lives to AIDS.[33] As the *Dallas Voice* remembered:

> [T]he drag queens looked out across a ravaged community and sang for dollars. One dollar became 10. The 10 dollars became a thousand, and the thousand dollars became millions. On that foundation, . . . [t]he sick and the dying had a place to get medical help, food, a place to live and a place to rest.[34]

Still today, drag performances serve as a form of free expression, a source of joy and liberation, and an engine of economic empowerment for Texas's LGBTQ+ community. Verniss McFarland III, founder of The Mahogany Project, a Houston nonprofit that provides resources and support to the Black Trans community, explained: "Drag is how we've buried our dead, and

---

31 Todd Camp, *Fort Worth LGBT Community*, TEX. STATE HISTORICAL ASS'N (May 12, 2021), https://www.tshaonline.org/handbook/entries/fort-worth-lgbt-community.

32 *Id.*

33 Steve Ramos and David Taffet, *Drag queens pulled us through, one dollar at a time*, DALLAS VOICE (April 25, 2014), https://dallasvoice.com/drag-queens-pulled-through-dollar-time/.

34 *Id.*

how we've raised money for our community and programs. . . . Drag provides sustainable life to all of our community."[35]

This history underscores the social, political, and cultural context that gives meaning to drag shows and strengthens their expressive nature. QEC's drag shows cannot be reduced to pure conduct but are part of a legacy of joy, liberation, and expression that has spanned generations. Just as someone who sees a Jackson Pollock painting for the first time might not know its significance to the history of art—and consider it splattered paint with no message or meaning—the Board clearly failed to understand the rich history and context of Draggieland.

### C. Appellants' Attempts to Distinguish this History Fail

Despite this history, Appellants call the definition of drag "imprecise and ambiguous" because the term has implicated everything from Shakespeare to Vaudeville to the Texas State Fair. *See* Appellants' Br. 22–23 (citing Brief of ACLU & Equality Texas, *Spectrum WT v. Wendler*, No. 23-10994, 2025 WL 3540028, at 7-11 (5th Cir. Dec. 3, 2025)). But the breadth of a performance tradition is not a defect in its constitutional protection; it is a problem for the censor. The government cannot ban all musicals just

---

35 Robert Downen, *How Texas activists turned drag events into fodder for outrage*, TEX. TRIBUNE (Feb. 24, 2023, 5:00 AM), https://www.texastribune.org/2023/02/24/texas-drag-protests-children/.

because they are markedly different from each other and have evolved over the centuries.

The Board also chose its own definition of "Drag Show Events," applied it to cancel a specific show, and now tells this Court the category is too indeterminate to warrant constitutional protection. But it cannot have it both ways when the Board has already decided what it seeks to prohibit. The Board's chosen definition also falls far short of the "narrow, objective, and definite standards" that any prior restraint demands. *See Se. Promotions*, 420 U.S. at 553; Appellees' Br. 44-45.

Appellants' related complaint that QEC "failed to marshal evidence" linking drag to LGBTQ+ culture, Appellants' Br. 22–23, fares no better. The place of drag in American and Texan performance is a matter of general historical knowledge of the sort courts routinely notice—as the district court did in citing the Royal Shakespeare Company and Harvard's Hasty Pudding Club. *See Mahomes*, 772 F. Supp. 3d at 805. More fundamentally, the history of an art form is a legislative fact, to which formal evidentiary rules are unnecessary. *See Dunagin v. City of Oxford*, 718 F.2d 738, 748 n.8 (5th Cir. 1983) (en banc) (plurality opinion of Reavley, J.) (legislative facts "are often considered and cited by the Supreme Court with or without introduction into the record or even consideration by the trial court"); *accord Lockhart v.*

*McCree*, 476 U.S. 162, 168 n.3 (1986). Courts have long taken this approach to the arts—including drag. *See Norma Kristie, Inc. v. City of Oklahoma City*, 572 F. Supp. 88, 92 (W.D. Okla. 1983) (relying, without record evidence, on "acclaimed performances by Dustin Hoffman, Julie Andrews, Flip Wilson, Harvey Korman, Tony Curtis and Milton Berle in the roles of female impersonators"). Appellants themselves also ask this Court to notice extra-record materials, Appellants' Br. 6 n.2, including the 1943 film referenced above. *See supra* n.7.

## VI. Drag Is Neither Demeaning to Women Nor Inherently Sexual —and Even If It Were, the First Amendment Would Still Protect It

Despite the history and significance of drag, the Board expressed unequivocal disapproval of ***all*** drag performances and the underlying messages they express. Even taken as true, the Board's views neither justify a prohibition on drag nor alter the constitutional standards that govern it. But they are also wrong in their views, and at odds with how drag has long been used to challenge—not reinforce—the constraints placed on women.

Nothing in the record supports the Board's contention that drag shows inherently "parody the female body type," "demean women," or "involve sexualized, vulgar or lewd conduct." *Mahomes*, 772 F. Supp. 3d at 799. First, people of every sex and gender perform drag and cherish the art form.

"[D]rag is open to all genders, and how someone identifies outside of their drag persona does not dictate whether they are a drag king or queen."[36] The Board here aimed its Resolution solely at drag queens. But this definition misses the fact that countless women also participate in and celebrate drag.

Drag also empowers women and people of all genders, because "[d]rag, at its very core, has been about the self-expression of the oppressed, giving a voice to those whom society would rather silence."[37] Nothing in this record shows that any Draggieland performance has harmed or denigrated women. Anyone who finds a drag show offensive to women may say so or choose not to attend, but the First Amendment does not allow university officials to ban entire genres they find offensive.

The Fourth Circuit held that a fraternity's "ugly woman contest"—students in women's clothing and blackface, a skit the university deemed "incompatible with . . . the University's mission of promoting diversity"—still had to be analyzed "within the constitutionally protected rubric of entertainment." *Iota Xi*, 993 F.2d at 389-90, 392-93. If that skit was protected, a student pageant celebrating LGBTQ+ culture plainly is. Any

---

36 Vienna J. Ainsworth, *Legalizing Homophobia*, 88 Alb. L. Rev. 643, 645 (2025).

37 *Id.* at 645-46.

restriction aimed at a performance's viewpoint must satisfy the most exacting scrutiny—a burden the Board has not attempted to carry. "First Amendment principles governing live entertainment are relatively clear: short of obscenity, it is generally protected." *Id.* at 389–90; *see also Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring) (the remedy for odious speech "is more speech, not enforced silence").

Drag is also "not inherently sexual or explicit and is a popular form of entertainment for all ages." *Naples Pride, Inc. v. City of Naples*, No. 2:25-CV-291-JES-KCD, 2025 WL 1370174, at *2 (M.D. Fla. May 12, 2025), *injunction stayed pending appeal* (11th Cir. June 6, 2025). Like any art form, drag is tailored to its audience, ranging from "all-ages shows like drag story time" to "sexual shows" at venues "restricted to ages 21+." *See Woodlands Pride v. Paxton*, 168 F.4th 293, 307 (5th Cir. 2026). But even if some of Draggieland's performances could be considered "vulgar" or "lewd"—they would still be shielded from unbridled censorship.

"[S]exual expression which is indecent but not obscene is protected by the First Amendment." *Sable Communications of California, Inc. v. FCC*, 492 U.S. 115, 126 (1989); see *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975). The test is not whether a show is "objectively offensive,"

*Mahomes*, 772 F. Supp. 3d at 799, but whether it satisfies the Supreme Court's exacting requirements for obscenity, or obscenity as to minors.

Ultimately, the Board tethered its ban neither to the presence of minors nor to sexual—much less obscene—content. A categorical prohibition on a cherished art form reaches far beyond the narrow obscenity exception, and nothing in the record justifies so sweeping a restraint.

## CONCLUSION

The preliminary injunction of the district court should be affirmed.

DATED: September 3, 2026

Respectfully submitted,

*/s/ Brian Klosterboer*

Brian Klosterboer
Charelle Lett
Chloe Kempf
Thomas Buser-Clancy

Counsel for *Amici Curiae* ACLU of Texas and Equality Texas

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
OF TEXAS
P.O. Box 8306
bklosterboer@aclutx.org
clett@aclutx.org
ckempf@aclutx.org
tbuser-clancy@aclutx.org

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of September, 2026, a true and corrected copy of the foregoing was filed electronically using the CM/ECF system, which served counsel for the parties.

*/s/ Brian Klosterboer*
Brian Klosterboer

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 6,478 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Georgia, font size 14.

*/s/ Brian Klosterboer*
Brian Klosterboer

## CERTIFICATIONS UNDER ECF FILING STANDARDS

Pursuant to paragraph A(6) of this Court's ECF Filing Standards, I hereby certify that (1) any required privacy redactions have been made, 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Brian Klosterboer*
Brian Klosterboer